UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SOUTH MIDDLESEX OPPORTUNITY         )
COUNCIL, INC. and SOUTH MIDDLESEX   )
NON-PROFIT HOUSING CORPORATION      )
                                    )
        Plaintiffs,                 )
                                    )
v.                                  )
                                    )
TOWN OF FRAMINGHAM,                 )
PETER C. S. ADAMS, STEVEN ORR,      )    CIVIL ACTION
LAURIE LEE and CYNTHIA LAURORA, in  )    NO. 07-12018-DPW
their individual capacities and as  )
they are Framingham Town Meeting    )
Members, DENNIS GIOMBETTI,          )
GINGER ESTY and JASON SMITH, in     )
their individual capacities and     )
as they are members of the          )
Framingham Board of Selectmen,      )
SUSAN BERNSTEIN, CAROL SPACK,       )
ANDREA CARR-EVANS and ANN WELLES,   )
in their individual capacities and  )
as they are members of the          )
Framingham Planning Board,          )
ALEXIS SILVER and JULIAN M. SUSO,   )
in their individual and official    )
capacities, and JOHN DOES I-V, and  )
JANE DOES I-V, in their individual  )
and official capacities             )
                                    )
        Defendants.                 )


MEMORANDUM AND ORDER
September 30, 2008

        The relocation of a residential substance abuse treatment

program in Framingham gives rise to this litigation.  When the

South Middlesex Opportunity Council, Inc. ("SMOC"), a nonprofit

educational and social service provider, attempted to move its

Sage House Program, it encountered opposition from various

Framingham residents and town officials.  After two years of

delays, the Plaintiffs filed the instant action against the Town of Framingham itself and certain town officials and employees, including Town Meeting Members and members of the Board of Selectmen and Planning Board.  In a sprawling complaint, the Plaintiffs seek damages and injunctive relief for various federal and state law violations including violations of the Fair Housing Act ("FHA"), the Americans with Disabilities Act ("ADA"), the Federal Rehabilitation Act of 1973 (the "Rehabilitation Act"), the general federal Civil Rights Act (42 U.S.C. § 1983), the Massachusetts Civil Rights Act (Mass. Gen. L. ch. 12 § 11H-I), common law defamation, and civil conspiracy.  The Defendants have all filed motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), and certain Defendants have filed additional motions to dismiss pursuant to Mass. Gen. Laws ch. 231, § 59H, commonly referred to as the Massachusetts anti-SLAPP statute.

## I. BACKGROUND

### A.  The Parties

The Plaintiffs are nonprofit educational corporations that provide a range of social services to low-income and disadvantaged individuals in the Metrowest region of Massachusetts.  (Compl. ¶¶ 9-10.)  SMOC formed the South Middlesex Non-Profit Housing Corporation ("SMNPHC") in 1986, a wholly owned subsidiary.  (Compl. ¶¶ 9-10.)  SMNPHC owns, develops, and manages SMOC's real estate portfolio. (Compl. ¶¶ 34-35.)  SMOC has operated in Framingham for over four decades and has administration offices there.  (Compl ¶ 41.)

The Plaintiffs have filed this Complaint against the Town of Framingham (the "Town"), four Town Meeting Members, three members of the Board of Selectmen, four members of the Framingham Planning Board, the Human Services Coordinator of the Town, the Town Manager, anonymous members of the Town's police department and other anonymous Town officials and employees.

The Town is a body corporate and politic established under the laws of the Commonwealth of Massachusetts.  (Compl. ¶ 11.)

The four Town Meeting Member defendants are:

- **Steven Orr:** Orr was elected a Town Meeting Member in 2000 and also served as a member of the Payment in Lieu of Taxes ("PILOT") Committee.  (Orr Special Motion at 6, 11; Compl. ¶ 194.)  He created the Frambors website, which includes a web board for Town Meeting Members to post messages and also has a link to the Stop Tax Exempt Private Property Sprawl ("STEPPS") website.  (Compl. ¶ 13.)

- **Laurie Lee:** Lee was elected a Town Meeting Member in 2005 and was also appointed to serve on the PILOT Committee.  (Lee Special Motion Aff. ¶¶ 4-6.)  The Town's PILOT Program (Payment In Lieu Of Taxes) is directed at securing voluntary payments from nonprofit social service providers in the Town.

- **Cynthia Laurora:** Laurora was appointed to the PILOT Committee in 2005 and elected a Town Meeting Member in 2006.  (Laurora Special Motion Aff. ¶ 3.)

- **Peter C. S. Adams:** Adams was elected a Town Meeting Member in March 2007.  (Compl. ¶ 12.)  He is also the founder and Director of Communications for STEPPS and set up a website for the organization in 2005.  (Compl. ¶ 12.)

The Town of Framingham has adopted a "limited town meeting" form of government that vests executive authority in an elected Board of Selectmen and the Town Manager.  The Plaintiffs have

filed claims against **Dennis Giombetti**, the Chairman of the Board of Selectmen; **Jason Smith**, the Vice-Chair of the Board of Selectmen; and **Ginger Esty**, a member of the Board of Selectmen. (Compl. ¶¶ 16-18.)  They have also filed claims against **Julian M. Suso**, who was the Town Manager at all relevant times.  (Compl. ¶ 25.)

The Town's Planning Board is charged with adopting and implementing the Town's land use and municipal planning policies. (Compl. ¶ 11.)  The Plaintiffs have filed claims against four Planning Board members:  **Susan Bernstein**, **Carol Spack**, **Andrea Carr-Evans**, and **Ann Welles**.  (Compl. ¶¶ 19-22.)

The position of Human Services Coordinator was created on the recommendation of the PILOT Committee.  (Compl. ¶ 23.)  The Plaintiffs have filed claims against **Alexis Silver**, who has been the Human Services Coordinator since approximately January 2007. (Compl. ¶ 23.)

**B.  SMOC's Programs**

    1.  *The Sage House Program*

        *a.  Site Plan Review*

The Sage House is a residential treatment program that provides substance abuse treatment and support services to homeless or at-risk families.  (Compl. ¶¶ 47-48.)  SMOC has operated the program continuously as a "Dover Amendment" exempted use at 61 Clinton Street in Framingham since 1991.  (Compl. ¶

4

47.)  The Dover Amendment states:

> No zoning ordinance or by-law shall regulate or
> restrict the interior area of a single family
> residential building nor shall any such ordinance or
> by-law prohibit, regulate or restrict the use of land
> or structures . . . for educational purposes on land
> owned or leased . . . by a nonprofit educational
> corporation . . . .

Mass. Gen. Laws ch. 40A, § 3.  *See generally Boyajian v.
Gatzunis,* 212 F.3d 1 (1st Cir. 2000) (discussing Dover Amendment
in context of religious uses).

In order to expand the Sage House, SMOC decided to relocate
the program and purchased a property at 517 Winter Street in June
2005 for this purpose.  (Compl. ¶¶ 53-54.)  Community opposition
began after SMOC signed the purchase and sale agreement for the
property in March 2005, and the STEPPS organization was formed
during this time period.  (Compl. ¶ 58.)  The STEPPS website
posted the following message:  "The first public mention of the
517 Winter issue that sparked the creation of STEPPS was made on
the Frambors mailing list, following the quintessential
neighborhood moment of neighbors gathering in the street to
discuss neighborhood issues."  (Compl. Ex. 1.)  Starting in May
2005, STEPPS members began making public and written statements
opposing the relocation of the Sage House to 517 Winter Street.
(Compl. ¶¶ 59-62.)  These statements included commentary by
members and on the organization's website that SMOC acted
"secretly" or in a "covert" manner to purchase 517 Winter Street

and planned to turn the property into "a homeless drug rehab shelter." (Compl. ¶¶ 58-64.)

In June, during a regular Board of Selectmen meeting, the Board held a conference with STEPPS members regarding 517 Winter Street. (Compl. ¶ 70.) The Chair of the Board of Selectmen, Giombetti, subsequently instructed the Building Commissioner to provide the Board with a list of permits that SMOC would need in order to relocate the Sage House, and the Building Commissioner indicated he would require SMOC to submit complete documentation confirming that it was entitled to a Dover Amendment exempted permit. (Compl. ¶¶ 74-75.)

Prior to August 2005, the Town of Framingham's Zoning By-Law specifically exempted Dover Amendment protected projects from having to go through a Site Plan Review. (Compl. ¶ 77.) STEPPS members, including certain Town Meeting Members, began discussions with the Board of Selectmen and the Planning Board to amend the By-Law. (Compl. ¶ 78.) On July 12, 2005, SMOC had filed a building permit change of use application with the Building Department, seeking approval to operate the Sage House Program at the new location, 517 Winter Street. (Compl. ¶ 80.) On July 28, 2005, the Planning Board voted unanimously to support an amendment to the Zoning By-Law removing the previous Site Plan Review exemption for Dover Amendment properties. (Compl. ¶ 86.) At a Special Town Meeting held on August 3, 2005, the Town

adopted the By-Law amendment, along with additional restrictions. (Compl. ¶ 87.)  The amendment was sent to the Attorney General of the Commonwealth for final approval.  (Compl. ¶ 88.)

On August 11, 2005, in accordance with the newly adopted By-Law amendment, the Building Commissioner denied SMOC's change of use application.  (Compl. ¶ 89.)  SMOC appealed this decision to the Framingham Zoning Board of Appeals ("ZBA") on September 9, 2005.  (Compl. ¶ 95.)

On November 16, 2005, the Attorney General approved the provisions of the By-Law amendment that would subject Dover Amendment projects to limited Site Plan Review.  (Compl. ¶ 102.) Specifically, the Attorney General's ruling stated:

> [The Dover Amendment] provides exemptions for the use
> of land or structures for religious purposes and
> educational purposes.  While Section IV.I.2 [of the By-
> Law amendment] no longer expressly exempts uses
> protected under [the Dover Amendment], any application
> of the site plan review process to such uses may only
> be applied to the extent allowed under [the Dover
> Amendment], that is, to check for compliance with
> reasonable regulations pertaining to bulk and height of
> structures, yard size, lot area, setbacks, open space,
> parking, and building coverage requirements.  It is
> only in those instances in which site plan review may
> be utilized.  It is our view that site plan review is
> not facially inconsistent with state law to ascertain
> whether a protected use complies with those <u>reasonable
> regulations</u>.  However, we caution the town that it may
> need to modify its site plan requirements and process
> in order to avoid a challenge that the town is applying
> unreasonable regulations to a protected use.  For
> example, requiring the submittal of a lengthy, detailed
> site plan application or requiring an application to
> wait nine to twelve months for a site plan review may
> be found to be an unreasonable regulation of a
> protected use, and thus, inconsistent with [the Dover

7

Amendment].

(Compl. ¶ 102; Ex. 30 at 4-5.)  After the Attorney General's ruling, SMOC withdrew its ZBA appeal and submitted a requested parking plan proposal to the Building Commissioner.  (Compl. ¶¶ 104-05.)  On November 22, 2005, the Town Counsel submitted an opinion letter to the Building Commissioner, the Board of Selectmen, and the Planning Board indicating that "it is more likely than not that a reviewing court would find that the proposed use of the [Winter Street property] . . . would constitute an educational use" and that "[i]n this instance, any application of site plan review would appear to be primarily limited to parking concerns."  (Compl. ¶¶ 106-07; Ex. 31.)

SMOC submitted an application for site plan approval to the Planning Board on February 17, 2006, seeking waivers of all Site Plan Review requirements other than the parking plan.  (Compl. ¶ 113.)  On February 23, 2006, the Planning Board Administrator requested further clarification from the Town Counsel as to whether the Sage House Program qualified for Dover Amendment protection and whether SMOC's application triggered major rather than limited Site Plan Review.  (Compl. ¶¶ 114-15.)  On April 6, 2006, the Town Counsel issued a memorandum to the Planning Board reaffirming the earlier opinion that the Sage House Program more likely than not constituted an educational use and further stating:  "Because this is a pre-existing structure, this limits

8

the application of site plan review to parking concerns."
(Compl. ¶¶ 117-18; Ex. 40.)

Despite the Town Counsel's memorandum, on June 9, 2006, the
Planning Board requested further input from the Building
Commissioner on the applicability of the Dover Amendment to
SMOC's intended use at 517 Winter Street. (Compl. ¶ 121.) On
June 13, 2006, the Building Commissioner responded that it was
his opinion that the proposed use qualified as an exempt use
pursuant to the Dover Amendment. (Compl. ¶ 123.)

On June 22, 2006, the Planning Board held the first of seven
public hearings on SMOC's 517 Winter Street application for Site
Plan Review. (Compl. ¶ 127.) Although the Site Plan Review was
supposed to be limited to parking concerns, the Planning Board
discussed issues including the applicability of the Dover
Amendment, future development at the property, and the interior
layout. (Compl. ¶ 127.) The Planning Board held six additional
public hearings from September 2006 through January 2007.
(Compl. ¶ 130.) During several of these hearings, members of the
Planning Board as well as Adams and other STEPPS members devoted
a significant amount of time to discussing the applicability of
the Dover Amendment. (Compl. ¶ 130.) On September 18, 2006, the
Planning Board Director issued a memorandum to the Building
Commissioner stating that "the Board requested me to find out how
your office verified that the [517 Winter Street] use was exempt

9

under [the Dover Amendment].   Further, the Board would like to know how you will monitor The Sage House in the future to determine that the use remains exempt or not." (Compl. ¶ 139; Ex. 49.)

In response to this memorandum, the Town Counsel stated that a program to monitor the Sage House for compliance with the Zoning By-Law "could subject the Town to potential liability for violation of the Federal Fair Housing Act, and potentially other federal and state laws prohibiting discrimination." (Compl. ¶ 141.)   The Town Counsel further stated that the Building Commissioner and not the Planning Board is charged "with determining whether a use or proposed use has satisfied the requirements of the Dover Amendment" and that "[t]he scope of the Planning Board's review of an exempt educational use under [the Zoning By-Law] is limited." (Compl. ¶ 142; Ex. 51.)

In October 2006, the Board of Selectmen voted to subject the Sage House Program to further scrutiny regarding whether it qualified for Dover Amendment protection.   (Compl. ¶ 152.)   On November 28, 2006, the Town Counsel issued a memorandum to the Board of Selectmen stating:

> You have requested an opinion as to whether the Building Commissioner has the authority to reconsider and reverse a previous determination that a particular proposed use is exempt from Zoning Bylaws' use provisions as an educational use under the Dover Amendment. . . .
>
> Where there have already been two determinations

10

issued, one by the Building Commissioner on June 13, 2006, and the second by the Acting Building Commissioner on November 1, 2006, that the proposed use of the facility at 517 Winter Street is an exempt use under the Dover Amendment, the Building Commissioner should stand by these determinations unless he obtained evidence that the information provided by the applicant that was relied upon by the Building Commissioner contains fraudulent misrepresentation.

(Compl. ¶ 158; Ex. 63 at 1, 3.)

The Planning Board concluded the public hearings at the end of the January 25, 2007 hearing.  (Compl. ¶ 170.)  On January 29, 2007, Silver, the Town's newly hired Human Services Coordinator, called the Sage House Program's referral source and stated that the Town was going to make it difficult for SMOC to relocate the Sage House Program to 517 Winter Street.  (Compl. ¶ 171.)

In April 2007, the Planning Board voted to approve the Site Plan Review.  (Compl. ¶ 176.)  On August 23, 2007, SMOC received a temporary occupancy permit for 517 Winter Street.  (Compl. ¶ 190.)  In September, a neighbor filed an appeal with the Framingham ZBA seeking to overturn the issuance of the temporary occupancy permit and the determination that the Sage House Program qualified as a Dover Amendment exempt use.  (Compl. ¶ 191.)

### b.  Oral and Written Statements Regarding SMOC

During the two-year time period of land use review by various Town entities, several of the Defendants made oral or

written statements regarding SMOC and the Sage House Program.  In December 2005, with regard to SMOC's Re-Entry Housing program that provides housing for individuals leaving the correctional system, the *Metrowest Daily News* quoted Esty as saying, "I think this exposes the fact that there is an underlying plan . . . for designating Framingham as a place that would be suitable for centering a large population of arsonists, sex offenders and criminals." (Compl. ¶ 109.)  Adams made the following post on Frambors in January 2006:  "Now we have evidence of SMOC actively pursuing criminals as clients." (Compl. ¶ 109.)  In May 2006, Orr posted on Frambors:  "The Dept of Corrections is the maker of the contract to SMOC to troll the prison system to look for arsonists and sex criminals to bring to Framingham and Worcester." (Compl. ¶ 109.)

In November 2006, several Town Meeting Members including Laurora filed complaints claiming that 61 Clinton Street, the existing location of the Sage House, and 517 Winter Street were violating zoning requirements. (Compl. ¶ 155.)  These complaints stated that the properties were "not in compliance with the law," should not qualify as a Dover Amendment exempt property, and were "attempting to open a neighborhood drug rehab center." (Compl. ¶ 156.)  The Building Commissioner ultimately concluded that there was no basis for any of the complaints. (Compl. ¶ 157.)

At the January 2007 public hearings, Adams, Laurora, and Lee

commented on various matters that were not within the scope of what was to be discussed at the public hearings.  (Compl. ¶ 167.) Based on the comments, the Planning Board demanded additional concessions from SMOC.  (Compl. ¶ 167.)

Adams and Orr posted several statements regarding SMOC on the Frambors website.  In February 2007, in reference to SMOC, Adams posted:  "Clearly the worst of the bunch, they are bringing prostitutes, drug addicts, and other criminals from across the state to live in Framingham using their Dover Amendment trump card."  (Compl. ¶ 172.)  In March 2007, Orr posted:  "They troll the cities, the prisons, everywhere they can to find substance abusers and violent criminal offenders to place them here in Framingham."  (Compl. ¶ 172.)  In September 2007, Adams stated in his Frambors post:  "SMOC is currently occupying 517 Winter on a temporary occupancy permit which expires in November.  They hope to have their permanent permit by then.  We are working in the intervening time to convince the state to revoke their contract and pull their financing."  (Compl. ¶ 237.)

2.  *The Common Ground Shelter*

The Common Ground Shelter was an emergency residential shelter program that SMOC formerly operated at 105 Irving Street. (Compl. ¶ 201.)  In October 2005, Orr and another individual entered the Common Ground Shelter and indicated they had authority to "inspect" the shelter even though they did not

13

actually have such authority.  (Compl. ¶ 203.)  They effectively
trespassed and intruded on the privacy of the disabled residents
at the shelter.  (Compl. ¶ 203.)  In July 2006, the Board of
Selectmen voted to reexamine whether the Common Ground Shelter
provided the educational activities necessary to qualify for
Dover Amendment protection.  (Compl. ¶ 205.)  On information and
belief, the Plaintiffs allege that Giombetti, Esty, and Smith
pressured the Building Commissioner to revisit his decision that
the shelter represented a qualified use pursuant to the Dover
Amendment.  (Compl. ¶ 206.)  The Building Commissioner requested
additional information from SMOC that no other social service
program was required to provide.  (Compl. ¶ 206.)

The Plaintiffs allege that as part of an overall conspiracy,
Framingham police detectives arrived on August 22, 2006 to
question shelter residents about the services they were receiving
at the shelter.  (Compl. ¶ 207.)  The detectives indicated that
they were investigating the educational use of the shelter.
(Compl. ¶ 207.)  They returned throughout the day and attended an
Alcoholics Anonymous meeting where they interviewed one of the
participants.  (Compl. ¶ 207.)

Thereafter, as part of its strategic plan, SMOC closed the
Common Ground Shelter in October of 2006.  (Compl. ¶ 209.)

   3.  *Larry's Place*

14

In 2005, SMOC purchased the property at 90 Lincoln Street in Framingham for purposes of establishing a supportive residential program for homeless disabled veterans. (Compl. ¶ 218.) This program, known as "Larry's Place," requires participants to attend educational programs to help them achieve self-sufficiency. (Compl. ¶ 219.)

In July 2007, SMOC submitted a building permit application for 90 Lincoln Street to the Building Commissioner. (Compl. ¶ 221.) The Building Commissioner requested additional information, all of which SMOC provided except for the request for information on SMOC's funding sources for the program. (Compl. ¶ 224.) In September, the Building Commissioner denied SMOC's request for a building permit. (Compl. ¶ 225.) In addition, he required that SMOC file an application for a Special Permit with the ZBA and go through a full Site Plan Review with the Planning Board. (Compl. ¶ 225.) After the Building Commissioner denied SMOC's request for Dover Amendment protection for Larry's Place, SMOC appealed this decision to the ZBA, which reversed the determination in February 2008. (Compl. ¶ 246.)

## C. Town of Framingham's Actions

In June 2005, the Town Meeting members voted to fund research for and institution of a Payment in Lieu of Taxes ("PILOT") program for nonprofit social service providers in Framingham. (Compl. ¶ 192.) The PILOT program permits nonprofit

15

social services - even those that are tax-exempt - to make voluntary contributions to the town.  (Compl. ¶ 6.)  The Town Counsel cautioned that limiting the PILOT program to nonprofit social service providers could raise issues of disparate treatment.  (Compl. ¶ 195.)  Throughout the 517 Winter Street public hearings, Bernstein, a member of the Planning Board, repeatedly requested that SMOC make PILOT payments.  (Compl. ¶ 198.)

As a recipient of Community Development Block Grants ("CDBG") funding, the Town of Framingham is required to make certain certifications to the Department of Housing and Urban Development ("HUD").  (Compl. ¶ 240.)  In the Town's 2008 Annual Action Plan submitted to HUD, the Town discussed "positive initiatives" by SMOC concerning Larry's Place and the Sage House at 517 Winter Street.  In its Consolidated Annual Performance and Evaluation Report, the Town listed the two projects as "priority activities."  (Compl. ¶¶ 242-44.)  The Plaintiffs allege that the Town made repeated false certifications to HUD that it would affirmatively further fair housing in Framingham.  (Compl. ¶ 247.)


## II. STANDARD OF REVIEW

A Fed. R. Civ. P. 12(b)(6) motion to dismiss is evaluated by "taking as true the well-pleaded facts contained in the complaint

16

and drawing all reasonable inferences therefrom in the plaintiff's favor." *Puoung Luc v. Wyndham Mgmt. Corp.*, 496 F.3d 85, 88 (1st Cir. 2007) (quoting *Garrett v. Tandy Corp.*, 295 F.3d 94, 97 (1st Cir. 2002)). Dismissal is appropriate "if the complaint fails to state facts sufficient to establish a 'claim to relief that is plausible on its face.'" *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 320 (1st Cir. 2008) (Lipez, J.) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007)).

### III. ANALYSIS

The Defendants filed eleven separate motions for dismissal.[1] I evaluated at the threshold the four special motions to dismiss pursuant to the Massachusetts anti-SLAPP statute.[2] I ruled at the motion hearing in this matter that, for reasons set forth more fully in Section III.A., *infra,* the state anti-SLAPP statute is not applicable in federal court. In Section III.B. of this Memorandum, I take up the several substantive claims the Plaintiffs have asserted before addressing the conspiracy claims in Section III.C.

---

[1] Orr also filed a motion for leave to file a reply brief in support of his Rule 12(b)(6) motion to dismiss. (Docket No. 124.) He argued that the federal Communications Decency Act, 47 U.S.C. § 230, provides him with immunity from claims for which he may be liable as the moderator or proprietor of the Frambors website.

[2] The acronym "SLAPP" stands for Strategic Litigation Against Public Participation.

A.  **Massachusetts Anti-SLAPP Statute**

The four Town Meeting Member defendants - Orr, Lee, Laurora, and Adams - filed special motions to dismiss under the anti-SLAPP statute.

The Massachusetts Legislature enacted the anti-SLAPP statute, Mass. Gen. Laws ch. 231, § 59H, to provide increased protection to "private citizens . . . exercising their constitutional right to speak out against development projects or other matters of concern to them and their communities." *Kobrin v. Gastfriend*, 443 Mass. 327, 336-37 (2005).  "SLAPP suits have been characterized as 'generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so.'" *Duracraft Corp. v. Holmes Prods. Corp.*, 427 Mass. 156, 161 (1998) (quoting *Wilcox v. Superior Court*, 27 Cal. App. 4th 809, 816-17 (App. Ct. 1994)).  The statute provides:

> In any case in which a party asserts that the civil
> claims . . . against said party are based on said
> party's exercise of its right of petition under the
> constitution of the United States or of the
> commonwealth, said party may bring a special motion to
> dismiss.  The court shall advance any such special
> motion so that it may be heard and determined as
> expeditiously as possible.  The court shall grant such
> special motion, unless the party against whom such
> special motion is made shows that: 1) the moving
> party's exercise of its right to petition was devoid of
> any reasonable factual support or any arguable basis in
> law and 2) the moving party's acts caused actual injury
> to the responding party.

Mass. Gen. Laws ch. 231, § 59H.

18

The Plaintiffs argue that the Massachusetts anti-SLAPP statute does not apply in the context of either federal claims or state claims brought in federal court.  Aside from Adams, who only argues for dismissal of state claims in his motion, the other three Defendants all argue in their special motions for dismissal of both the state and federal claims against them.

   1.  *Federal Claims*

Orr, Lee, and Laurora do not distinguish between the state and federal claims in their respective motions.  They argue that *U.S. v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963 (9th Cir. 1999), *cert. denied*, 530 U.S. 1203 (2000), supports their assertion that anti-SLAPP statutes should be applied generally in federal court.  The Ninth Circuit had concluded that the California anti-SLAPP statute was applicable in federal court. *Lockheed Missiles*, 190 F.3d at 973.  But unlike the instant case, *Lockheed Missiles* was a diversity action and the court only addressed state claims in its decision.  *See In re Bah*, 321 B.R. 41, 46 (9th Cir. B.A.P. 2005) ("While the Ninth Circuit has held that the anti-SLAPP statute applies in diversity actions . . . it has not decided whether it applies in cases involving federal question jurisdiction.").  Other courts that have had the opportunity to address the issue have rejected the applicability of state anti-SLAPP statutes to federal claims in federal court. *See Summit Media LLC v. City of Los Angeles, California*, 530 F.

Supp. 2d 1084, 1094 (C.D. Cal. 2008) ("Several District Courts have determined that the anti-SLAPP statute does not apply to federal question claims in federal court because such application would frustrate substantive federal rights."); *In re Bah*, 321 B.R. at 46 (finding that applying anti-SLAPP rules to bankruptcy cases could undermine the processes of the bankruptcy court); *Yeshiva Chofetz Chaim Radin, Inc. v. Village of New Hempstead*, 98 F. Supp. 2d 347, 360 (S.D.N.Y. 2000) (refusing to apply the standards of the New York anti-SLAPP statute to federal claims brought in federal court); *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 63 F. Supp. 2d 1127, 1130 (N.D. Cal. 1999) (finding no support in *Lockheed* or elsewhere for the applicability of anti-SLAPP statutes to federal question claims).

There is no support for applying the anti-SLAPP statute to federal claims. Federal law governs both the substance and procedure in the litigation of federal claims. *See Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 371 (1st Cir. 1980), *abrogated on other grounds*, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 776 (1992) ("The doctrine of *Erie R.R. Co. v. Tompkins* . . . is inapplicable to claims created and governed by federal law . . . .").

Lee argues in her special motion that there are substantive provisions to the Massachusetts anti-SLAPP statute and that these substantive provisions should be applied in federal question cases. Assuming that portions of the anti-SLAPP statute, such as

20

perhaps the attorney's fee award,[3] can be characterized as substantive in nature, only serves to underscore that these substantive state law provisions cannot be applied to federal claims.  Mandatory imposition of attorney's fees on the losing non-moving party is in direct conflict with certain provisions of federal law.  *See* 42 U.S.C. § 3613(c)(2) (providing that in a civil action for a violation of the FHA, "the court, in its discretion, *may* allow the prevailing party, other than the United States, a reasonable attorney's fee and costs" (emphasis added); *Hughes v. Rowe*, 449 U.S. 5, 14 (1980) (per curiam) (holding that a plaintiff who ultimately loses his § 1983 claim is *not automatically assessed* attorney's fees).  State substantive law cannot be used to trump federal substantive law when analyzing federal claims; thus, I conclude that the Massachusetts anti-SLAPP statute is inapplicable to the Plaintiffs' federal claims.

   *2.  State Claims*

   The Massachusetts anti-SLAPP statute would presumptively apply to state claims in federal court if the statute is viewed as state substantive law.  Under the *Erie* doctrine, federal courts reviewing state law claims generally apply federal procedural law and state substantive law.  *See Hanna v. Plumer,*

---

[3] Pursuant to the Massachusetts anti-SLAPP statute:  "If the court grants such special motion to dismiss, the court *shall* award the moving party costs and reasonable attorney's fees, including those incurred for the special motion and any related discovery matters."  Mass. Gen. Laws ch. 231, § 59H (emphasis added).

380 U.S. 460, 465 (1965).  This rule holds not only for state
claims in diversity cases, but also for those pendent state
claims that arise in federal question cases.  *United Mine Workers
of America v. Gibbs*, 383 U.S. 715, 725 (1966); *Doty v. Sewall*,
908 F.2d 1053, 1063 (1st Cir. 1990).

Whether state law is procedural or substantive is not always
clearly delineated; "[t]he line between 'substance' and
'procedure' shifts as the legal context changes."  *Hanna*, 380
U.S. at 471.  Nevertheless, that line is discernible with respect
to the Massachusetts anti-SLAPP statute and I agree with my
colleagues in this District who have concluded that the
Massachusetts anti-SLAPP statute is procedural.  *Stuborn Ltd.
P'ship v. Bernstein*, 245 F. Supp. 2d 312, 316 (D. Mass. 2003)
(Lasker, J.); *Baker v. Coxe*, 940 F. Supp. 409, 417 (D. Mass.
1996) (Saris, J.), *aff'd*, 230 F.3d 470 (1st Cir. 2000), *cert.
denied*, 532 U.S. 995 (2001).  The statute governs the rules for
the dismissal of claims and regulates the burden shifting that
occurs when a defendant introduces evidence that the plaintiff
has engaged in a SLAPP suit.

Where the state law rule is procedural, the federal court
must apply the federal rule if the state rule conflicts with it.
The test for determining whether there is a conflict between the
federal and state procedural rules is whether a federal rule "is
sufficiently broad to control the issue."  *Hanna*, 380 U.S. at
471-72; *Gil de Rebollo v. Miami Heat Ass'ns, Inc.*, 137 F.3d 56,

65 n.5 (1st Cir. 1998); *Commercial Union Ins. Co. v. Walbrook Ins. Co.*, 41 F.3d 764, 772 (1st Cir. 1994).  Generally, "[w]hen a situation is covered by one of the Federal Rules . . . the court has been instructed to apply the Federal Rule."  *Hanna*, 380 U.S. at 471.

In the instant action, Orr, Lee, Laurora, and Adams argue that the Massachusetts anti-SLAPP statute does not conflict with the Federal Rules of Civil Procedure governing motions to dismiss.  As I have noted, two of my colleagues have had an opportunity to address this issue, and both concluded that the anti-SLAPP statute conflicts with Fed. R. Civ. P. 12(b)(6), and, therefore, cannot be applied.  *See Stuborn*, 245 F. Supp. 2d at 316; *Baker*, 940 F. Supp. at 417 ("[T]his Court will examine the allegations of the complaint under the well-worn standards governing Fed. R. Civ. P. 12(b)(6) motions, not the hybrid statutory procedure in section 59H which is more akin to a summary judgment motion.").

The defendants argue alternatively that *Stuborn* was wrongly decided or that it is distinguishable from the instant case because it was a diversity action.  The rules of *Erie* and *Hanna*, however, apply both to diversity cases and federal question cases in which supplemental jurisdiction is exercised over pendent state law claims.  *Gibbs*, 383 U.S. at 725.  More fundamentally, I do not agree that *Stuborn* was wrongly decided.  In *Stuborn*, Judge Lasker determined that "the anti-SLAPP statute's special motion

23

provision is predominantly procedural in nature." *Stuborn*, 245
F. Supp. 2d at 316.  Because of the collision between state and
federal procedures, "in a diversity action the Federal Rules of
Civil Procedure supplant the state anti-SLAPP procedures . . . ."
*Id.*  This view of the anti-SLAPP statute comports with the
Supreme Judicial Court's description of Mass. Gen. Laws ch. 231,
§ 59H as "a procedural remedy for early dismissal of the
disfavored SLAPP suits."[4]  *Duracraft*, 427 Mass. at 161.

   Although the defendants argue that there is no procedural
conflict between the Federal Rules of Civil Procedure and the
anti-SLAPP statute, I find the Massachusetts statute's burden-
shifting scheme functions differently from Rule 12.  Under the
anti-SLAPP statute, the moving party, relying on pleadings and
affidavits, must make a threshold showing "that the claims
against it are 'based on' the petitioning activities alone and
have no substantial basis other than or in addition to the
petitioning activities."  *Id.* at 167-68.  Once this showing is
made, the burden shifts to the non-moving party to show that the
moving party's petitioning activity "was devoid of any reasonable

---

   [4] In her special motion to dismiss, Laurora cites another
section of *Duracraft*, which states that "the statute on its face
alters procedural *and substantive* law in a sweeping way . . . ."
*Duracraft Corp. v. Holmes Prods. Corp.*, 427 Mass. 156, 167 (1998)
(emphasis added).  Nothing in this language causes me to disagree
with Judge Lasker's conclusion  that the anti-SLAPP statute is
"predominantly procedural."  *Stuborn Ltd. P'ship. v. Bernstein*,
245 F. Supp. 2d 312, 316 (D. Mass. 2003).

factual support or any arguable basis in law" and "caused actual injury to the responding party."  Mass. Gen. Laws ch. 231, § 59H. This process incorporates additional fact-finding beyond the facts alleged in the pleadings, which is fundamentally different from a Rule 12 motion.[5]

The Massachusetts anti-SLAPP statute's burden-shifting scheme functions somewhat like a Rule 56 summary judgment motion. *See Baker*, 940 F. Supp. at 417.  But under Rule 56, I view the record in the light most favorable to the non-moving party and grant all reasonable inferences in favor of the non-moving party. *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000). Once the non-moving party establishes that there is a genuine issue of material fact, summary judgment must be denied.  The anti-SLAPP statute, however, requires the non-moving party to "show by a preponderance of the evidence that the moving party's petitioning activities were devoid of any reasonable factual support or any arguable basis in law." *Baker v. Parsons*, 434 Mass. 543, 544 (2001).  The Supreme Judicial Court has indicated that this standard is more stringent for the non-moving party

---

[5] The Plaintiffs also argue that the Massachusetts anti-SLAPP statute requires judges, rather than juries, to engage in fact-finding, a role limited in federal court by the Seventh Amendment.  While I do not dispute the importance of our jury system in the federal courts, I note that it is possible for a judge to conclude as a matter of law that the legal claims raised are based purely on petitioning activities.  Such a decision does not usurp the role of the jury.

than the traditional summary judgment standard.[6] *Id.* at 553
(rejecting the application of a summary judgment standard to the
anti-SLAPP statute since the statute is a "special" procedural
mechanism devised by the Massachusetts Legislature).

The Defendants rely on *Lockheed Missiles* and a line of
subsequent cases within the Ninth Circuit for support for the
specific proposition that the anti-SLAPP statute is applicable to
state claims in federal court.  *Lockheed*, however, involved
isolated provisions in the California anti-SLAPP statute.
*Lockheed*, 190 F.3d at 973.  This case, of course, involves the
Massachusetts anti-SLAPP statute, which Massachusetts courts,
irrespective of the views expressed by courts construing the
California statute, have specifically identified as a procedural

---

[6] The difference in dismissal standards has been recognized
by subordinate Massachusetts courts.  A Superior Court decision
offered the following observations regarding the procedural
conflict between the anti-SLAPP statute and the Massachusetts
corollaries to the Federal Rules of Civil Procedure:

> The standard of review under [the anti-SLAPP statute]
> is unlike that employed when a party moves for entry of
> judgment on the pleadings (Mass. R. Civ. P. 12(c)), for
> dismissal for failure to state a claim upon which
> relief can be granted (Mass. R. Civ. P. 12(b)(6)), or
> for summary judgment (Mass. R. Civ. P. 56).  When a
> party moves for dismissal under [the anti-SLAPP
> statute], the court must grant the special motion,
> unless the nonmoving party makes the two showings
> required by the statute.

*Margolis v. Gosselin*, 5 Mass. L. Rptr. 283, * 1 n.1 (Super. Ct.
May 22, 1996); *Weinberg v. Colon*, 11 Mass. L. Rptr. 82, * 3 n.4
(Super. Ct. Dec. 3, 1999).

rule.  *See, e.g., Duracraft,* 427 Mass. at 161 ("The act . . .
provides a procedural remedy for early dismissal of the
disfavored SLAPP suits.").  Furthermore, even courts within the
Ninth Circuit have recognized that applying the anti-SLAPP
statute in federal court does in some cases conflict with the
Federal Rules of Civil Procedure.  When evaluating a special
motion to dismiss, "[s]tandards that put a more onerous burden on
the non-moving party would conflict with Rules 8 and 12" and
therefore "cannot apply in federal court."  *Rogers v. Home
Shopping Network, Inc.,* 57 F. Supp. 2d 973, 982-83 (C.D. Cal.
1999).  In addition, "if a defendant makes a motion to strike
under the anti-SLAPP statute based on a failure of proof or
evidence, the motion must be treated as though it is a motion for
summary judgment and discovery must be 'developed sufficiently to
permit summary judgment under Rule 56.'"  *In re Bah,* 321 B.R. at
45 n.6 (quoting *Rogers,* 57 F. Supp. 2d at 982).

Because I found that the Massachusetts anti-SLAPP statute
does not apply in federal court, I did not go on to address the
remaining issues raised in the special motions to dismiss brought
under the anti-SLAPP statute.

**B.   Substantive Claims**[7]

---

[7] The Defendants filed a motion to strike the affidavits of
James Cuddy, Gerard Desilets, James Hanrahan, and Marisa Pizzi.
These affidavits are directed to the anti-SLAPP motions.  It is
undisputed that the Plaintiffs are entitled to submit affidavits
in opposition to the anti-SLAPP motions filed by several of the

27

The Town of Framingham has filed a motion to dismiss Count V of the Complaint, which alleges a violation of 42 U.S.C. § 1983. (Docket No. 87.)  Town officials Giombetti, Esty, Suso, Silver, Bernstein, Spack, Carr-Evans, and Welles (collectively the "Town Officials") have filed a joint motion to dismiss the Complaint against them in its entirety.  (Docket No. 91.)  In addition, Smith, Lee, Laurora, Orr, and Adams have each filed individual motions to dismiss the Complaint against them in its entirety.[8] (Docket Nos. 83, 85, 87, 93, 96.)  Rather than taking the motions up one by one, I address each of the Plaintiffs' substantive claims at issue in the motions in turn.

1.  *Fair Housing Act (Count II)*

Orr, Laurora, Lee, Smith, and Adams move to dismiss Count II of the Complaint, which alleges violations of the FHA.[9]  The FHA prohibits discrimination "in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of that buyer or renter."  42 U.S.C. § 3604(f)(1)(A).  The Act goes on to state:  "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in

---

Defendants.  The Plaintiffs do not ask me to rely upon their affidavits in determining the Rule 12(b)(6) motions.  Thus, I will deny the Defendants' motion to strike the affidavits as moot.

[8] To be precise, Adams moved to dismiss Counts I, II, V, VI and VII.  (Docket No. 96.)  These five counts, however, constitute the entirety of the allegations against him.

[9] All the Defendants but the Town of Framingham have moved to dismiss Count II, but the Town Officials' legal memorandum does not make any specific arguments regarding the FHA allegation.

the exercise or enjoyment of . . . any right granted or protected by section . . . 3604 . . . of this title." 42 U.S.C. § 3617. A "handicap" includes "drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism" that substantially limits one or more major life activities. 24 C.F.R. § 100.201(a)(2); *see White v. Lee*, 227 F.3d 1214, 1229 n.11 (9th Cir. 2000).

Orr, Lee, and Adams argue that Count II should be dismissed because their conduct involved speech, which they contend is only actionable under the FHA if the speech was directed at inciting violence and was likely to do so.[10] The lines between permissible and impermissible conduct, however, are not so easily drawn. Some courts decline to accept precise definitions. *See People Helpers, Inc. v. City of Richmond*, 789 F. Supp. 725, 733 n.5 (E.D. Va. 1992) ("Neither the cases nor the legislative history of § 3617 attempt to define the minimum level of intimidation or coercion necessary to violate this statute.").

Some courts have expressly referred to the inciting of imminent violence as a touchstone for impermissible speech under § 3617. "Speech can amount to a violation of § 3617 only when it is 'directed to inciting or producing imminent violence and is

---

[10] Laurora and Smith present a different argument for dismissal of Count II. They rely on *Gagliardi v. Sullivan*, 513 F.3d 301 (1st Cir. 2008), to argue that because they were not on the Planning Board and had no authority to approve SMOC's requested permits, they cannot be held responsible for any violations. But *Gagliardi* was a § 1983 case. *Id.* at 304. I find the reasoning of *Gagliardi* inapplicable to claims based on FHA violations.

likely in fact to do so.'"  *Taal v. Zwirner*, 2004 WL 556709, at
*8 (D.N.H. Mar. 22, 2004), *aff'd*, 117 Fed. Appx. 775 (1st Cir.
2005), *cert. denied*, 546 U.S. 871 (2005) (quoting *White*, 227 F.3d
at 1230).   Yet *White,* upon which *Taal* relies, observed that
"[t]hreats of violence *and other forms of coercion and
intimidation* directed against individuals *or groups* are, however,
not advocacy, and are subject to regulation or prohibition."
*White*, 227 F.3d at 1230 (emphasis added).   The Seventh Circuit,
in discussing the scope of § 3617, has noted that a clear act of
inciting violence, such as cross-burning outside someone's home,
is but one example of intimidation.   *Halprin v. The Prairie
Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330
(7th Cir. 2004) (Posner, J.).   "There are other, less violent but
still effective, methods by which a person can be driven from his
home and thus 'interfered' with in his enjoyment of it."   *Id.*

Although Orr, Lee, and Adams argue that their speech was
advocacy and therefore cannot violate § 3617, they are also
elected Town Meeting Members, and thus their speech has greater
ability to coerce and intimidate.   In *People Helpers,* the court
stated:

> [W]hen the full weight of the City is brought to bear
> on a person and where criminal and other types of
> investigations are threatened in order to discourage
> Plaintiffs from helping [the handicapped] find suitable
> housing, then it cannot be said that interference,
> coercion, or intimidation of the type contemplated by §
> 3617 did not occur.

789 F. Supp. at 733 n.5.   To be sure, a quarrel among neighbors
that results in discriminatory speech should not be elevated into

an FHA violation.  *Halprin*, 388 F.3d at 330.  But where there is "a pattern of harassment, invidiously motivated," a claim for a violation of the FHA has been adequately pled.  *See id.; King v. Metcalf 56 Homes Ass'n, Inc.*, 385 F. Supp. 2d 1137, 1144 (D. Kan. 2005) (holding, on a summary judgment motion, that a neighbor's persistent complaints represented a "severe and pervasive pattern of harassing plaintiff that was designed to interfere with plaintiff's enjoyment of her dwelling").

The factual allegations in the Complaint show that Orr, Lee, and Adams continued to petition the Planning Board and the Board of Selectmen to review the Sage House Program's Dover Amendment status even after the status was confirmed on multiple occasions by both the Town Counsel and the Building Commissioner.  The Plaintiffs allege that although the defendants were aware of the limited Site Plan Review, they continued to push to expand the scope of the Site Plan Review in an effort to delay the Sage House relocation.  In addition, according to the Complaint, Orr trespassed on one of SMOC's shelters and disturbed the disabled residents in that shelter.  I find that the Plaintiffs have made sufficient factual allegations against Orr, Laurora, Lee, Smith, and Adams to provide a plausible showing of a pervasive pattern of harassment that could be viewed as coercive or intimidating. This is enough to state a valid claim for a violation of the FHA, and with one exception, I will deny the Defendants' motions to dismiss Count II of the Complaint.

The one Defendant for which the Plaintiffs have failed to

state an FHA claim is Julian Suso, the Town Manager.  The only factual allegations involving Suso are a letter he wrote to STEPPS (Compl. ¶ 153) and a comment he made at a meeting on November 6, 2006 (Compl. ¶ 216).[11]  The Plaintiffs allege that a letter Suso sent to STEPPS thanking the organization's members for discussion and information at an October 20 meeting is evidence of coordination between Adams, other STEPPS members, and elected Town officials.  (Compl. ¶ 153.)  But the letter merely provides answers to concerns raised by STEPPS and goes on to state:  "I ask for your appreciation of our continuing efforts to work in a responsible manner within the limits provided by State law and related court decisions as guided by Town Counsel."  (Compl., Ex. 60 at 2.)  The Complaint also alleges that Suso stated at another meeting that the issue of one of SMOC's other shelters "might explode at the next Board of Selectmen's meeting."  (Compl. ¶ 216.)  Taken together, these two allegations do not provide any support that Suso violated any of the Plaintiffs' rights.  *See Kadar Corp. v. Milbury*, 549 F.2d 230, 232 (1st Cir. 1977) (Campbell, J.) (dismissing a defendant from the case where her "status generally as an intended defendant is so nebulous as plainly to warrant dismissal").  Thus, I will

---

[11] The Plaintiffs also allege that Suso and members of the Board of Selectmen were coordinating with STEPPS members to delay, obstruct, and impermissibly "review" the Sage House Program.  (Compl. ¶ 151.)  While this is a conclusory statement, the factual support appears to be presented in ¶ 153.
    The Complaint also alleges certain facts regarding an earlier Town Manager, George P. King, Jr., who is not a party to this litigation.  (Compl. ¶¶ 71-75, 82.)

dismiss Suso from Count II.

   *2.  Section 1983 (Count V)*

   The Plaintiffs have raised a § 1983 claim against all of the
Defendants, in their individual and official capacities, and each
of the Defendants has moved to dismiss this claim.  A § 1983
claim has two "essential elements:  the defendant must have acted
under color of state law, and his or her conduct must have
deprived the plaintiff of rights secured by the constitution or
by federal law."  *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st
Cir. 2008); *see Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150
(1970).  In addition, the Plaintiffs "must show that the
defendants' conduct was the cause in fact of the alleged
deprivation."  *Rodriguez-Cirilo v. Garcia*, 115 F.3d 50, 52 (1st
Cir. 1997); *see also Maldonado Santiago v. Velazquez Garcia*, 821
F.2d 822, 831 (1st Cir. 1987) ("Section 1983 imposes a causation
requirement similar to that of ordinary tort law.").

   The Plaintiffs base their § 1983 claim on:  (a) alleged
violations of three federal statutes--the FHA, the ADA, and the
Rehabilitation Act; and (b) alleged constitutional violations of
the First Amendment (on a retaliation theory), the equal
protection clause, and substantive due process.  In order to
recover pursuant to § 1983, the Plaintiffs must demonstrate that
they have an enforceable federal right, independently secured by
a federal statute or by the Constitution.  *Gonzaga University v.
Doe*, 536 U.S. 273, 285 (2002).

To address these claims, I first consider whether the
Plaintiffs have alleged a federal right - statutory or
constitutional - enforceable under § 1983 that has been violated.
Finding that they have not, I will dismiss Count V.

　　　a.　*Violation of a Federal Statutory Right*

Once the Plaintiffs have established that "a statute confers
an individual right, the right is presumptively enforceable by §
1983." *Gonzaga,* 536 U.S. at 284.  But the Defendants "may rebut
this presumption by showing that Congress 'specifically
foreclosed a remedy under § 1983.'" *Id.* at 284 n.4 (quoting *Smith
v. Robinson*, 468 U.S. 992, 1004-05 n.9 (1984)).  The Defendants
can do this by showing that Congress expressly foreclosed private
enforcement of a particular statute or that it impliedly did so
when it created a comprehensive enforcement scheme incompatible
with individual enforcement.  *Gonzaga,* 536 U.S. at 284 n.4; *see
also Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
453 U.S. 1, 20 (1981).

I address each of the bases for the Plaintiffs' § 1983
statutory claims[12] to determine whether they have alleged rights

_____

[12] The Defendants also argue in their Supplemental
Memorandum that the regulations governing Community Development
Block Grant ("CDBG") funds, promulgated by the Housing and

enforceable under § 1983.

 i.   Sections 3604 and 3617 of the Fair Housing Act

 The Plaintiffs have argued that they have enforceable federal rights under the FHA.  To support this analysis, they refer to *Blessing v. Freestone*, 520 U.S. 329 (1997), in which the Supreme Court outlined three factors for "determining whether a particular statutory provision gives rise to a federal right." *Id.* at 340.

> First, Congress must have intended that the provision
> in question benefit the plaintiff.  Second, the
> plaintiff must demonstrate that the right assertedly
> protected by the statute is not so "vague and
> amorphous" that its enforcement would strain judicial
> competence.  Third, the statute must unambiguously
> impose a binding obligation on the States.

*Id.* at 340-41 (citations omitted).  Recognizing lower court confusion in interpreting this standard, the Supreme Court further honed its analysis in *Gonzaga*, when it stated:  "We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983. . . . [I]t is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section." *Gonzaga,* 536 U.S. at 283.  The Complaint itself does not identify which particular provisions of

Community Development Act of 1974 ("HCDA"), do not confer individual rights.  The Plaintiffs agree that there are no individual rights under the HCDA and argue that their § 1983 claim is based on a violation of 42 U.S.C. § 3608 and not the HCDA.  Accordingly, I need not address the CDBG/HCDA argument.

the FHA give rise to relief through § 1983,[13] but the Plaintiffs' Opposition to the Town Officials' Motion to Dismiss discusses §§ 3604 and 3617 of the FHA as the provisions at issue.  I therefore consider whether §§ 3604 and 3617 provide rights enforceable under § 1983.

Section 3604 of the FHA makes it unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of a person residing in or intending to reside in that dwelling . . . ."  42 U.S.C. § 3604(f)(1)(B).  Section 3617 makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."  42 U.S.C. § 3617.  These provisions clearly establish the rights of persons who experience discrimination in the housing context, and the Defendants do not dispute that these sections of the FHA create individual rights.

But even if a statute provides an individual right, that right is not necessarily enforceable under § 1983 if Congress has foreclosed § 1983 relief by creating a comprehensive enforcement scheme within the statute itself.  *Gonzaga*, 536 U.S. at 284 n.4.

---

[13]   The exception is § 3608, which the Plaintiffs specifically allege only against the Town of Framingham.  Compl. ¶ 275.  I consider § 3608 as a predicate for a § 1983 claim in Section III.B.2.a.ii, *infra*.

One indication that an enforcement scheme is designed to have this foreclosing effect is when the scheme itself provides a private right of action.  The First Circuit recently noted that: "Whenever the underlying statute contained a private right of action (express or implied), the [Supreme] Court has deemed that fact to be strong evidence of congressional intent to preclude parallel actions under section 1983." *Fitzgerald v. Barnstable School Comm.*, 504 F.3d 164, 177 (1st Cir. 2007); *see also A.W. v. Jersey City Public Schools*, 486 F.3d 791, 801 (3d Cir. 2007) ("The inclusion of a private remedy gives rise to a presumption that this remedy is to be exclusive.").

I find the FHA contains a comprehensive enforcement mechanism for the rights cited by the Plaintiffs under §§ 3604 and 3617.  Section 3613 provides that private persons can seek judicial relief within two years "after the occurrence or termination of an alleged discriminatory housing practice . . . ."  42 U.S.C. § 3613.  Section 3602 defines "discriminatory housing practice" as "an act that is unlawful under §§ 3604, 3605, 3606, or 3617 of this title."  42 U.S.C. § 3602. Furthermore, § 3613 specifies that the aggrieved person can pursue relief in the federal courts without regard to complaints filed under § 3610, which governs complaints filed with the Secretary of Housing and Urban Development.  §§ 3610(a), 3613(a)(2).

37

I am satisfied that the FHA itself sets forth a comprehensive enforcement mechanism through which private persons can seek relief for violations of §§ 3604 and 3617 of the FHA. Accordingly, I conclude that the FHA enforcement mechanism forecloses complementary relief through § 1983.

> ii.   Section 3608 of the Fair Housing Act

The Plaintiffs also seek § 1983 relief for a violation of § 3608 of the FHA, but only against the Town of Framingham. Section 3608 of the FHA states:  "The Secretary of Housing and Urban Development shall . . . administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter."  42 U.S.C. § 3608(e)(5).

The analysis for § 3608 differs slightly from that for §§ 3604 and 3617.  The key issue for § 3608 is not whether Congress has created an enforcement mechanism to preclude § 1983 enforcement, but rather, whether Congress created an enforceable individual right at all.  Section 3608 does not establish rights for aggrieved persons in the same clear manner in which §§ 3604 and 3617 do.  Sections 3604 and 3617 specifically prohibit discriminatory actions against protected persons.  Section 3608, in contrast, refers to the affirmative duties of the Secretary for Housing and Urban Development (HUD).  The First Circuit has recognized the purpose of the FHA:  "This broader goal suggests

38

an intent that HUD do more than simply not discriminate itself;
it reflects the desire to have HUD use its grant programs to
assist in ending discrimination and segregation, to the point
where the supply of genuinely open housing increases."
*N.A.A.C.P. v. Sec'y of Hous. & Urban Dev.*, 817 F.2d 149, 155 (1st
Cir. 1987).  This broader view, however, speaks to administrative
objectives for the benefit of parties seeking housing, and, as
the Supreme Court made clear in *Gonzaga*, such benefits do not
necessarily translate into enforceable individual rights.
*Gonzaga*, 536 U.S. at 283.

To be sure, even after *Gonzaga*, some cases concluded that §
3608 confers individual rights.  *See Wallace v. Chicago Hous.
Auth.*, 298 F. Supp. 2d 710 (N.D. Ill. 2003); *Langlois v. Abington
Hous. Auth.*, 234 F. Supp. 2d 33 (D. Mass. 2002).  But *Langlois*
made little reference to the impact of *Gonzaga* on the *Blessing*
analysis.  *Langlois*, 234 F. Supp. 2d at 71-75.  This may have
been due to the belief, articulated more fully in *Wallace*, that
*Gonzaga* only applied to statutes enacted pursuant to Congress's
spending power.  *Wallace*, 298 F. Supp. 2d at 718 (finding *Gonzaga*
inapplicable because the statute at issue in that case was
enacted pursuant to Congress's spending power).  In the years
after *Langlois* and *Wallace* were handed down, courts have
interpreted *Gonzaga* and a later case, *City of Rancho Palos Verdes
v. Abrams*, 544 U.S. 113 (2005), as rejecting a distinction for

39

statutes passed pursuant to Congress's spending power.  *See McCready v. White,* 417 F.3d 700, 703 (7th Cir. 2005); *Asylum Hill Problem Solving Revitalization Ass'n v. King*, 277 Conn. 238, 261 n.22 (2006).

Based on *Gonzaga*, I find that even if certain other provisions of the FHA confer individual rights, § 3608 does not. The Supreme Court in *Gonzaga* stated that "where the text and structure of a statute provide no indication that Congress intends to create new individual rights," the statute affords no basis for a private suit.  *Gonzaga*, 536 U.S. at 286.  After reviewing the structure of the FHA, I conclude that Congress did not intend to confer an individual right pursuant to § 3608.  *See Thomas v. Butzen*, 2005 WL 2387676, at *10 (N.D. Ill. Sept. 26, 2005).  Congress provided an enforcement mechanism in the FHA for private individuals to bring civil actions "after the occurrence or the termination of an alleged discriminatory housing practice."  42 U.S.C. § 3613.  "Discriminatory housing practice" is defined as "an act that is unlawful under § 3604, 3605, 3606, or 3617 of this title."  42 U.S.C. § 3602.  Conspicuously missing from the list is § 3608.  "The existence of an express cause of action in the FHA that does not encompass § 3608(e)(5) strongly suggests that Congress did not intend § 3608(e)(5) to create

enforceable rights."[14]  *Thomas*, 2005 WL 2387676, at *10.

Accordingly, I will dismiss so much of the § 1983 claim as is

based on a violation of § 3608 of the FHA.

iii. The Rehabilitation Act and the ADA as
     Comprehensive Statutory Schemes

In addition to the FHA, the Plaintiffs rely upon the ADA and

the Rehabilitation Act as statutory predicates for their § 1983

claim.  But these statutes also have comprehensive statutory

schemes that foreclose separate § 1983 enforcement, with no

indication in the legislative history or elsewhere that these

schemes were intended to complement § 1983 remedies.

The Rehabilitation Act protects qualified individuals with

handicaps from being "denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal

financial assistance."  29 U.S.C. § 794.  The Rehabilitation Act

permits aggrieved individuals to pursue direct causes of action

against recipients and federal providers of federal assistance.

---

[14] Although the question of whether a statute may be
enforced through § 1983 presents a different question from
whether it provides a private right of action, "the inquiries
overlap in one meaningful respect – in either case we must first
determine whether Congress *intended to create a federal right*."
*Gonzaga University v. Doe*, 536 U.S. 273, 283 (2002).  I note that
the First Circuit has determined that § 3608(d) does not contain
a private right of action.  *See Latinos Unidos de Chelsea en
Accion (Lucha) v. Sec'y of Hous. & Urban Dev.*, 799 F.2d 774, 792
(1st Cir. 1986); *see also Puerto Rico Public Hous. Admin. v. U.S.
Dep't of Hous. & Urban Dev.*, 59 F. Supp. 2d 310, 324 (D.P.R.
1999) (also concluding that § 3608(e)(5) does not contain a
private right of action).

41

*See* 29 U.S.C. § 794a(a)(2) (providing aggrieved persons with the
remedies set forth in Title VI of the Civil Rights Act); *Colin K.*
*by John K. v. Schmidt*, 715 F.2d 1, 10 (1st Cir. 1983) (affirming
that the Rehabilitation Act provides a private cause of action);
*Lollar v. Baker*, 196 F.3d 603, 609-10 (5th Cir. 1999) ("Within
the Rehabilitation Act, Congress has provided a specific
comprehensive internal enforcement mechanism to protect the
rights of the disabled who are employed by recipients of federal
funds.").

The ADA states that "no qualified individual with a
disability shall, by reason of such disability, be excluded from
participation in or be denied the benefits of . . . a public
entity . . . ."  42 U.S.C. § 12132.  Enforcement of § 12132
consists of the same remedies provided in the Rehabilitation Act.
42 U.S.C. § 12133.

Courts in numerous circuits, noting the comprehensive
enforcement mechanisms provided in both the ADA and the
Rehabilitation Act, have determined that these provisions
preclude a separate § 1983 action.  *See Lollar*, 196 F.3d at 609-
10 (holding that the Rehabilitation Act's comprehensive remedial
scheme precludes § 1983 enforcement); *Alsbrook v. City of*
*Maumelle*, 14 F.3d 999, 1011 (8th Cir. 1999) (finding that the
ADA's "detailed remedial scheme" barred the plaintiffs from
maintaining a § 1983 cause of action); *Holbrook v. City of*

42

*Alpharetta*, 112 F.3d 1522, 1531 (11th Cir. 1997) (holding that the ADA and the Rehabilitation Act both preclude § 1983 enforcement because otherwise, § 1983 would be "duplicative," providing "two bites at precisely the same apple"); *Meara v. Bennett*, 27 F. Supp. 2d 288, 291-92 (D. Mass. 1998) (rejecting a § 1983 claim based on an ADA allegation because the plaintiff already had "his remedy under the ADA" for any "improper discrimination"). I find that the comprehensive statutory schemes of the ADA and the Rehabilitation Act bar separate § 1983 claims from being raised based upon them and, accordingly will dismiss so much of Count V as is predicated upon them.

b. *Violation of a Federal Constitutional Right*

I turn now to whether the Plaintiffs have asserted constitutional claims enforceable through § 1983.[15]

i.  First Amendment Retaliation

The Plaintiffs allege that the Defendants' conduct amounted to retaliation for the Plaintiffs' First Amendment activities, namely:  its petition to relocate the Sage House program; its application for site plan review; its attendance at public hearings; and its written and voiced opposition to the Town's

---

[15] I note that the Defendants argue that a § 1983 claim based on First Amendment retaliation is precluded by the comprehensive remedial schemes of the FHA, ADA, and Rehabilitation Act.  They provide no support for their proposition that a comprehensive statutory remedial scheme prevents the Plaintiffs from bringing a § 1983 claim based on constitutional injuries.

43

policies on permit applications and housing for the disabled.

As a general proposition, the First Circuit has recognized that "[c]laims of retaliation for the exercise of First Amendment rights are cognizable under § 1983." *Powell v. Alexander*, 391 F.3d 1, 16 (1st Cir. 2004); *see also Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 41 (1st Cir. 1992). But the label retaliation in the context of the activity alleged in this Complaint serves to mask the role of the First Amendment in this setting.  To be sure, the Plaintiffs have petitioned for certain governmental relief and the various Defendants have responded with what appears to be opposition of varying kinds. But the First Amendment is designed to permit a robust and wide-ranging clash of interests to resolve the dispute.  To the degree that highly focused limitations on such a clash are arguably applicable, *e.g.* under §§ 3604 and 3617 of the FHA, *see* Section III.B.1, *supra*, or under common law defamation, *see* Section III.B.4, *infra*, they will be enforced.  But the mere pursuit of government action does not immunize the petitioner from opposition.

Indeed it may be inappropriate even to characterize such requests for benefits as First Amendment petitions for redress of grievances.  The First Amendment provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances."  U.S.

44

Const. amend. I.  The Plaintiffs argue that their conduct is
"classic petitioning activity."  Pl.'s Opp. to Town of
Framingham's Mot. Dismiss at 13.  I recognize that an Eastern
District of New York opinion appears to support the Plaintiffs on
this issue.  In *Hampton Bays Connections v. Duffy*, 127 F. Supp.
2d 364 (E.D.N.Y. 2001), real estate developers had applied for
approvals and permits for the construction of a McDonald's
restaurant, but faced delays and opposition from local
governmental bodies in the Town of Southampton.  *Id.* at 368-69.
The district court found that the developers' permit applications
were constitutionally protected by the First Amendment.  *Id.* at
373.  I am not persuaded.  *See, e.g., WMX Techs, Inc. v. Miller*,
194 F.3d 367, 372 (9th Cir. 1999) (concluding that a waste
disposal corporation's application for a major use permit was
"not equivalent to a petition to the Government for redress of
grievances" and therefore not constitutionally protected).

But even if the Plaintiffs' conduct could be characterized
as falling under the First Amendment, I am not persuaded that the
Defendants' responses are prohibited as unconstitutional
retaliation.  First Amendment retaliation cases typically involve
the employment context, in which speech by an employee precedes
an employer's response of termination or sanction.  The
Defendants' response complained of in this case, by contrast,
involved public hearings, legal discussions among governmental
bodies, and internal debates about the Plaintiffs' applications.

This distinction convinces me that the First Amendment
interests at issue in this case are arrayed on *both* sides of the
public discourse regarding SMOC's facilities in Framingham.  The
Complaint makes clear that the Defendants viewed the Plaintiffs'
requests and activities as a matter of public concern.  The
public discourse about this matter involved not only
participation by the Plaintiffs, but also by members of the
Planning Board, Board of Selectmen, and the Town Meeting.  To
suggest that the Plaintiffs' activities are shielded by the First
Amendment, but that the Defendants' activities are prohibited by
that same constitutional rule, would allow the Plaintiffs to use
the First Amendment both as a shield and as a sword.  *See
Brandywine-Main Line Radio, Inc. v. F.C.C.*, 473 F.2d 16, 62 (D.C.
Cir. 1972) ("The first amendment was never intended to protect
the few while providing them with a sacrosanct sword and shield
with which they could injure the many.").  I will therefore
dismiss so much of the § 1983 claim as is based on the First
Amendment.

      ii.  Equal Protection

The Plaintiffs' claims of equal protection violations are
based on allegedly disparate treatment in delaying SMOC's
occupancy permit.  In the Complaint, the Plaintiffs have alleged
that they were subjected to unprecedented investigations.
Specifically, "[o]n information and belief, there has been no

46

other occasion on which the Board of Selectmen has asked the
Building Commissioner to advise it of the filing of a building
permit application by an individual or entity." (Compl. ¶ 74.)
The Complaint alleges that this request for information had "on
information and belief, never before been applied to other
requests for building permits." (Compl. ¶ 75.)  In addition, the
Complaint goes on to state that the Building Commissioner's
investigation of the services provided at the Common Ground
Shelter was "unprecedented" and that "[n]o other social service
program had ever been subjected to this type of Building
Department review of its Dover Amendment protected status."
(Compl. ¶ 206.)

      To be sure, "[u]nder the Equal Protection Clause, similarly
situated entities must be accorded similar governmental
treatment." *Barrington Cove Ltd. P'ship v. Rhode Island Housing
and Mortg.*, 246 F.3d 1, 7 (1st Cir. 2001).  This standard
requires the plaintiff to establish that "compared with others
similarly situated, [it] was selectively treated . . . based on
impermissible considerations such as race, religion, intent to
inhibit or punish the exercise of constitutional rights, or
malicious or bad faith intent to injure a person." *Id.* at 7
(quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 909-10 (1st Cir.
1995)).

      The First Circuit has noted its "extreme reluctance to
entertain equal protection challenges to local planning

47

decisions." *Macone v. Town of Wakefield*, 277 F.3d 1, 10 (1st
Cir. 2002).  I find the First Circuit's "longstanding policy"
applicable to this case.  I will therefore grant the Defendants'
motion to dismiss so much of the § 1983 claim as is based on an
equal protection violation.

      iii. Substantive Due Process

      The substantive due process claim also confronts a
prohibitive hurdle for the Plaintiffs.  "[T]he First Circuit has
long been reluctant to apply substantive due process analysis to
alleged violations in the local planning and development
process."  *Collier v. Town of Harvard*, 1997 WL 33781338, at *5
(D. Mass. Mar. 28, 1997).  In the instant action, the Plaintiffs'
due process claim turns on whether the state action "shocks the
conscience."  *Id.* at *4.  Only "truly horrendous situations" meet
this threshold; even the "bad faith violation[] of state law" is
inadequate.  *Nestor Colon Medina*, 964 F.2d at 45.  To the extent
the Plaintiffs' substantive due process claim is based on
discriminatory conduct toward the disabled population that SMOC
serves, the substantive due process claim is covered by the FHA
claims.  Thus, "there is . . . no need to enter the uncharted
thicket of substantive due process to find an avenue for relief,
and [I] decline to do so."  *Id.* at 46.  I will dismiss so much of
the § 1983 claim based on a violation of the Plaintiffs'
substantive due process rights.

   c.   *Conclusion*

Having found that none of the predicates alleged by the
Plaintiffs for a § 1983 claim can support such a remedy, I will
dismiss Count V.

   3.   *Massachusetts Civil Rights Act (Count VI)*

The Plaintiffs have alleged violations of the Massachusetts
Civil Rights Act ("MCRA") against all the Defendants but the Town
of Framingham.  The MCRA protects persons from interference with
federal and state rights.  Mass. Gen. Laws ch. 12, § 11H-I.
Liability arises under the MCRA when a person "interfere[s] by
threats, intimidation or coercion, or attempt[s] to interfere by
threats, intimidation or coercion, with the exercise or enjoyment
by any other person . . . of rights secured by the constitution
or laws of the United States, or . . . the commonwealth."  Mass.
Gen. Laws ch. 12, § 11H.[16]

Like § 1983, the MCRA is not itself a source of substantive
rights, but rather a cause of action for violations of rights
secured elsewhere by state and federal law.  Indeed, according to
the Supreme Judicial Court of Massachusetts, the MCRA is
"coextensive with" § 1983, "except that the federal statute
requires State action whereas its State counterpart does not."
*Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 822-23 (1985);

_____

   [16] Section 11I permits private individuals to pursue relief
for violations of § 11H.  Mass. Gen. Laws ch. 12, § 11I.

49

*see also Kelley v. LaForce*, 288 F.3d 1, 10 (1st Cir. 2002)
(citing the additional exception that the MCRA requires a
violation by "threats, intimidation, or coercion").

Aside from the expansion to private actors, there is no
indication that the MCRA was intended to provide broader relief
than that provided by § 1983.  The distinction based on state
action is not a relevant distinguishing feature here, thus for
purposes of this case, the MCRA and § 1983 are coextensive causes
of action.

To be sure, I already concluded that the Plaintiffs have
sufficiently pleaded that the Defendants have interfered with the
Plaintiffs' enjoyment of federal rights under the FHA; and the
ADA and Rehabilitation Act claims have not been challenged by
motions to dismiss.  But I have also concluded that the
Plaintiffs have not stated a claim for which relief can be
granted independently under § 1983.  Because § 1983 and the MCRA
are coextensive for the purposes of this case, I also find that
the Plaintiffs do not have an MCRA cause of action.  The
allegations of deprivation of federally secured rights are
properly pursued directly under the FHA, ADA, and Rehabilitation
Act, not derivatively through § 1983 or the MCRA.[17]

> 4.  *Defamation (Count VII)*

---

[17]  Because the Plaintiffs do not have a cause of action
pursuant to the MCRA, I do not reach the Defendants' argument
that the MCRA claim should have been brought first before the
Massachusetts Commission Against Discrimination ("MCAD").

The Plaintiffs have raised defamation claims against Adams, Esty, Giombetti, Laurora, and Orr.  A libel claim has five elements:  "(1) that the defendant published a written statement; (2) of and concerning the plaintiff; that was both (3) defamatory, and (4) false; and (5) either caused economic loss, or is actionable without proof of economic loss."  *Noonan v. Staples, Inc.*, 2008 WL 3866927 at *3 (1st Cir. August 21, 2008) (citations omitted); *see Phelan v. May Dept. Stores Co.*, 443 Mass. 52, 56 (2004).

The publication requirement is easily satisfied, so long as the statement is transmitted to one person other than the plaintiff as it is alleged to have been here.  *Phelan*, 443 Mass. at 56 (citing *Brauer v. Globe Newspaper Co.*, 351 Mass. 53, 56 (1966)).  That the statements were of and concerning the Plaintiffs is not in dispute.  The question of damage may prove problematic at a later stage in these proceedings, but for purposes of motion to dismiss practice, it is defamation and falsity that are at issue.

Courts have defined a defamatory statement as one that "would tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community."  *Phelan*, 443 Mass. at 56 (quoting *Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 853 (1975)).  In considering a Rule 12(b)(6) motion, "[a] court may

dismiss written defamation claims, i.e., libel claims, if the
communication is 'incapable of a defamatory meaning.'" *Amrak
Productions, Inc. v. Morton*, 410 F.3d 69, 72 (1st Cir. 2005)
(Torruella, J.) (citing *Brauer*, 351 Mass. at 55 (1966)).  This
question of "whether a communication is reasonably susceptible of
a defamatory meaning, is a question of law for the court."
*Phelan*, 443 Mass. at 56.  In order for a court to determine
whether the statement is susceptible to such a meaning, "the
communication must be interpreted reasonably, and can only be
ruled defamatory if it would lead a 'reasonable reader' to
conclude that it conveyed a defamatory meaning." *Damon v. Moore*,
520 F.3d 98, 103-04 (1st Cir. 2008) (internal quotations
omitted).

The threshold question is how a reasonable reader would view
the statements made by the Defendants.  I find that a reasonable
reader of the statements identified by the Plaintiffs could
conclude that they conveyed a defamatory meaning.  The Plaintiffs
have alleged a series of statements by each of the five
defendants in question that a reasonable reader could conclude
were defamatory:

- Adams's statement that "[now] we have evidence of SMOC
  actively pursuing criminals as clients";
- Esty's statement that "I think this exposes the fact that

there is an underlying plan . . . for designating Framingham
as a place that would be suitable for centering a large
population of arsonists, sex offenders and criminals";

- Giombetti's statement that SMOC had been "secretly importing
  winos" from neighboring towns;

- Laurora's statement that "[i]t's interesting that Framingham
  town government at first rejected, then blessed and voted to
  give SMOC drug dealing employees a larger environment to ply
  their trade";

- Orr's statement that SMOC was "troll[ing] the prison system
  to look for arsonists and sex criminals to bring to
  Framingham."

Defendant Orr has argued that the statements were opinion
rather than false statements of fact.  "Pure opinions" are not
actionable, *King v. Globe Newspapers Co.*, 400 Mass. 705, 708
(1987); but mixed statements of fact and opinion can be
actionable.  *Pritsker v. Brudnoy*, 389 Mass. 776, 778 (1983).
Whether a statement is one of opinion or fact is "generally
considered a question of law." *Cole v. Westinghouse Broad. Co.*,
386 Mass. 303, 309 (1982).  "In drawing the distinction, [courts]
focus on whether the assertion can be proved false." *Driscoll v.
Bd. of Trustees of Milton Academy*, 70 Mass. App. Ct. 285, 296
n.10 (App. Ct. 2007).

On their face, the Defendants' statements alleged by the

53

Plaintiffs are assertions that could be proved false, and not the "far more subjective judgments" that are the basis for opinions. *Driscoll*, 70 Mass. App. Ct. at 296 n.10.   The Defendants in question may have intended these statements to be mere opinion or hyperbole, but the test is "an objective test-i.e., inquiry into a reasonable recipient's understanding of the words rather than the speaker's intent." *Phelan*, 443 Mass. at 57 (quoting *New England Tractor-Trailer v. Globe Newspaper Co.*, 395 Mass. 471, 479-80 (1985)).

Because I find that a reasonable reader could conclude that the Defendants' statements conveyed a defamatory meaning, and because these involved either assertions of fact or statements of mixed fact and opinion, I deny the Defendants' motion to dismiss the state law claims of defamation against Adams, Esty, Giombetti, Laurora, and Orr.

## C. Conspiracy (Count I)

In Count I, the Plaintiffs raise § 1983 and Massachusetts state law conspiracy claims against the Defendants (except the Town of Framingham) in their individual capacities.[18]   I address

---

[18] In the Complaint, the Plaintiffs do not state the source of law for their conspiracy claim.   In their opposition brief, however, the Plaintiffs characterize their conspiracy claim as arising under both § 1983 and Massachusetts state law.   (Pl.'s Consolidated Opp. at 20 n.27.)   The Plaintiffs also clarify that they are only bringing Counts I (conspiracy), VI (Massachusetts Civil Rights Act), and VII (defamation) against the defendants in their individual capacities.   (Pl.'s Consolidated Opp. at 23 n.31.)

54

the § 1983 conspiracy claim first and then turn to the conspiracy claim raised under state law.

1. *Section 1983 Conspiracy*

The First Circuit has defined a civil rights conspiracy as "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." *Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir. 1988) (Campbell, C.J.) (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 620-21 (7th Cir. 1979)) (internal quotation marks omitted).  A conspiracy claim brought under § 1983 requires an additional showing of "an actual deprivation of a right secured by the Constitution and laws." *Id.*  Since a conspiracy claim pursuant to § 1983 therefore requires an alleged deprivation of rights protected by § 1983, *see Dixon v. City of Lawton, Okl.*, 898 F.2d 1443, 1449 n.6 (10th Cir. 1990) ("By a § 1983 conspiracy claim, we mean a conspiracy to violate a right protected by § 1983 . . . ."), violation of § 1983 may properly be said to be the object of the conspiracy.  I have found the Plaintiffs have not properly alleged in Count V a § 1983 deprivation of rights, which is the object of the federal conspiracy alleged in Count I. Therefore, essentially for the reason offered to justify dismissing the substantive § 1983 claims in Count V, *see* Section

55

III.B.2, *supra*, I also dismiss so much of their claim of
conspiracy in Count I as is based upon § 1983.

    2.   *State Law Conspiracy*

    Massachusetts recognizes two kinds of civil conspiracy.
*Kurker v. Hill*, 44 Mass. App. Ct. 184, 188 App. Ct. (1998)
(Smith, J.).  The first kind involves a "coercive" conspiracy.
*Id.*  "[T]he wrong was in the particular combination of the
defendants rather than in the tortious nature of the underlying
conduct."  *Id.*  The second kind, "reflected in the Restatement
(Second) of Torts § 876 (1979), derives from 'concerted action,'
whereby liability is imposed on one individual for the tort of
another."  *Id.* (quoting *Aetna Cas. Sur. Co. v. P & B Autobody*, 43
F.3d 1546, 1564 (1st Cir. 1994)).

    The Plaintiffs have failed adequately to state a claim for
conspiracy based on coercion.  This type of civil conspiracy
requires a plaintiff to allege that the defendants, "acting in
unison, had 'some peculiar power of coercion' over [the]
plaintiff that they would not have had if acting independently."
*Jurgens v. Abraham*, 616 F. Supp. 1381, 1386 (D. Mass. 1985)
(Garrity, J.) (quoting *Fleming v. Dane*, 304 Mass. 46, 50 (1939)).
A common example of this type of conspiracy is "the combined
action of groups of employers or employees, where through the
power of combination, pressure is created and results brought
about different in kind from any thing that could have been
accomplished by separate individuals."  *Fleming*, 304 Mass. at 50.

The coercion must come from the force of many defendants acting in unison rather than a situation where the coercive power resides in a few individual defendants.  *See id.*

The Plaintiffs have alleged interference by numerous defendants in this case but have failed to demonstrate that the defendants exercised some "peculiar power of coercion" acting in unison that they lacked independently.  Several members of the Planning Board, acting together, for example, could certainly be fully capable of delaying the Sage House Program's relocation and interfering with other aspects of SMOC's operations.  But it is not as co-conspirators that they exercised their power.  The Supreme Court in *Bell Atlantic v. Twombly* signaled its discomfort with conclusory pleading in conspiracy cases.  127 S. Ct. at 1966.  This is particularly true when all that the allegations demonstrate is that a collection of actors are proceeding consciously in a parallel fashion.  But a Massachusetts conspiracy claim requires something more than simply parallel opposition by a large number of persons.  The Plaintiffs have failed to allege a particular increase in coercion due to the increase in the number of defendants.

The second type of conspiracy recognized in Massachusetts, "concerted action" conspiracy, does not require proof of coercion.  *Kurker*, 44 Mass. App. Ct. at 189.  Instead, it relies on "a defendant's substantial assistance, with the knowledge that

such assistance is contributing to a common tortious plan." *Id.*
"For liability to attach on this basis, there must be first a
common design or an agreement, although not necessarily express,
between two or more person to do a wrongful act and, second,
proof of some tortious act in furtherance of the agreement."
*O'Neil v. DaimlerChrysler Corp.*, 538 F. Supp. 2d 304, 316-17 (D.
Mass. 2008) (Gertner, J.) (quoting *Aetna*, 43 F.3d at 1564).

Although the Plaintiffs do not clearly specify what unlawful
acts were the object of the state law conspiracy, their claim of
civil conspiracy must include an allegation of a tort.  "Of
course, there can be no joint liability for a tort unless there
has been a tort, so the 'concerted action' version depends on
proof of underlying tortious conduct for which liability can be
assigned." *Massachusetts Laborers' Health & Welfare Fund v.
Philip Morris, Inc.*, 62 F. Supp. 2d 236, 244 (D. Mass. 1999)
(O'Toole, J.).

The only tort alleged by the Plaintiffs is one of
defamation.  Although the Plaintiffs have suggested collective
action among some of the Defendants, none of the allegations if
taken as true suggest an agreement to defame.  The Plaintiffs'
Complaint does not allege facts that relate the Defendants'
conduct to a "common design or agreement" to publish tortious
statements about the Plaintiffs or their operations.  *Kurker*, 44
Mass. App. Ct. at 189.

I will therefore grant the Defendants' respective motions to

dismiss Count I.

### III. CONCLUSION

For the reasons stated more fully above:

- I have DENIED the special motions to dismiss pursuant to the Massachusetts Anti-SLAPP statute.  (Docket Nos. 43, 45, 46, 98.)

- As to Laurora's, Orr's, and Adams's Motions to Dismiss the entire Complaint (Docket Nos. 87, 93, 96), I GRANT in part and DENY in part:  I DISMISS Counts I, V, and VI against Laurora, Orr, and Adams; and I DENY the motions to dismiss Counts II and VII against them.

- As to Smith's and Lee's Motions to Dismiss the entire Complaint (Docket Nos. 83, 85), I GRANT in part and DENY in part:  I DISMISS Counts I, V, and VI against Smith and Lee; and I DENY the motions to dismiss Count II against them.

- As to the Town Officials' Motion to Dismiss the entire Complaint (Docket No. 91), I GRANT in part and DENY in part: I DISMISS Counts I, V, and VI against the Town Officials (Giombetti, Esty, Bernstein, Spack, Carr-Evans, Welles, Silver, Suso); I DENY the motion to dismiss Count II, except with regards to Julian Suso, who is dismissed from this case; and I DENY the motion to dismiss Count VII against Giombetti.

- As to the Town of Framingham's Motion to Dismiss (Docket No.

59

69), I GRANT the Motion to Dismiss Count V.

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE