UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SOUTH MIDDLESEX OPPORTUNITY COUNCIL, INC. and SOUTH MIDDLESEX NON-PROFIT HOUSING CORPORATION, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| TOWN OF FRAMINGHAM, PETER C. S. ADAMS, STEVEN ORR, LAURIE LEE and CYNTHIA LAURORA, in their individual capacities and as they are Framingham Town Meeting Members, DENNIS GIOMBETTI, GINGER ESTY, and JASON SMITH, in their individual capacities and as they are members of the Framingham Board of Selectmen, SUSAN BERNSTEIN, CAROL SPACK, ANDREA CARR-EVANS and ANN WELLES, in their individual capacities and as they are members of the Framingham Planning Board, ALEXIS SILVER, in her individual and official capacity, and JOHN DOES I-V, and JANE DOES I-V, in their individual and official capacities, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO. 07-12018-DPW |
| Defendants. | ) | |

MEMORANDUM AND ORDER
September 9, 2010

The Plaintiffs, South Middlesex Opportunity Council, Inc.

and South Middlesex Non-Profit Housing Corporation ("SMOC"),

operate several residential substance abuse treatment programs in

Massachusetts.  In its attempt to relocate one of its programs in

Framingham, Massachusetts, SMOC encountered resistance from some

of the residents and local officials.  SMOC brought this action,
alleging a variety of claims under federal and state law.  I
ruled on the defendants' motions to dismiss, *South Middlesex
Opportunity Council, Inc.* v. *Town of Framingham,* No. 07-12018-
DPW, 2008 WL 4595369 (D. Mass. Sept. 30, 2008), dismissing some
claims and allowing federal claims under the Fair Housing Act
("FHA"), the Americans with Disabilities Act ("ADA"), and the
Federal Rehabilitation Act of 1973 ("Rehabilitation Act") and a
multiplicity of state law defamation claims to move forward.  The
Defendants - the Town of Framingham and individual Framingham
residents and officials - now seek summary judgment on these
remaining claims.

## I.   BACKGROUND

## A.  Factual Background

### 1.  The Parties

SMOC provides a range of social services to low-income and
disadvantaged individuals and families in the Metrowest region of
Massachusetts.  SMOC has had operations in the Town of Framingham
for several decades, and maintains its headquarters there.  The
South Middlesex Non-Profit Housing Corporation ("SMNPHC") is a
wholly owned subsidiary of SMOC, and manages the majority of
SMOC's real estate holdings.  James Cuddy serves as Executive
Director and Chief Executive Officer of SMOC and SMNPHC.

The Town of Framingham is a body politic established under the laws of the Commonwealth of Massachusetts.  Framingham has a town meeting form of government, which places executive authority with an elected Board of Selectmen ("BOS") and the Town Manager. The Board of Selectmen does not have jurisdiction over the decisions of the Town Meeting, Building Commissioner, or Planning Board, and does not process applications for Site Plan Review. At regular meetings of the Board of Selectmen, the public can ask questions and make statements relating to the matter at issue.

The Planning Board is an elected five-member body, responsible for adopting and implementing Framingham's land use and municipal planning policies.  The Town's Zoning Bylaw regulates the use of premises in the Town.  The Planning Board evaluates Site Plan Review applications pursuant to Mass. Gen. Laws ch. 40A, § 9, the state zoning statute, and conducts public hearings on these applications.

Named as Defendants are the Town of Framingham, as well as twelve individual residents and Town officials: four Town Meeting members, three Board of Selectmen members, four Planning Board members, and the Human Services Coordinator.[1]

The **four Town Meeting member** defendants are Peter Adams, Cynthia Laurora, Laurie Lee, and Steven Orr.

---

[1] I have dismissed a thirteenth Defendant, Julian M. Suso, the Town Manager, from this case.  2008 WL 4595369, at *25.

Adams was elected a Town Meeting member in March 2007.  He is also the founder and Director of Communications for the Stop Tax Exempt Private Property Sprawl ("STEPPS") organization, whose formation was motivated at least in part by opposition to SMOC's relocation of Sage House to 517 Winter Street.  STEPPS has no formal membership lists or requirements, but some of the Defendants admit to being members.

Laurora was elected in September 2006 and also considered herself a member of STEPPS.  Laurora was appointed to the Payment in Lieu of Taxes ("PILOT") Committee in 2005.  The PILOT program was created by the Town Meeting to study the impact of social service sites on the Town, and permits nonprofit social service institutions to make voluntary contributions to the Town, even if the programs are tax-exempt.

Laurie Lee became a Town Meeting member in 2005; in April 2008 Lee was elected to the Board of Selectmen.

Orr was elected a Town Meeting member in 2001, and served as a member of the PILOT Committee.  He created the Frambors website, which enables Town Meeting members to post and view messages on an interactive board.

The **three Board of Selectmen** defendants are Dennis Giombetti, Jason Smith, and Ginger Esty.  Giombetti has served on the Board of Selectmen since April 2005, Smith since April 2006, and Esty since September 2000.

-4-

The **four Planning Board** defendants are Susan Bernstein, Carol Spack, Andrea Carr-Evans, and Ann Welles.

The Defendant Alexis Silver is the Human Services Coordinator, and has served in that position since January 2007. She does not sit on any Town board.

### 2. The SMOC Programs at Issue

SMOC has had three programs in Framingham that it alleges the Defendants targeted in various ways: the Sage House program, the Common Ground Shelter, and Larry's Place.

### a. Sage House

Sage House provides residential treatment and support services to homeless and at-risk families where one or both parents are undergoing substance abuse rehabilitation. From 1990 until 2007, SMOC operated the Sage House program at 61 Clinton Street in Framingham. The program is protected by the "Dover Amendment," Mass. Gen. Laws ch. 40A, § 3, which exempts land and structures used for educational purposes from restriction or regulation by zoning ordinances and by-laws; however, such land or structures may be subject to reasonable regulations concerning the bulk and height of structures, yard sizes, lot areas, setbacks, open space, parking and building coverage requirements. *Id.*[2]

---

[2] *See generally Boyajian* v. *Gatzunis,* 212 F.3d 1, 5 (1st Cir. 2000) ("This provision is commonly known as the Dover Amendment because its religion-focused component was enacted in

SMOC decided to expand the Sage House program, and purchased property at 517 Winter Street in June 2005 for purposes of relocation.  Local concerns about the relocation began to emerge, sparking the creation of STEPPS, some of whose members made public statements opposing Sage House's move to Winter Street.  During a BOS meeting on June 2, 2005, STEPPS members expressed their objections to the Sage House relocation.  After the meeting, Giombetti asked the Building Commissioner to list the permits that SMOC would require for the Sage House relocation.

Before June 2005, Framingham's Zoning Bylaw exempted Dover Amendment properties from Site Plan Review.  Some members of STEPPS began to petition the Board of Selectmen and the Planning Board to amend the Bylaw to remove this exemption.  Meanwhile, SMOC filed a building permit change-of-use application on July 12, 2005, seeking the Planning Board's approval to operate Sage House at 517 Winter Street.  On July 28, 2005, the Planning Board voted to support a Zoning Bylaw amendment that would remove the Site Plan Review exemption for Dover Amendment properties.  The Town adopted the Bylaw amendment on August 3, 2005, and it was

---

1950 in response to a zoning by-law passed by the town of Dover, Massachusetts prohibiting religious schools within that town's residential neighborhoods."); *see also Trustees of Tufts College* v. *City of Medford,* 616 N.E.2d. 433, 437-38 (1993); *Attorney General* v. *Dover,* 100 N.E.2d. 1 (1951); *The Bible Speaks* v. *Board of Appeals of Lenox,* 391 N.E.2d 279, 284 n.10 (Mass. App. 1979). The protections for other types of uses were added in later years.

then sent to the Attorney General of Massachusetts for final approval.  On August 11, 2005, the Building Commissioner denied SMOC's change-of-use application under the terms of the revised Bylaw, stating that SMOC had failed to provide a description of the education program at Sage House, to complete Site Plan Review, or to provide a parking plan and stamped floor plan. SMOC appealed this decision to the Framingham Zoning Board of Appeals ("ZBA").   The Massachusetts Attorney General approved the Bylaw amendment on November 16, 2005, noting that Site Plan Review should nonetheless be limited to ascertain whether the site complies with "reasonable regulations pertaining to bulk and height of structures, yard size, lot area, setbacks, open space, parking, and building coverage requirements."  On November 22, 2005, the Town Counsel submitted an opinion letter to the BOS and the Building Commissioner, stating that a reviewing court would probably find that SMOC's use of the Winter Street property would constitute an educational use, and that Site Plan Review would be primarily limited to parking concerns.

After the Attorney General approved the Bylaw in November 2005, SMOC withdrew its ZBA appeal.  SMOC applied to the Planning Board for site plan approval on February 17, 2006.  It declined, however, to submit some of the requested materials, maintaining that it was not required to do so under the Dover Amendment. Consequently, the Administrator of the Planning Board asked the

Town Counsel to provide further clarification as to which materials - of those typically required for Site Plan Review - Sage House would not be required to provide as a Dover Amendment project.  On April 6, the Town Counsel provided some guidance, stating that applicants have the burden of establishing that they have protected status, and suggesting that the Sage House program probably constituted an educational use.  Town Counsel also stated that because 517 Winter Street was a pre-existing structure, "this limits the application of site plan review to parking concerns."  On April 7, 2006, the Planning Board asked SMOC to provide a list of waivers for the items requested, with accompanying justifications.  SMOC submitted the requested information on May 8, 2006.  On June 9, 2006, the Planning Board requested that the Building Commissioner provide input on the applicability of the Dover Amendment, he responded that he believed that SMOC's proposed use would qualify for exemption under the Dover Amendment.

Between June 2006 and January 2007, the Planning Board held seven public hearings on SMOC's application for Site Plan Review of the 517 Winter Street application.  The hearings discussed Sage House's parking plans, and access for fire and rescue vehicles.  On October 12, 2006, SMOC filed an application for a Public Way Access permit, which also became a matter of discussion.

On September 18, 2006, the Director of the Planning Board issued a memorandum to the Building Commissioner, Joseph Mikielian, stating that the Board wanted to find out how Building Commissioner Mikielian had verified that Sage House was protected by the Dover Amendment, and how the Commissioner would monitor Sage House's activities in the future to determine whether it remains exempt.  The Town Counsel responded in an opinion letter on September 29, 2006, stating that Mikielian had previously determined that the proposed use of 517 Winter Street was an educational use, and that a program monitoring Sage House for zoning compliance could subject the Town to potential liability under the Fair Housing Act.

During this time, the Board of Selectmen was engaged in discussions about the Sage House relocation.  In October 2006, the BOS voted to examine further whether Sage House qualified for Dover Amendment protection.  Building Commissioner Foley confirmed that the 517 Winter Street project was an exempt use under the Dover Amendment.  The Town Counsel responded on November 28, 2006 that several determinations regarding Sage House's exemption had already been made, and that the Building Commissioner should stand by these determinations absent indications of "fraudulent misrepresentation."

At the Planning Board hearing on December 7, 2006, residents of Framingham made a presentation regarding the residents'

opinions about SMOC's proposal.   Some time was devoted to the
discussion of the Dover Amendment's applicability to Sage House.
At the January 4, 2007 hearing, defendant Bernstein, a member of
the Planning Board, asked whether SMOC would consider
participating in the PILOT program, i.e., making voluntary PILOT
payments to the Town.

     The public hearings closed on January 25, 2007.   On January
29, 2007, Silver was hired as the Human Services Coordinator, and
soon thereafter called the Institute for Health and Recovery
("IHR") and told IHR that SMOC would never get approval to
operate at 517 Winter Street.   Nevertheless, the Planning Board
approved SMOC's application for Site Plan Review on April 5,
2007, and approved its application for a Public Way Access permit
on April 12, 2007.

     Meanwhile, in March 2007, the Department of Public Health
("DPH") and the Department of Social Services ("DSS")
investigated evidence that several Sage House employees had tried
to bring drugs into the MCI-Shirley Prison.   The Department of
Corrections ("DOC") had investigated the matter after the
allegations first emerged in late 2006, but no arrests were made.

     DPH issued a report on April 20, 2007, concluding that SMOC
had failed to inform DPH about investigations by the DOC into the
employees' conduct, and that SMOC had hired employees with
criminal convictions without prior approval from DPH.   But DPH

also concluded that SMOC's supervision of its employees had been adequate.  DPH placed SMOC's license to operate Sage House in a "Renewal Pending" status, until SMOC had complied with DPH's request to remedy the violations.

### b.  Common Ground Shelter

Common Ground Shelter, operated by SMOC, provided shelter to a variety of homeless individuals, and did not deny access to those with active substance abuse problems or those with criminal records.  SMOC closed the shelter in October 2006 as part of its revised plan for homelessness programs.

In 2002, the Building Commissioner had determined that Common Ground qualified for exemption from the Town's zoning laws under the Dover Amendment.  In 2006, after receiving complaints that Common Ground performed no educational services, the Building Commissioner began a review of whether or not Common Ground was being used predominantly or primarily for educational use.  In September 2006, Building Commissioner Mikielian concluded that there was little evidence of educational use at the shelter, and recommended a cease-and-desist order requiring the closure of the shelter.  On September 27, 2006, SMOC wrote to Framingham's Town Manager, announcing that it would close Common Ground.  SMOC's Director of Emergency Shelters has stated that the decision was made by SMOC because of its own policy objectives.

In March 2006, in discussions related to those involving the Common Ground Shelter, defendants Lee and Esty and the interim Town Manager discussed the possibility of strengthening the Town's Lodging House Bylaw to require shelters to be licensed by the Town.  In May 2007, the Town Meeting adopted a Lodging House Bylaw amendment that required lodging house owners to exercise "due care" in selecting tenants, to keep a residents log, and to have on-site supervision at all times if there are twelve or more units.  SMOC operates six of the thirteen lodging houses registered in Framingham.

Several incidents involving Common Ground Shelter are at issue.  First, in October 2005, defendant Orr and another individual entered Common Ground Shelter on the pretense that they had authority to inspect the shelter as Town officials, when in fact they had no such authority.  Second, SMOC allowed the police to enter the shelter to serve arrest warrants and conduct warrant checks on SMOC's behalf.  SMOC alleges, however, that the police also made unauthorized entries in 2005, and monitored the shelter in unmarked cars parked outside the facility.  At one point, a police officer inquired about educational activities at the shelter.

**c.  Larry's Place**

Larry's Place is a supportive residential program for homeless disabled veterans, located at 90 Lincoln Street in

-12-

Framingham.   Larry's Place requires participants to attend
educational programs directed at helping the residents achieve
greater independence.

In September 2005, SMOC had acquired property at 90 Lincoln
Street for the development of Larry's Place.   In July 2007, SMOC
applied for a building permit for 90 Lincoln Street, and claimed
exemption from the Town's zoning requirements under the Dover
Amendment.   The Building Commissioner denied SMOC's request in
September 2007, for failure to provide documentation necessary to
demonstrate that the proposed use was primarily educational.
SMOC appealed the Commissioner's decision to the ZBA, providing
new documentation on its proposed use at 90 Lincoln Street.   In
February 2008 the ZBA reversed the Commissioner's determination,
and found Dover Amendment protection.

## B.  Procedural History

The Plaintiffs' Amended Complaint included eight counts.   In
my Memorandum and Order of September 30, 2008, 2008 WL 4595369, I
dismissed the counts alleging conspiracy (Count I), violations of
42 U.S.C. § 1983 (Count V), and violations of the Massachusetts
Civil Rights Act (Count VI).   I also dismissed Julian Suso from
the case.   What remain are the following allegations: FHA
violations by all Defendants (Count II); ADA violations by the
Town of Framingham (Count III); Rehabilitation Act violations by
the Town of Framingham (Count IV); and defamation by Adams, Esty,

Giombetti, Laurora, and Orr (Count VII).  The Defendants move for
summary judgment on all remaining counts.

## II.   STANDARD OF REVIEW

Summary judgment should be granted when the pleadings,
discovery, disclosure materials, and affidavits show that there
is no genuine issue as to any material fact, and that the moving
party is entitled to judgment as a matter of law.  Fed. R. Civ.
P. 56(c).  A dispute over material facts is "genuine" if the
evidence is such that a reasonable jury could resolve the dispute
in favor of the non-moving party.  *Rodriguez-Rivera v. Federico
Trilla Reg'l Hosp.*, 532 F.3d 28, 30 (1st Cir. 2008).  "The party
with the burden of proof must provide evidence sufficient for the
court to hold that no reasonable fact-finder could find other
than in its favor."  *Scottsdale Ins. Co. v. Torres*, 561 F.3d 74,
77 (1st Cir. 2009).

## III.   FAIR HOUSING ACT CLAIMS

SMOC alleges FHA violations by all of the remaining
Defendants in the case.  In particular, SMOC alleges that 42
U.S.C. § 3617 was violated by each of the Defendants, and that §
3604(f)(1) was violated by the Town, the Board of Selectmen
members (Esty, Giombetti, and Smith), and the Planning Board
members (Bernstein, Carr-Evans, Spack, and Welles).

## A.  Legal Framework

### 1.  Sections 3604 and 3617

Under 42 U.S.C. § 3604(f)(1), it is unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of that buyer or renter, [or of] a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available."  42 U.S.C. § 3604(f)(1)(A)-(B). Federal regulations define "handicap" to include drug addiction or alcoholism that "substantially limits one or more major life activities."  24 C.F.R. § 100.201; § 100.201(a)(2).

A plaintiff can allege three causes of action under Section 3604 of the FHA: intentional discrimination (or disparate treatment), disparate impact, or failure to make reasonable accommodation.  *See Gamble v. City of Escondido*, 104 F.3d 300, 304-07 (9th Cir. 1997) (describing the three causes of action); *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48 (2d Cir. 2002) (same); *Langlois v. Abington Housing Authority*, 207 F.3d 43, 49 (1st Cir. 2000) (reading the FHA to permit a disparate impact cause of action).  SMOC advances only a theory of disparate treatment, which requires the plaintiff to present evidence showing that the challenged conduct "was due in

part or whole to discriminatory intent." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1123 (9th Cir. 2004).[3]

Section 3617 of the FHA further provides that a person cannot "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of" rights protected under the FHA.  42 U.S.C. § 3617.  Actions under this section require the plaintiff to make the following showing: (1) the plaintiff is a member of an FHA-protected class; (2) the plaintiff exercised a right protected by §§ 3603-06 of the FHA, or aided others in exercising such rights; (3) the defendants' conduct was at least partially motivated by intentional discrimination; and (4) the defendants' conduct constituted coercion, intimidation, threat, or interference on account of having exercised, aided, or encouraged others in exercising a right protected by the FHA. *King v. Metcalf 56 Homes Ass'n, Inc.*, 385 F. Supp. 2d 1137, 1142-43 (D. Kan. 2005).

## 2. Discriminatory Intent

Under both in connection with a disparate treatment claim under Section 3604 and under Section 3617, there must be "sufficient evidence for a reasonable jury to conclude" that the Defendants were motivated by a protected characteristic in

---

[3] Under a disparate impact theory, not advanced by SMOC, a plaintiff would have to show that the defendants' actions "actually or predictably [resulted] in . . . [actionable] discrimination." *Macone v. Town of Wakefield*, 277 F.3d 1, 7 (1st Cir. 2002) (internal citations omitted).

performing the challenged conduct.  A plaintiff can show
discriminatory intent either through direct or circumstantial
evidence, or by making a prima facie case of discrimination under
the *McDonnell Douglas* framework.  *See McDonnell Douglas Corp. v.
Green*, 411 U.S. 792, 802-03 (1973); *Budnick v. Town of Carefree*,
518 F.3d 1109, 1114 (9th Cir. 2008) (describing the two
approaches).

### a.  Direct Method of Proof

A plaintiff can make a disparate treatment claim by
presenting evidence that a discriminatory purpose "more likely
than not" motivated the conduct.  *Budnick*, 518 F.3d at 1114
(internal citations omitted).  This "direct method of proof"
shows that the conduct was discriminatory "without reliance on
inference or presumption."  *Cerutti v. BASF Corp.*, 349 F.3d 1055,
1061 (7th Cir. 2003).

"Direct evidence is that which can be interpreted as an
acknowledgment of the defendant's discriminatory intent."
*Kormoczy v. Sec'y, U.S. Dep't of Housing and Urban Dev.*, 53 F.3d
821, 824 (7th Cir. 1995).  Circumstantial evidence is that which
allows the fact-finder to infer that the defendant engaged in
intentional discrimination.  *Id.*  This circumstantial evidence,
however, "must point directly to a discriminatory reason for the
. . . action."  *Cerutti*, 349 F.3d at 1061 (quoting *Adams v. Wal-
Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) (describing

this "direct" method of proof as well as the "indirect" method under *McDonnell Douglas*).

### b. *McDonnell Douglas* Burden-Shifting

A plaintiff can also survive summary judgment by making a case under the *McDonnell Douglas* framework, which permits a plaintiff to present evidence "from which a jury could infer that the [defendants'] articulated reasons [for the challenged conduct] were pretextual and that . . . discrimination was the real reason for [the adverse action]." *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 429 (1st Cir. 2000) (applying the *McDonnell Douglas* framework to employment discrimination under the Age Discrimination in Employment Act); *Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 791 (6th Cir. 1996) (applying the burden-shifting process to alleged violations of the FHA).

The plaintiff must first make a prima facie case by providing evidence that gives rise to an inference of unlawful discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981). The First Circuit has stated that the prima facie showing is not an "onerous" burden, and can be "easily made." *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003) (internal citations omitted); *see also Greenberg v. Union Camp Corp.*, 48 F.3d 22, 26 (1st Cir. 1995) (observing that the prima facie burden is "relatively light").

Second, after the prima facie case is made, the burden shifts to the defendant to articulate a nondiscriminatory reason for the conduct. *Dominguez-Cruz*, 202 F.3d at 430; *Casa Marie, Inc. v. Superior Court of Puerto Rico*, 988 F.2d 252, 269 n.20 (1st Cir. 1993) (describing burden-shifting for disparate impact cases under the FHA).

Finally, after the defendant rebuts the presumption, the plaintiff has the burden of proof with respect to the discriminatory intent of the conduct. *Dominguez-Cruz*, 202 F.3d at 430. At this stage, a court ruling on a summary judgment motion must focus on whether, given the "aggregate package of proof" and drawing all inferences in the plaintiff's favor, there is a genuine issue of fact as to the discriminatory motive of the conduct. *Id.* at 430-31 (quoting *Mesnick v. General Elec. Co.*, 950 F.2d 816, 824-25 (1st. Cir. 1991)).

### c. Totality of the Evidence

The First Circuit has noted that "bright line articulations" distinguishing the direct evidence approach from *McDonnell Douglas* may not always be helpful. *Dominguez-Cruz*, 202 F.3d at 429. The court has recognized that "the need for flexibility" sometimes justifies bypassing these approaches and instead considering whether the "totality of the evidence permits a finding of discrimination." *Id.* at 430.

**B.  Section 3604 Allegations**

Before turning to the specific allegations under 42 U.S.C. § 3604, I first address a threshold issue of whether the purported delays in obtaining approval for SMOC's permits can be a cognizable claim, given that the permits were ultimately approved by Town officials.

**1.  Delay as a Cognizable Violation**

Several of the Defendants challenge the Section 3604 allegations by arguing that there was no discriminatory action taken against SMOC, and therefore that the Defendants did not "discriminate in the sale or rental, or . . . otherwise make unavailable or deny, a dwelling" to the SMOC residents.  42 U.S.C. § 3604(f)(1).  The Defendants maintain that, notwithstanding any commentary made before and during the Site Plan Review, SMOC's clients were never denied residence in Framingham, and all of SMOC's housing applications were ultimately granted.

Discrimination under the FHA, however, includes delays in issuing permits that are caused in part by discriminatory intent, even if the permits are ultimately granted.  To be sure, the court in *Carmona-Rivera v. Puerto Rico*, 464 F.3d 14 (1st Cir. 2006), observed that "[m]erely labeling the delay as intentional discrimination, without some modicum of evidence demonstrating an actual discriminatory animus," is not a violation of the FHA, *id.*

-20-

at 18, but in that case, the record included no evidence that the delays "were anything more than the result of a slow-moving bureaucracy." *Id.* While the FHA requires a "close causal link between housing and the disputed action," *United States v. Bankert*, 186 F. Supp. 2d 623, 628 (E.D.N.C. 2000), once such a connection is demonstrated, the types of discriminatory actions prohibited are wide-ranging. Section 3604 "prohibit[s] all forms of discrimination, sophisticated as well as simpleminded, . . . and tactics of delay, hindrance, and special treatment must receive short shrift from the courts." *Williams v. Matthews Co.*, 499 F.2d 819, 826 (8th Cir. 1974); *see also United States v. Hughes Memorial Home*, 396 F. Supp. 544, 549 (W.D. Va. 1975) (internal citations and quotations omitted) (The FHA's "catch-all phraseology may not be easily discounted or de-emphasized. Indeed it appears to be as broad as Congress could have made it."). "The imposition of more burdensome application procedures, [and] of delaying tactics . . . constitutes a violation of" the FHA. *United States v. Youritan Const. Co.*, 370 F. Supp. 643, 648 (N.D. Cal. 1973); *see also United States v. City of Jackson*, 318 F. Supp. 2d 395, 417-18 (S.D. Miss. 2002) (finding that a delay, combined with defendants' statements evincing discriminatory intent, could violate the FHA); *Bankert*, 186 F. Supp. 2d at 628 (noting that delay tactics may be a violation of the FHA); Robert G. Schwemm, *Hous. Discrim. Law &*

*Litig.* (2008), § 13:4 ("[D]elaying tactics and burdensome
application procedures used to limit . . . access to housing []
are clearly covered by [the] phrase . . . 'otherwise make
unavailable or deny.'").

This case involves not only evidence in the record
indicating delays, but also communications by the Defendants
linking such delays to the nature of the projects and their
residents.  While there may be some dispute as to whether animus
played any role in creating such delays, and whether SMOC's own
slow-moving conduct also played a role, there is sufficient
evidence in the record to raise a dispute as to whether
discriminatory action was taken.

### 2.  Alleged Instances of Discrimination

Although several Defendants were often engaged in the same
instances of decision-making at particular moments, I organize my
discussion according to the categories of Town officials.

#### a.  Board of Selectmen Members

The Board of Selectmen did not have jurisdiction over the
decisions made by the Planning Board or Building Commissioner.
Nevertheless, several of the actions taken by the BOS raise
genuine issues of material fact as to whether the Board (as
governing body for the Town) and the Board member defendants
intentionally discriminated against the residents of SMOC

programs, in particular by raising procedural hurdles and delays during the permit application process.

### i.  Involvement before Site Plan Review

SMOC claims that the BOS became significantly involved in the deliberations over the Sage House relocation to 517 Winter Street.  In the period before Site Plan Review of the Winter Street application began, SMOC claims that the BOS "united" with STEPPS to obstruct the relocation.  However, some of these allegations miss the mark.  SMOC points to comments made by STEPPS members at the BOS meeting on May 19, 2005 and a memorandum sent to BOS outlining the group's concerns.  But SMOC cannot fairly characterize comments by non-BOS members, made in a public forum, as action by the BOS.

More relevant is BOS action during a meeting with STEPPS members on June 2, 2005.  BOS member Giombetti stated that the Board's approach should be "to put a strong burden on [SMOC] to be here in front of us and position it in such a way that we would be strongly disappointed if they did not show for this hearing, and that there may be . . . problems . . . for other things they want to do in Town."  The BOS then decided to look into the permitting process for Sage House's relocation to Winter Street.  On June 20, 2005, Town Manager King asked Building Commissioner Mikielian, at defendant Giombetti's request, to answer a set of questions drafted by STEPPS and to provide the

BOS with a list of permits that SMOC required before opening the
Winter Street facility.  Mikielian stated during his deposition
that he could not recall other instances in which the BOS had
inquired about a particular permit application.

In June 2006, Giombetti had a meeting with SMOC's Executive
Director during which Giombetti notified him that the Town wanted
the Common Ground Shelter to be closed, and that the Sage House
program was inappropriate for the Winter Street location.

Furthermore, the record includes evidence of various
comments by Giombetti and Esty that may indicate discriminatory
intent.  *See, e.g.*, *Cmty. Housing Trust v. Dep't of Consumer &
Regulatory Affairs*, 257 F. Supp. 2d 208, 226 (D.D.C. 2003)
(considering as evidence comments made by the defendants
regarding the "condition" of the disabled residents).  BOS member
Esty specifically stated that she opposed the relocation of Sage
House to 517 Winter Street because she was concerned about the
residents who would live there.  Giombetti, during a June 23,
2005 meeting with Bernstein and the Town Manager, described a
strategy to challenge the Dover Amendment determination in court,
thereby "set[ting] the tone that if you want to come under the
Amendment, it's going to cost you some money because we're going
to fight those."  At this meeting, Esty also proposed roadblocks
to the Sage House relocation, observing that "[w]e may have some
influence here in stalling" the Building Commissioner's decision

on permits sought by SMOC until zoning rules could be changed to
subject Sage House to more scrutiny.

### ii.   Supporting the Bylaw Amendment

Another disputed action is the passage of the Zoning Bylaw
amendment in July 2005, which subjected Dover Amendment
properties to Site Plan Review by the Planning Board.   On July
12, 2005, the BOS voted to hold a special town meeting to amend
the Zoning Bylaw.   In response to a BOS member's observation that
the BOS does not generally get involved in zoning issues, Esty
responded that by taking a position, the BOS would have "some
grasp of controlling some small aspect of proposed 40A Dover
Amendment projects."

The Attorney General, of course, ultimately approved the
Zoning Bylaw amendment on its face.   But the record suggests that
the amendment may have targeted SMOC in order to prevent or deter
SMOC from relocating Sage House to Winter Street.   If the
Defendants did intend the amendment to target SMOC and derail the
relocation efforts, this could run afoul of the FHA.   Under
Section 3604, the unlawful denial of a dwelling includes erecting
procedural hurdles that make it difficult to obtain the dwelling.
In *Support Ministries for Persons with AIDS, Inc. v. Vill. of
Waterford*, 808 F. Supp. 120 (N.D.N.Y. 1992), residents objected
to a house for homeless individuals with AIDS, and the Village
changed the zoning laws to forbid group residences for persons

-25-

recovering from illness or disease.  One village resident described the change as "another lag" causing enough delay so that "they'll just give up."  *Id.* at 124.  The court found the Village's actions improper under the FHA.  *Id.* at 135.

### iii.   *Sage House's Dover Amendment Status*

Although the Board of Selectmen had no official authority to determine or challenge an institution's protection under the Dover Amendment, the BOS did become involved in the process.  The clearest instance of involvement is the BOS's multiple requests that the Building Commissioner address BOS concerns regarding Sage House's Dover Amendment qualifications.

At a BOS meeting on October 17, 2006, Esty stated that "[n]ow the climate has changed" and the BOS is willing "to do anything we can to help [Framingham residents], and in the interest of testing this Dover Amendment."  Esty further stated with respect to the Winter Street project and the Vernon House project, "we should really hop on those before they go too much further and let the planning board know."  The BOS requested that Foley, the Town Manager, and the Town Counsel develop "criteria" for the Building Commissioner's review of Dover Amendment sites. After Foley confirmed that Sage House fell under the Dover Amendment, the BOS asked Foley to "reconsider and reverse" the decision.

The Town adopted the new criteria for Dover Amendment uses by November 22, 2006, entitled "Supplemental Information for Applicants Seeking Exempt Use Status."  Building Commissioner Foley requested SMOC to complete the Supplemental Information form, though he could not require its completion.

### iv.   Approval for Larry's Place

SMOC argues that the BOS, by creating new Dover Amendment criteria, influenced Commissioner Foley's decision to deny SMOC's application for a Dover Amendment exemption for Larry's Place. Giombetti argues that the BOS remained uninvolved in SMOC's permit application for Larry's Place.  Because the parties have presented conflicting evidence as to BOS's involvement, I must read the evidence in the light most favorable to Plaintiffs, as the non-moving parties.

### v.   Common Ground Shelter

SMOC contends that the BOS also made inquiries into the Dover Amendment status of the Common Ground Shelter, at several points asking Building Commissioner Mikielian to reevaluate his 2002 determination that the Shelter was covered by the Dover Amendment.  When Mikielian confirmed his determination, the BOS voted to have him review the issue again.  The BOS voted on July 25, 2006 to provide support to a lawsuit by residents wishing to challenge Mikielian's determination.

Disputed is whether the BOS involved the Framingham police department in the investigation of the Common Ground Shelter, including parking unmarked cars outside the shelter and questioning homeless individuals in Framingham about the shelter's educational activities.   The Defendants contend that the Town Meeting merely asked the police department to look into the increase in crime in the downtown area of Framingham.   The nature of the conflicting evidence, however, creates an issue of fact for the fact-finder.   Giombetti, for example, maintains that his actions had no impact on the Planning Board hearings.   He concedes, however, that the BOS asked the Town Manager to respond to the STEPPS questions in June 2005, and asked Foley to reexamine the Dover Exemption for 517 Winter Street.

### b.   Planning Board Members

SMOC alleges that the Planning Board members engaged in a variety of actions, similar to those of the BOS members, aimed at deterring or delaying SMOC's permit applications for the residences in question - from targeting SMOC with the Zoning Bylaw amendment to slowing the process of Site Plan Review.

### i.   *Passage of the Bylaw amendment*

The Planning Board members supported the Town's passage of the Zoning Bylaw amendment, and there is evidence to suggest that some of the Planning Board members supported the amendment in order to target SMOC.   Defendant Bernstein, for example,

-28-

described the amendment as a "silver bullet" against the Sage
House relocation effort, and without such effect, the "mission of
the amendment would not be 'productive.'"

*ii. Site Plan Review*

There are genuine disputes as to whether the Planning Board
deliberately prolonged the Site Plan Review process in order to
delay the relocation or deter Sage House from pursuing it.
Bernstein stated at one point that requiring a traffic study by
SMOC, now permitted under the Zoning Bylaw amendment, "would have
a nuisance value."

A reasonable jury could infer that during the first Site
Plan Review hearing on June 22, 2006, the Planning Board members
expanded the scope of the review process beyond that permitted by
the Zoning Bylaw amendment and the Dover Amendment.  Spack, for
instance, commented that "[t]he whole issue here is the context
of this project in the neighborhood" and requested SMOC to
provide information on this context.  Spack also asked SMOC to
"volunteer" to submit a fiscal impact assessment, stating that it
was "appropriate" for the Planning Board to make this request
even though the assessment was not required.  Welles invited the
public to submit additional conditions to the Planning Board.
Bernstein asked SMOC to resubmit its Dover Amendment materials
that had already been submitted to the Building Commissioner,

-29-

commenting that "I don't always agree with the Building Department's rulings."

Before the January 25, 2007 hearing, the Board permitted STEPPS to present a list of requests for the Sage House relocation, including a PILOT payment, which STEPPS suggested would be "conditions of approval for SMOC's proposed Sage House program at 517 Winter Street." At the January 25, 2007 hearing, Laurora asked when SMOC would address the STEPPS conditions. Welles responded that the Town Counsel had advised the Planning Board that most of the STEPPS conditions were beyond the jurisdiction of Site Plan Review. Bernstein nevertheless submitted these and other conditions to the other Board members for discussion, although admitting that the Planning Board could not require them.

There is evidence to suggest that various forms of economic pressure were also placed on SMOC. During a March 8, 2007 meeting, Bernstein addressed the possibility of asking SMOC to make PILOT payments in order to facilitate the Site Plan Review. Faced with the Town Counsel's statements that such a condition was beyond the scope of Site Plan Review, Bernstein responded that "it's up to whether the applicant would prefer to see that in there or not have the positive vote." Bernstein, along with Town Meeting member Adams, also discussed ways to make the Winter Street property's development more costly. For example, the

Planning Board tried to get SMOC to agree not to subdivide the
Winter Street lot, apparently out of fear that multiple programs
would be sited at Winter Street.  Bernstein acknowledged that the
Planning Board had no legal means of blocking the lot's
subdivision, but suggested that if the Board pursued this
approach, this could present SMOC with a choice between
"spend[ing] a year or so in court unable to open the building vs.
giving up the extra lots."

### iii.   Dover Amendment Evaluation

The Planning Board also engaged in fairly extensive
discussions of the Dover Amendment protected status of Sage
House, even though the Building Commissioner, not the Planning
Board, was charged with making Dover Amendment determinations,
and even though the Town Counsel informed the Planning Board that
the Building Commissioner had determined that Sage House
qualified for Dover Amendment protection.  Bernstein, for
example, requested Dover Amendment materials from SMOC during the
November 22, 2006 hearing, admitting that such requests were
beyond the Planning Board's authority, but indicating that she
would expect SMOC to "want to give all the help they could in
that direction."

The Planning Board members maintain that the record shows
their genuine confusion as to the Dover Amendment status of Sage
House.  But given the evidence on record, the Defendants have

failed to show as a matter of law that their conduct was
motivated by confusion, and that discriminatory intent was not at
least partially a motivating factor.

SMOC has identified various comments suggesting
discriminatory animus on the part of some of the Defendants.  The
Planning Board members argue that their remarks and inquiries
cannot be interpreted as inappropriate or insensitive to the
disabled.

The Planning Board members are correct that a few scattered
comments alone do not suffice to overcome a defendant's motion
for summary judgment.  *See Nat'l Amusements, Inc. v. Town of
Dedham*, 43 F.3d 731, 743-44 (1st Cir. 1995) ("While ambiguous
remarks may, under some circumstances, help to illuminate the
summary judgment record, such remarks rarely will suffice to
conceive an issue of material fact when none otherwise exists.");
*Saulsberry v. St. Mary's Univ. of Minn.*, 318 F.3d 862, 867-68
(8th Cir. 2003) (finding that "an isolated, stray comment
unrelated to the decisional process" is not direct evidence of
discrimination).  But Defendants' alleged statements consist of
far more than just "isolated, stray" remarks unrelated to the
decisions in question.  The alleged comments were specific, and
often directly related to the permit application process.
Further, they sit amidst a wealth of disputed material facts.

The Defendants also contend that the Planning Board (and other Town officials) were merely responding or listening to concerns expressed by private citizens during the hearings on Site Plan Review.  Yet for discrimination against a protected group to qualify as a motivating factor, the decision-maker need not personally feel animus toward the group.  One district court has found it sufficient that the Town officials' purpose was to "effectuat[e] the desires of its private citizens," and that "improper considerations were a motivating factor behind those desires."  *People Helpers, Inc. v. City of Richmond*, 789 F. Supp. 725, 732 (E.D. Va. 1992).

### c.  Town of Framingham

While "federal courts should not become zoning boards of appeal to review non-constitutional land use determinations," *Zahra v. Town of Southold*, 48 F.3d 674, 679-80 (2d Cir. 1995) (internal quotation omitted), federal and state laws do place limits on discriminatory housing practices.

Given the evidence of the BOS and Planning Board members' involvement, the Plaintiffs have adduced sufficient evidence to demonstrate a genuine issue of material fact as to the Town's liability under Section 3604(f)(1).  The Town argues that there is no evidence any of the Planning Board members harbored anti-disabled prejudices, and contends that the Board merely complied with its obligation to permit Framingham residents to exercise

their First Amendment rights.  This position, however, is in
conflict with comments made by the defendant Planning Board
members themselves, including the statements regarding how to use
Planning Board policies and procedures to impede SMOC's
relocation request.

### 3.  Similarly Situated Projects

To establish a disparate treatment claim under the § 3604 of
the FHA, a plaintiff must establish that a similarly situated
party, during a time period relatively near the period in
question, was treated differently by the defendants.  *Gamble*, 104
F.3d at 305; *Budnick*, 518 F.3d at 1114.  SMOC maintains that it
need not show disparate treatment of similarly situated projects
so long as it can show that a discriminatory purpose motivated
the conduct.  This position is not supported by the case law
cited for it.  *See Reg'l Econ. Cmty. Action Program*, 294 F.3d 35
(making no mention of how to analyze similarly situated
projects).

Nevertheless, SMOC does raise questions of fact as to
whether the Defendants treated such projects differently from
SMOC.  Mikielian, the former Building Commissioner, has stated on
the record that the Planning Board made regular inquiries into
the Dover Amendment status of Sage House, and treated SMOC's
application for Sage House "differently" than it did other
programs.

-34-

During the Site Plan Review process, the Planning Board and Building Commissioner considered four other projects.  SMOC argues that these projects were not subjected to the delays and procedures imposed on SMOC.  The Metrowest Jewish Day School, which qualified as religious and education use under the Dover Amendment, applied for Site Plan Review on May 18, 2006, and obtained a Planning Board decision by September 2006.  The Planning Board Defendants respond that the Day School requested only the construction of a temporary off-street parking area, thereby requiring a much shorter period of review.  But given the similarity in issues raised for both projects - Dover Amendment status, applicability of the Zoning Bylaw amendment, placement in a residential area - these projects can be considered similarly situated.

Another project was a group home for mentally ill adults at 20 Vernon Street.  The Dover Amendment covered the project, but Site Plan Review took only five months from the filing of the application to Board approval.  The Planning Board members explain this difference by pointing to factors such as the greater local opposition to Sage House's relocation and the greater level of cooperation from the Vernon Street parties.  But of course, resident opposition and SMOC's level of cooperation could very well be directly related to discriminatory treatment against SMOC.

SMOC has presented sufficient evidence to indicate that there are genuine issues of material fact as to the comparison of these programs, and whether SMOC was treated differently from them.  As a result, the Defendants' motion for summary judgment as to the violations under Section 3604 will be denied.

## C.  Section 3617 Allegations

SMOC maintains that all of the Defendants engaged in unlawful coercion, interference, intimidation, or threats that give rise to liability under 42 U.S.C. § 3617.  Of the four elements in a cause of action under Section 3617,[4] the first two are not disputed by the Defendants.  The third element, discriminatory intent, is discussed above except with reference to the Town Meeting Defendants (whom I will consider in this section), in connection with the discussion under Section 3604, leaving the fourth issue of whether the Defendants engaged in threats, intimidation, coercion, or interference on account of SMOC exercising rights protected by the FHA.

---

[4] As stated in Part III.A., *supra*, a plaintiff must show that (1) he is a member of an FHA-protected class, (2) he exercised a right protected by §§ 3603-06 of the FHA, or aided others in exercising such rights, (3) the defendants' conduct was at least partially motivated by intentional discrimination, and (4) the defendants' conduct constituted coercion, intimidation, threat or interference on account of having exercised, or aided or encouraged others in exercising, a right protected by the FHA. *King v. Metcalf 56 Homes Ass'n, Inc.*, 385 F. Supp. 2d 1137, 1142-43 (D. Kan. 2005).

### 1.  "Interference" Under the Statute

Some of the Defendants argue that overt acts of force must be involved to support an allegation under Section 3617.  I rejected this approach at the motion to dismiss stage, 2008 WL 4595369, at *12-*13, and need not rehearse that discussion in great detail here.  It is sufficient to state that "interference" under the statute can encompass a "pattern of harassment, invidiously motivated."  *Halprin v. Prairie Single Family Homes*, 388 F.3d 327, 330 (7th Cir. 2004).  Though the case law is not uniform, the common view is that interference encompasses more than physical force or intimidation.  *See, e.g.*, *Mich. Protection & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 347 (6th Cir. 1994) ("Section 3617 is not limited to those who used some sort of 'potent force or duress,' but extends to other actors who are in a position directly to disrupt the exercise or enjoyment of a protected right and exercise their powers with a discriminatory animus."); *Gourlay v. Forest Lake Estates Civic Ass'n of Port Richey, Inc.*, 276 F. Supp. 2d 1222, 1235 (M.D. Fla. 2003) (vacated because of subsequent settlement) (holding that the word "interference" refers to conduct "so severe or pervasive that it will have the effect of causing a protected person to abandon the exercise of his or her housing rights"); *People Helpers*, 789 F. Supp. at 733 n.5 ("[W]hen the full weight of the City is brought to bear on a person and where . . . investigations are threatened

in order to discourage Plaintiffs from helping minorities find
suitable housing, then it cannot be said that interference,
coercion, or intimidation of the type contemplated by § 3617 did
not occur."); *King*, 385 F. Supp. 2d at 1144 (finding that the
defendant, by collecting information and making reports to the
housing authority to get Section 8 funding cut off, "engaged in a
severe and pervasive pattern of harassing" the plaintiff). *But
see White v. Lee*, 227 F.3d 1214, 1230 (9th Cir. 2000) (holding
that Section 3617 violations are limited to advocacy "directed to
inciting or producing imminent violence and is likely in fact to
do so").

### 2.  Board of Selectmen Members

As discussed in Part III.B.2.a., *supra*, there is evidence
from which a jury could infer that Giombetti, Esty and Smith were
involved in increasing the scrutiny of the SMOC projects and in
making it difficult for SMOC to relocate Sage House to Winter
Street.  The BOS members were allegedly involved in getting the
police department to place unmarked cars outside the Common
Ground Shelter, and described their own efforts as a strategy to
increase the cost of Dover Amendment applications.  Because the
BOS is the primary executive decision-maker in the Town, it had
influence over the process and the Town officials directly
involved in it, even though the BOS did not have authority over
Site Plan Review or Dover Amendment determinations.  The BOS

-38-

members also communicated directly with SMOC officers at times to request information and concessions.

Viewing the facts in the light most favorable to the Plaintiffs, I find that a reasonable jury could conclude that under Section 3617, Giombetti, Esty, and Smith unlawfully "interfered" with the Plaintiffs' rights protected by the FHA.

### 3.  Planning Board Members

A reasonable jury could also conclude that the Planning Board members engaged in unlawful conduct under Section 3617.  As discussed in Part III.B.2.b., *supra*, there is evidence on the record involving each of the Planning Board Defendants and the discriminatory motives that may have been a factor in their involvement in the Sage House relocation.

Bernstein made several requests for PILOT payments by SMOC, even though such requests were an impermissible part of Site Plan Review.  Her comments could have led SMOC to believe that it would have to abandon the Sage House relocation if it did not make payoffs to the Town, thereby constituting an interference with FHA-protected rights.  Spack, during Site Plan Review, was involved in increasing the burdens on SMOC to gain Planning Board approval, for example, offering a fiscal impact assessment and detailing the more general contextual issues related to the relocation.  Welles sought to expand Site Plan Review beyond its permissible scope by inviting the public to submit additional

conditions for the Sage House relocation.  Carr-Evans also participated in attempting to impose additional conditions on SMOC and in preventing the STEPPS presentation from being interrupted.  In addition, she allegedly made attempts to prevent Sage House from running programs that non-residents could access, though this was beyond the jurisdiction of the Planning Board.

Together, these actions could lead a reasonable jury to conclude that the Planning Board members actively and intentionally interfered with SMOC's rights to neutral and non-discriminatory treatment by Town officials.

**4.   Town Meeting Members**

SMOC alleges that the Town Meeting members - Adams, Laurora, Lee, and Orr - violated Section 3617, but not Section 3604.

**a.   Characterizing the Involvement**

The threshold issue is whether the Town Meeting members can be liable under the FHA, given that they did not have any official authority over SMOC's applications to the Town.

Adams cites *Michigan Protection*, 18 F.3d 337, for the principle that Section 3617 covers only those who could directly make a dwelling unavailable.  The Town Meeting members, according to plaintiffs, were in such a position.  The court in *Michigan Protection* stated that Section 3617's proscription applies to those "who are in a position directly to disrupt the exercise" of a protected right.  18 F.3d at 347.  Section 3617 does not

-40-

require that the actors have official or sanctioned authority over the housing-related decisions; but it does require that they have the power or position to influence, upset, or delay the process.  For example, in *People Helpers*, the court noted that one of the defendants in a Section 3617 claim was a former city councilwoman, and consequently "exerted more pressure and had greater influence than the average citizen would have had in getting the City to act on her behalf."  789 F. Supp. at 732 n.4.

Case law suggests that *neighbors* and *residents* who oppose a project and use municipal procedures to express their opposition do not run afoul of Section 3617.  *See White*, 227 F.3d at 1230 (determining that a group of neighborhood homeowners did not violate the FHA when they opposed a development by writing letters, publishing a newsletter, and discussing their opposition with the local press); *Sunrise Dev. Inc. v. Lower Makefield*, No. 2:05-CV-02724, 2006 WL 626806, at *5 (E.D. Pa. Jan. 23, 2006) ("This Court does not believe that, in enacting § 3617, Congress intended to restrict the legal right of [neighbors] to appeal an adverse decision of the  [zoning board].").

But where defendants are themselves Town officials, and privately contact other Town officials in an attempt to influence the Town's determination regarding the plaintiff's application, the scenario is no longer that of private residents using public channels of influence.  Although the permitting decisions were

made by the Planning Board, with involvement by the BOS, there
are material disputes as to whether the Town Meeting members used
their positions of influence as Town Meeting members to
contribute to and directly influence the decision-making process.
Here, like in *People's Helpers*, plaintiffs offer evidence to
establish that defendants brought "the full weight of the City .
. . to bear . . .  in order to discourage Plaintiffs from helping
minorities find suitable housing."  789 F. Supp. at 733 n.5.
Adams, who did not become a Town Meeting member until March 2007,
may limit his liability under Section 3617 to activities taken
after his acceptance of a position as a Town Meeting Member.

### b.  Alleged Interference

All of the Town Meeting member Defendants maintain that
although they engaged in petitioning activity opposing the Sage
House relocation, their behavior was reasonable and benign, and
had no interference with the Plaintiffs' exercise of their rights
under the FHA.  SMOC has adduced evidence raising factual
questions about this characterization.

Before the first Site Plan Review hearing for Sage House on
June 22, 2006, Orr made a statement on the Frambors website about
the meeting, encouraging the project's opponents to attend and
"Lock'n'load."  Orr also trespassed on the property of the Common
Ground Shelter under false pretenses, in an effort to gather
information about the shelter and its educational activities.

-42-

Orr disputes the manner in which SMOC characterizes these instances, but on the Defendants' summary judgment motion, I interpret the facts in the light most favorable to SMOC, the non-moving party.

Laurora worked to raise Dover Amendment issues before the BOS and Planning Board, writing to the Executive Office of Health and Human Services on May 11, 2007, asking for a written copy of allegations against SMOC involving the Sage House location on Clinton Street.

Lee allegedly helped prepare the STEPPS presentation at the December 7, 2006 hearing, and emailed Bernstein in January, 2007 with an "important idea" regarding additional provisions that the Planning Board should request of SMOC.

The outlier in this group is Adams, who, as noted, was not a Town official until March 2007.  Adams emailed Bernstein on July 21, 2005, advocating that the Planning Board require a traffic study to impose "delay" and "burden" on SMOC.  But this occurred long before his involvement as a Town Meeting member.  While the Plaintiffs focus on Adams's role as a STEPPS organizer, Adams's STEPPS involvement is not sufficient to create liability under Section 3617.  Case law suggests that courts should be hesitant to hold private citizens liable for opposing development projects, even when discriminatory intent may be a motivation. *See, e.g.*, *White*, 227 F.3d at 1220, 1230 (finding no FHA

violation where a group of neighbors actively opposed a development project that they feared would attract the mentally disabled).

The Plaintiffs' evidence, however, does include comments made by Adams on the Frambors site on September 30, 2007, while Adams was a Town Meeting member: "SMOC is currently occupying 517 Winter on a temporary occupancy permit which expires in November. They hope to have their permanent permit by then.  We are working in the intervening time to convince the state to revoke their contract and pull their financing."  A reasonable jury could conclude that the pronoun "[w]e" refers to Adams and other Town Meeting members, not Adams as a private citizen.  This is sufficient to create issues of material fact as to whether Adams used his capacity as a Town official to oppose SMOC's program at 517 Winter Street in service of the discriminatory intent evidenced in his pre-Town Meeting membership activities.

### c.  Discriminatory Intent

A reasonable jury could conclude that the actions of the Town Meeting member Defendants were motivated in part by the disability of the Sage House residents.  Orr has admitted that he is "prejudiced" against individuals with drug addiction and alcoholism, and stated that he believed such individuals would "steal huge amounts of private property" in order to maintain their habits.  Laurora opposed the Sage House relocation because

she believed that the residents on Winter Street would be
criminals.  Lee provided the original idea to revise the Lodging
House Bylaw in March 2006, and opposed Larry's Place, commenting
that "[i]n case you are not aware, this is around the corner from
our only real library in town."  These comments and actions
provide sufficient evidence of discriminatory intent by each
defendant to survive summary judgment on the Section 3617
allegation.

### 5.  Human Services Coordinator, Silver

The allegations against Silver, the Town's Human Resources
Coordinator as of January 2007, are limited.  SMOC alleges that
in a 2007 discussion with an employee at the IHR, Sage House's
referral source, Silver stated that SMOC would never get approval
to relocate Sage House to Winter Street.  There is no indication,
however, that this comment created any response whatsoever at the
IHR or had any effect on SMOC's housing programs.  Silver also
presented a report to the BOS on August 21, 2007 on the costs
imposed on the Town by social service agencies.  Silver
recommended an eighteen-month moratorium on the siting of such
programs in the Town, and recommended that the Town develop
community groups to monitor social service agency properties and
their clients.  But the facts do not show that the report was
adopted by the BOS or communicated to SMOC in any way that would
constitute threats, intimidation, coercion, or interference.

Indeed, Silver's presentation occurred four months after the Planning Board formally approved the Sage House relocation.

One of SMOC's less compelling arguments is that Silver was involved in Foley's denial of Dover Amendment status to Larry's Place. SMOC points to a meeting with Foley on July 15, 2007 as well as to communications with Lee, in which Lee stated that evaluating Larry's Place "is exactly your job." Foley denied SMOC's application for Larry's Place, and SMOC argues that a reasonable jury could infer that Silver played a role in this outcome (although Foley's decision was ultimately reversed by the Zoning Board of Appeals).

Although Silver's conduct, if the Plaintiffs' allegations are true, suggests a less than neutral approach to SMOC's programs in Framingham, the facts as presented in the record give insufficient support for the contention that Silver engaged in conduct with a discriminatory motive that made housing unavailable to the programs' residents, or interfered with their enjoyment of rights protected under the FHA. Therefore, Silver's motion for summary judgment against Count II is granted.

### 6. Town of Framingham

Given the genuine issues of material fact regarding the Town officials' compliance with Section 3617, as discussed, the Town is not entitled to summary judgment as to this allegation.

## D.  Rebutting the Presumption of Discrimination

Because SMOC has presented a prima facie case that the
Defendants, except Silver, engaged in intentional discrimination,
under *McDonnell Douglas*, the Defendants must rebut the
presumption of discrimination by providing non-discriminatory
reasons for the challenged conduct.

### 1.  Planning Board Explanations

The Planning Board members identify several justifications
for their approach to the Site Plan Review of Sage House.  The
Planning Board members argue that there was confusion about the
application of the Dover Amendment to Sage House.  The Defendants
do not provide evidence, however, showing genuine confusion.
While there was much discussion of Dover Amendment protection,
the comments do not indicate confusion as to the legal
requirements for Dover Amendment uses.  Rather, they reflect
unwillingness to comply with the Dover Amendment.  Furthermore,
even if there was genuine confusion, that would not provide a
legitimate justification for the Planning Board members' conduct
given that they were not responsible for making Dover Amendment
determinations.

The Planning Board members also argue that there were
legitimate Site Plan Review problems that further delayed the
process.  The Supreme Judicial Court has indicated that local
zoning requirements serving "legitimate municipal purposes" can

be applied to Dover Amendment uses. *Trustees of Tufts Coll. v. City of Medford*, 616 N.E.2d 433, 438 (Mass. 1993) (citing *MacNeil v. Town of Avon*, 435 N.E.2d 1043, 1045 (Mass. 1982)).  The proper scope of the Site Plan Review is a matter of dispute between the parties, with SMOC maintaining that such review was limited to parking concerns, while the Defendants interpret the Zoning Bylaw amendment as permitting review of traffic effects, lighting, and landscaping.  A reasonable jury could believe - or not - that objectives within the scope of the Dover Amendment motivated the Planning Board's discussion and imposition of additional burdens on SMOC during the Site Plan Review.

Finally, the Planning Board members argue that the First Amendment restrained their ability to "regulate the First Amendment rights of citizens" that appeared at public hearings. The Defendants claim that First Amendment law prohibited them from restricting residents' comments based on their content.  *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983) (holding that in public property used by the public for expressive activity, restrictions on speech must be content-neutral).  In a public forum, such as the Planning Board hearings, government officials can make content-neutral restrictions on time, place, and manner of expression, but they must be narrowly tailored to serve a "substantial government interest."  *New England Reg'l Council of Carpenters v. Kinton*,

284 F.3d 9, 20 (1st Cir. 2002) (citing *Perry Educ. Ass'n*, 460
U.S. at 45-46).

Nevertheless, the Planning Board members have not
established as a matter of law that certain restrictions - such
as placing designated time limits for the public discussion of
the issues relevant to the application - were unavailable as a
means for narrowly tailoring the substantial government interest
in facilitating a timely and efficient processing of a
petitioner's request for Site Plan Review or relocation.  Indeed,
the Planning Board's own regulations give the Chairman authority
to "enforce such order and decorum as may be necessary for the
sufficient conduct of the Board's business, guided by a desire to
maximize public input on matters before the Board."  The Planning
Board members are no doubt correct that "the whole concept of
representation depends upon the ability of the people to make
their wishes known to their representatives."  *Eastern R.R.*
*Presidents Conf. v. Noerr Motor Freight, Inc.* ("*Noerr Motor*
*Freight*"), 365 U.S. 127, 137 (1961).  But the record before me
does not establish that the very concept of representation would
have been placed at risk by exercising greater control over the
scope and efficiency of the Planning Board hearings.

The Defendants have met their burden of production insofar
as legitimate disputes over Site Plan Review requirements may
have contributed to the delay in the Sage House relocation.  At

-49-

this stage of the *McDonnell Douglas* analysis, however, the
summary judgment process reaches its limits.   There remains the
question of whether SMOC can meet its burden of persuasion on
whether discriminatory intent was a motivating factor in the
delay of the Sage House relocation.   The Defendants have not
shown as a matter of law that SMOC cannot do so.

### 2.   Town Meeting Member Explanations

Adams, Lee, and Orr, who face allegations under Section
3617, maintain that their actions were motivated by concern for
the financial burden placed on the Town by social service
agencies and tax-exempt institutions.   Courts, however, have
found that these arguments about community resources are not
legitimate justifications for discriminatory housing
determinations.   *See, e.g.*, *Horizon House Developmental Servs.
Inc. v. Twp. of Upper Southampton*, 804 F. Supp. 683, 698 (E.D.
Pa. 1992) (rejecting the argument that the township's actions
were justified because the community already had supported its
share of services for disabled persons).

Laurora, Lee, and Orr also refer to their concern about
safety and potential crime related to SMOC's programs.   Section
3604(f)(9) provides that a dwelling need not be made available to
an individual who would constitute a "direct threat" to the
health and safety of others.   42 U.S.C. § 3604(f)(9).   The
Defendants have admitted, however, that they did not have

information indicating that Sage House residents posed such risks. Town officials cannot refer to threats as a legitimate justification when their inferences are "unsubstantiated" and unsupported by "objective evidence." *United States v. Mass. Indus. Fin. Agency*, 910 F. Supp. 21, 27 (D. Mass. 1996) (citing H.R. Rep. No. 711, 100th Cong., 2d Sess. (1988)).

Nevertheless, because of the evidence indicating that some of the Defendants' actions fell within the purview of the Dover Amendment and the Zoning Bylaw amendment, I find the Defendants have presented sufficient evidence to respond to the Plaintiffs' prima facie case of discrimination. But on this record, I cannot rule as a matter of law that SMOC is unable to meet its burden of persuasion as to the Defendants' discriminatory intent.

## E. Immunities

Some of the Defendants claim some form of immunity from civil suit. I turn to the several immunity defense they raise: qualified immunity, legislative immunity, and immunity under the First Amendment.

### 1. Qualified Immunity

Qualified immunity permits government officials to perform discretionary functions without facing personal liability or the burdens of litigation, but only "insofar as their conduct does not violate clearly established . . . rights of which a reasonable person would have known." *Febus-Rodriguez v.*

*Betancourt-Lebron*, 14 F.3d 87, 91 (1st Cir. 1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Riverdale Mills Corp. v. Pimpare*, 392 F.3d 55, 60 (1st Cir. 2004).

The First Circuit has a two-part inquiry for qualified immunity: (1) whether the defendant's actions violated a federal or constitutional right; and (2) whether the right was "clearly established" at the time of the alleged violation. *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). The "clearly established" step itself involves two considerations. A court must ask first whether "'the contours of the right . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Second, it must determine whether "a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." *Id.* A government official will not be held personally liable for a "reasonable, although mistaken, conclusion" about the lawfulness of his conduct. *Cookish v. Powell*, 945 F.2d 441, 443 (1st Cir. 1991) (per curiam).

The Defendants have not established that qualified immunity applies to the alleged conduct here. The first part of the test, the Defendants' alleged violation of a constitutional or federal right, is a factual dispute, as discussed.

And with respect to the second question and its subsidiary inquires, the Defendants have failed to show that SMOC's rights under the FHA were not clearly established at the time in question, or that a reasonable person would not have understood that the conduct violated a clearly established right.  The Defendants have not demonstrated that a reasonable person would have thought prolonging Site Plan Review and erecting additional procedural hurdles for SMOC and the Sage House relocation were lawful.  Indeed, at various points during the time period in question, Town counsel, SMOC's representatives, and the Massachusetts Attorney General expressed concerns and cautioned the Town regarding its compliance with the FHA, putting a reasonable person on notice that the conduct could be exceeding the limits of permissible treatment.

Even if the factual circumstances surrounding the first prong are in dispute, an official could still be put on notice that his conduct may be unlawful.  The Supreme Court has stated that "even in novel factual circumstances," the question is whether the state of the law "gave fair warning that their alleged treatment" of the plaintiff was unlawful.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (declining to require that previous cases have "materially similar" facts to those of the instant case).  I have already discussed at length the nature of SMOC's rights under the FHA, concluding that the Defendants have

failed to show as a matter of law SMOC's rights have not been violated.  Similarly, a qualified immunity defense would have to establish that SMOC's rights under the FHA were not clearly established at the time of the alleged violations, and consequently that a reasonable person in the Defendants' position would not have known that such conduct was unlawful.  The qualified immunity arguments made by the Defendants do not make such a showing.

## 2. Legislative Immunity

Legislative immunity protects federal, state, and local legislators from civil liability for their legislative acts. *Bogan v. Scott-Harris*, 523 U.S. 44, 48-49 (1998); *Acevedo-Garcia v. Vera-Monroig*, 204 F.3d 1, 7-8 (1st Cir. 2000) (applying legislative immunity principles to municipal legislators).  Such protection can extend to executive officials, but their actions must be within the "sphere of legitimate legislative activity." *Collier v. Town of Harvard*, No. 95-11652, 1997 WL 33781338, at *7 (D. Mass. 1997) (quoting *Romero-Barcelo v. Hernandez-Agosto*, 75 F.3d 23, 28 (1st Cir. 1996)).  "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 54. Municipal legislative actions range from voting on a local ordinance, *id.* at 55, to enacting zoning regulations. *Smithfield*

*Concerned Citizens for Fair Zoning v. Town of Smithfield*, 907
F.2d 239, 246 (1st Cir. 1990).

Actions, however, that single out individuals or groups,
rather than create general policies, are administrative actions,
not legislative.  *Acevedo-Garcia*, 204 F.3d at 9.  For example,
"the granting or denial of a permit is a classic administrative
or executive act."  *Welch v. Paicos*, 66 F. Supp. 2d 138, 181-82
(D. Mass. 1999).  If a legislator is involved in attempting to
influence an executive decision, his conduct is not considered to
be legislative activity.  *Gravel v. United States*, 408 U.S. 606,
625 (1972).

The issue here is whether the Defendants' alleged conduct
constituted legislative acts, thereby triggering legislative
immunity.

Of the actions allegedly performed by the Town Meeting
members, the act of approving the Zoning Bylaw amendment is
clearly a legislative act, and one for which the Town Meeting
members cannot be held liable.  Also, the actions of the PILOT
Committee, to the extent they were performing the tasks delegated
to it by the Town Meeting, may constitute legislative actions,
although none of the Defendants discuss which activities by the
PILOT Committee might be considered legislative and why.

But the allegations against the Town Meeting Defendants

involve more than simply approving the Bylaw amendment or performing the assigned tasks of the PILOT Committee.  They include using the Committee to target SMOC properties for investigation and to press Town officials on the properties' Dover Amendment status, at times after the PILOT Committee had been dissolved.  They also include Orr's unauthorized appearance and trespass at the Common Ground Shelter.[5]

With respect to the Board of Selectmen members, Giombetti maintains that the only allegations against them involve legislative acts, such as voting on proposals, discussing regulations, and even holding public sessions in which STEPPS was permitted to attend and address the BOS.  Giombetti claims that the BOS had no involvement in the Planning Board hearings for 517 Winter Street and Larry's Place.  However, the Plaintiffs offer evidence regarding a variety of actions which the BOS Defendants have not established as legislative conduct, such as communicating with Mikielian and Foley regarding SMOC's Dover Amendment status, brainstorming methods for "stalling" the decision regarding 517 Winter Street, and meeting with SMOC's

---

[5] In her argument for legislative immunity, Lee points out that she did not engage in demanding bribes or engaging in other forms of extortion, as described in *Collier v. Town of Harvard*, No. 95-11652, 1997 WL 33781338, at *7 (D. Mass. 1997) (observing that "attempted extortion . . . cannot be considered legitimate legislative activity").  But Lee misreads my opinion in *Collier*, which did not hold that all non-extortionate activity was legislative; rather, *Collier* merely noted that extortionate activity was not legitimate legislative activity.  *Id.*

Executive Director to discuss the closing of the Common Ground Shelter.

Likewise, the alleged violations by the Planning Board members have not been shown to be legislative action.  The bulk of the allegations against the Planning Board members involve the treatment of SMOC's Site Plan Review application and its request to relocate Sage House to 517 Winter Street.  The Planning Board Defendants have offered no explanation or evidence to indicate that these actions are legislative and thereby protected by legislative immunity.  Indeed, these actions are "classic administrative or executive act[s]," in which the decision-maker considers a specific petition in light of standards already set forth in law. *Welch*, 66 F. Supp. 2d at 181-82.

Legislative immunity is an affirmative defense, and the Defendants have the burden of establishing that their actions were legislative, rather than administrative or executive.  Given the range of the evidence adduced against them, compared to the narrow scope of the conduct available under legislative immunity, they have failed to satisfy their burden.

### 3.  First Amendment Protections

The Defendants assert two forms of First Amendment argument: that the Planning Board was obligated to respect and protect the First Amendment rights of the individuals who attended their

meetings, which I discuss in Part III.D.1., *supra*; and that the officials themselves engaged in petitioning activity that is protected by the First Amendment.

The First Amendment protects "the right of the people . . . to petition the Government for redress of grievances." U.S. Const. Amend. I. The *Noerr-Pennington* doctrine, which arose in the antitrust context, provides immunity from suit to those private citizens who engage in "concerted effort to influence public officials." *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965); *see also Noerr Motor Freight,* 365 U.S. at 137-38; *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (finding that "peaceful pamphleteering" is protected by the First Amendment); *Affordable Housing Dev. v. City of Fresno*, 433 F.3d 1182, 1193 (9th Cir. 2006) (observing that the First Amendment shields petitioning activity).

The Defendants' contentions regarding the First Amendment are not persuasive for several reasons. First of all, the focus of the evidence presented for summary judgment purposes is on those actions taken by individuals while acting as government officials of the Planning Board, Board of Selectmen, and Town Meeting - not action taken as private citizens. The *Noerr-Pennington* doctrine does not apply to government activities. *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1083 (5th Cir. 1988) ("The point of the

*Noerr-Pennington* doctrine is to protect private parties when they petition the government for laws or interpretations of its existing laws . . . ."); *Foley v. Town of Randolph*, 601 F. Supp. 2d 379, 386-88 (D. Mass 2009) (finding that the First Amendment does not protect a fire chief for statements made in the course of performing his official duties at the scene of a fire). This case contrasts with *Weiss v. Willow Tree Civic Ass'n*, 467 F. Supp. 803 (S.D.N.Y. 1979), where a group of Hasidic Jews claimed that a local civic association had pressured the local planning board into denying the plaintiffs' requested permit for a housing development. The court found the civil association's petitioning and lobbying to be protected First Amendment activity because all the members were private parties; none were town officials or connected with official municipal activity in any way. *Id.* at 809-10, 816-17.

It is true that "public employees do not check all of their First Amendment Rights at the door upon accepting public employment." *O'Bradovich v. Vill. of Tuckahoe*, 325 F. Supp. 2d 413, 423 (S.D.N.Y. 2004) (internal quotation omitted). But the Plaintiffs' evidence suggests that the Defendants used their positions of authority to manipulate the treatment of SMOC's permit applications. For example, Esty argues that the evidence adduced against her involves petitioning the Town Meeting and PILOT Committee, but the evidence also includes Esty's admission

that she intended to use the Zoning Bylaw amendment to provide the BOS with "some grasp of controlling some small aspect of proposed 40A Dover Amendment projects."

The second reason that the First Amendment does not shield the Defendants' conduct here is that the FHA allegations do not involve expressions of opinion or the petition of local government, but rather the manipulation of procedural devices in order to target SMOC's residents for discriminatory treatment. Adams, for his part, maintains that his alleged conduct consists entirely of peaceful opposition to a development project.  The evidence, however, suggests that after becoming a Town Meeting member, he was cognizant of the potential for using government procedures to damage SMOC's operations, stating in an online post that "[w]e are working . . . to convince the state to revoke their contract and pull their financing."  The Defendants have not explained how the Town officials' various attempts to undermine the Dover Amendment status of SMOC's programs or to stall the relocation of the Sage House constitute petitioning activity under the First Amendment; it could be viewed by a jury as manipulation of administrative machinery to obstruct the Plaintiff's rights.

Finally, even if the conduct alleged here qualified as a form of petitioning, the *Noerr-Pennington* doctrine would not protect the activity if it were conducted with "fraudulent or

unlawful purposes." *Wright v. DeArmond*, 977 F.2d 339, 347 (7th Cir. 1992).  "First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils' . . . which the legislature has the power to control." *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 515 (1972).  In *California Motor*, the Supreme Court held that a trucking company engaged in petitioning activity could be liable under the Clayton Act for filing actions to defeat their competitors' applications for operating rights.  *Id.* at 513-14.  The Court concluded that "First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute." *Id.* at 514.  Adams and Laurora maintain that their actions were driven by genuine confusion over Dover Amendment qualifications, and not by opposition to SMOC programs; but, as discussed, the facts supporting this assertion are subject to dispute, leaving Adams and Laurora unable to establish that their conduct is immunized by the First Amendment.

## IV. ADA AND REHABILITATION ACT

SMOC's ADA and Rehabilitation Act allegations are lodged only against the Town of Framingham.  Both the Town and SMOC address the ADA and Rehabilitation Act claims with the same analysis used for the FHA claim.  The legal framework under these statutes is largely the same.  *See Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573-74 (2d Cir. 2003) (comparing the FHA to

the ADA); *Sharpvisions, Inc. v. Borough of Plum*, 475 F. Supp. 2d
514, 521 n.2 (W.D. Pa. 2007) (concluding that because all three
statutes provide bases for challenging housing discrimination,
the legal analysis under the FHA is "equally applicable" to the
other claims).

To the extent that the statutory frameworks are distinct
- if at all - from that of the Fair Housing Act, the issue has
not been raised or addressed by the parties on this motion for
summary judgment. Consequently, and in light of my analysis of
the Plaintiffs' FHA allegations against the Town, I will deny the
Town's motion for summary judgment as to the ADA (Count III) and
Rehabilitation Act (Count IV) allegations.

## V. DEFAMATION

SMOC alleges that five Defendants made defamatory comments:
Adams, Esty, Giombetti, Laurora, and Orr. SMOC alleges that
Adams made twenty-seven defamatory statements. SMOC attributes
three defamatory statements to Esty, one to Giombetti, and one to
Laurora. Orr is alleged to have made fourteen defamatory
statements.[6]

---

[6] The individual statements are numbered and identified and
individually but concisely addressed in the attached Appendix.
In the narrative of this Memorandum, I address the governing
defamation law and the broader disputes over the factual record.

## A.    Legal Standard

Under Massachusetts law, a defamation plaintiff must prove five elements: "(1) that the defendant published a written statement; (2) of and concerning the plaintiff; that was both (3) defamatory, and (4) false; and (5) either caused economic loss, or is actionable without proof of economic loss." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009); *see also Phelan v. May Dep't Store Co.*, 819 N.E.2d 550, 553 (Mass. 2004).

A statement is "defamatory" if it could be read as discrediting the plaintiff "in the minds of any considerable and respectable class of the community." *Noonan*, 556 F.3d at 25 (quoting *Disend v. Meadowbrook Sch.*, 604 N.E.2d 54, 55 (Mass. App. Ct. 1992)).  A defamatory statement holds the plaintiff up to "scorn, hatred, ridicule, or contempt." *Stone v. Essex County Newspapers, Inc.*, 330 N.E.2d 161, 165 (Mass. 1975).  Summary judgment for the defendant is appropriate if the statement is not reasonably capable of having a defamatory meaning. *Noonan*, 556 F.3d at 25 (citing *Sharratt v. Housing Innovations, Inc.*, 310 N.E.2d 343, 346 (Mass. 1974)).

As a defense to a defamation claim, a defendant may establish the truth of the statement in question.  *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 42 (1st Cir. 1998) (citing *Bander v. Metro. Life Ins. Co.*, 47 N.E.2d 595, 598

(Mass. 1943)).  A Massachusetts statute, however, provides one
exception to this rule: if the plaintiff proves that the
defendant acted with "actual malice" in making the statement,
then the defamation action may proceed whether or not the
statement was false.  Mass. Gen. Laws ch. 231, § 92 ("[T]he truth
shall be a justification unless actual malice is proved.");
*Noonan*, 556 F.3d at 26 (citing *White v. Blue Cross & Blue Shield
of Mass., Inc.*, 809 N.E.2d 1034, 1036 n.4 (Mass. 2004)).  The
meaning of "actual malice" in this particular context is "ill
will," which is not the same as the meaning developed by the
Supreme Court of the United States under federal constructional
law in the context of public figures.  *Noonan*, 556 F.3d at 29.

    The First Amendment places an additional burden on
plaintiffs pursuing, as here, a defamation action against public
figures.  When the plaintiff is a private individual, the
plaintiff must simply show that the defendant was negligent in
publishing the alleged defamatory statement.  *Stone*, 330 N.E.2d
at 168 n.6.  If, however, the plaintiff is a public figure, the
plaintiff must show that the statement was made with actual
malice under federal constitutional law.  *New York Times Co. v.
Sullivan*, 376 U.S. 254, 280 (1964).  In the context of public
figures, the constitutional "actual malice" standard requires a
showing that the statement was made with knowledge of its falsity

-64-

or with reckless disregard as to whether the statement was true or false.  *Id.*

## B.   Duty of Care

Whether the Plaintiffs must show that the statements were made with negligence, or instead must satisfy the higher standard of actual malice, depends on whether SMOC is characterized as a public figure.

### 1.   SMOC's Status as a Public Figure

The Defendants maintain that SMOC is a public figure, and therefore must show that the statements in question were made with actual malice.  A general purpose public figure is one for which there is "clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974). Without general fame or notoriety, a plaintiff can only be considered a public figure if it "thrust[s] [it] to the forefront of particular public controversies in order to influence the resolution of the issues involved."  *Gertz*, 418 U.S. at 345. This typically requires a voluntary assumption of a role of special prominence.  *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 202 (1st Cir. 2006) (per curiam); *see also Gertz*, 418 U.S. at 345 (finding it "exceedingly rare" to become a public figure through no purposeful action of one's own).

Orr points out that SMOC relies on public funding and is a prominent corporate citizen of the Town with extensive property holdings.  This, however, merely speaks to SMOC's relationship with some aspects of the public arena. Because the evidence does not indicate that SMOC has general fame or notoriety as an institution, the critical inquiry is whether SMOC has thrust itself into the public realm in order to influence a public issue.

Orr also refers to SMOC's voluntary involvement in the Planning Board's public review and approval process, its hiring of public relations firms, and its response to issues via the media.  It is clear from the record that the Sage House relocation garnered considerable attention from citizen groups and occasionally the media, and that SMOC at times responded to these concerns using public channels.  But "media attention does not alone transform a private controversy into a public one." *Bowman v. Heller*, 651 N.E.2d 369, 374 (Mass. 1995).  Furthermore, a plaintiff's response to a defendant's prior defamatory statements does not qualify as thrusting oneself into public affairs.  *Grass v. News Group Publ'ns, Inc.*, 570 F. Supp. 178, 182-83 (S.D.N.Y. 1983).

Ultimately, determining whether a plaintiff is a public figure is, in most cases, a fact-specific inquiry, requiring an examination of the particular circumstances that gave rise to the

-66-

alleged defamation.  *Gertz*, 418 U.S. at 352 ("It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation."). Even if the Defendants had presented evidence from the record suggesting that SMOC had injected itself into the public issue of the Town's treatment of substance abuse residences and shelters, the facts in the record remain subject to considerable dispute among the parties.

The Defendants have not established as a matter of law that SMOC is a public figure.  Consequently, for purposes of the summary judgment motion before me, the Defendants are not entitled to the daunting constitutional malice standard. Instead, they must establish as a matter of law that SMOC meet the lessor standard by showing that the Defendants were negligent in publishing the alleged false statements.  *Stone*, 330 N.E.2d at 168 n.6.

### 2.  Negligence

Because there are factual disputes surrounding the alleged negligence of all five Defendants, the Defendants cannot obtain summary judgment on these grounds.

Adams: Adams stated that he did not want the "voluntarily disabled" and "walking insults to the truly disabled" living in his neighborhood, but he acknowledged that he

understood that individuals recovering from substance addiction were considered disabled under federal law.  Adams stated that the Sage House had "numerous safety and health violations including spoiled food on the counters and use of prohibited heating equipment."  He claims that the statement is supported by a report from the DPH, but the report indicates that the allegations were unfounded.  These facts raise questions about whether Adams was negligent in ascertaining if his statements were true or false.

Esty: Esty is quoted in a *MetroWest Daily News* article as saying "I think this exposes the fact that there is an underlying plan . . . for designating Framingham as a place that would be suitable for centering a large population of arsonists, sex offenders and criminals."  Although she claims that this statement was based on the contract documents with the DOC, she stated during her deposition that she had no information that established a relationship between sex offenders and the DOC contract.  Such a statement must be found to have been made with reckless disregard of its truth or falsity.

Giombetti: The comment attributed to Giombetti by the *MetroWest Daily News* suggested that SMOC closed the Common Ground Shelter because it was "intimidated by the possibility of a lawsuit."  Giombetti has not provided an explanation or evidence for his belief that litigation fears drove the decision to close

the shelter.  Such a statement may also be found to have been
made with reckless disregard of its truth or falsity.

Laurora: Laurora's allegedly defamatory statement
observed that "[i]t's interesting that Framingham town government
at first rejected, then blessed and voted to give SMOC drug
dealing employees a larger environment to ply their trade."  The
basis for this statement is apparently Orr's post on April 13,
2007, reliance on which would raise a factual dispute as to
Laurora's negligence in making (or republishing) the statement.

Orr: Orr stated on June 17, 2007 that "[h]opefully, the
staff people of Sage House at 517 Winter won't be involved in
actually supplying drugs like the staff at Sage House on Clinton
St did to the Shirley Prison."  Orr claims that in making this
statement, he relied on the contents of the DOC investigation,
and on the DPH site visit.  The DOC investigation, however, led
to no arrests, and the police did not pursue the investigation.
Orr provides no indication of any attempts to confirm his
statement that Sage House employees had actually committed this
act.

In addition, on March 22, 2007, Orr posted on the Frambors
site that "SMOC was caught multiple times with their pants down
(so to speak), secretly importing winos from Waltham and using
the Store 24 as their drop-off point so that people wouldn't see
them getting door-to-door service directly to the shelter."  Orr

admitted during his deposition that this statement was incorrect, and that he did not remember checking these facts before posting the statement.   The record indicates at least a factual dispute as to whether Orr was negligent in making the statements in question.

## C.    "Of and concerning" SMOC

Only Adams, Laurora, and Orr argue that some of their statements were not "of and concerning" SMOC, and thus cannot provide a cause of action for defamation against SMOC.

<u>Adams</u>: Adams claims that several of his allegedly defamatory statements are not in fact "of and concerning" SMOC. I address the individual statements in the attached Appendix, but briefly, there are factual disputes as to whether a reasonable reader would have understood the statements to be concerning SMOC.  For example, when Adams posted that "such facilities . . . increase crime in the host community whenever someone is imported from one community to another," "such facilities" could have been read as SMOC in particular.

The one exception to this is Adams's Statement 4, which he posted on Aug. 8, 2005 that the "abundance of shelters in Framingham" caused "increase[s in] crime and school expenditures" and "weakens the town's ability to deal with those problems." SMOC fails to show how the phrase "abundance of shelters in Framingham" could mean SMOC in particular, and for that reason, I

find as a matter of law this statement is not defamatory
regarding SMOC.

Laurora: Laurora maintains that her statement involved
only SMOC employees, not SMOC itself.  But the statement can be
read as being directed to SMOC as an institution, and how SMOC
manages its personnel.

Orr: Orr maintains that Statements 1, 3, 7, and 9 were
not of and concerning SMOC.  In most of these statements,
however, SMOC is either referred to explicitly (Statement 1) or
referred to in related posts or headings (Statement 3, 7, 9).  In
Statement 7, for example, Orr posted that "[o]n an almost daily
basis, we have crime being handled by our police force, committed
by people who have been brought here by the social service
agencies."  The post, however, had the subject heading of
"Another model SMOC client living in Framingham."  A reasonable
reader could infer that Orr was referring to SMOC when he
described "social service agencies."

## D.  Defamatory

All the Defendants but Laurora claim that at least one of
their statements was non-defamatory.  For a statement to be
defamatory in nature, it must discredit the plaintiff in some
way.  *Noonan*, 556 F.3d at 25.  In the statements challenged by
the Defendants, it remains a question of fact whether a jury
could find them to hold SMOC up to "scorn, hatred, ridicule, or

contempt." *Stone*, 330 N.E.2d at 165.

Adams: Several of his statements, argues Adams, cannot be
understood by a reasonable audience to have a defamatory meaning.
Adams, however, has not proved the non-defamatory nature of these
statements as a matter of law.  For instance, when Adams stated
that people would not have learned about the 517 Winter Street
plans until "the buses arrived to drop off homeless drug
addicts," and that SMOC asked the Winter Street seller to "keep
their arrangement *secret*!", it is a factual question whether a
reasonable reader could have understood this to mean that SMOC
sought to operate the program surreptitiously without the
Town's knowledge and outside the required procedures for
development projects.

Esty: Esty claims that her Statement 3 is not
defamatory because speculating as to SMOC's reasons for closing
the shelter does not hold SMOC up to scorn or contempt.  Although
the statement could bear other non-defamatory meanings, I cannot
say as a matter of law that the statement was not defamatory,
e.g., by implying that the Common Ground Shelter had no proper
basis for Dover Amendment status, and that SMOC feared discovery
for running a program whose legal status was invalid.

Giombetti: Giombetti maintains that there is no
defamatory sting in the statement that SMOC was "intimidated by
the possibility of a lawsuit" involving the Common Ground

Shelter.  This could have a non-defamatory meaning - e.g., SMOC was afraid of the costs of litigation even though the lawsuit had no merit - but I cannot say it has a non-defamatory meaning as a matter of law.  A reasonable reader would have understood this as suggesting that SMOC feared being discovered as running a non-compliant program.

Orr: Of his alleged defamatory statements, Orr maintains that Statements 1 and 12 had no defamatory meaning. Statement 1, from a May 21, 2005 Frambors post, stated that "SMOC has contributed to the entire downfall of Framingham by bringing other communities['] problem people to our town for the mere sake of assisting SMOC to sustain themselves," and that "[w]e now have sex offenders calling their SMOC residences home."  This could be understood to be defamatory insofar as it suggests that SMOC targeted sex offenders as residents, and did so in order to serve its own institutional interests, rather than the community's or residents' interests.  In Statement 12, Orr referred to a "long list of violent offenders that SMOC either has as clientele or wishes they had."  This suggests that SMOC actively seeks violent offenders as residents, which could be understood as holding SMOC up to scorn for its attempts to increase the number of violent offenders in the neighborhood.

## E.  Falsity

All of the Defendants argue that many of the statements were

either factually true, or were statements of opinion or rhetoric whose truth or falsity cannot be established.  The truth of the statement can be an affirmative defense to a defamation claim, *Mass. Sch. of Law*, 142 F.3d at 42, while statements of opinion cannot serve as a basis for a defamation cause of action.  *King v. Globe Newspaper Co.*, 512 N.E.2d 241, 243-44 (Mass. 1987).

        <u>Adams</u>: Of the statements that Adams identifies as true or substantially true (Statements 1–5, 7-10, 12-20), Adams has not overcome the material factual disputes as to their accuracy. For example, he claimed in Statement 1 that "we" would not have learned about 517 Winter Street until the "buses arrived to drop off homeless drug addicts," but the record includes indications that SMOC did not keep the sale a secret.  In Statement 16, he stated that SMOC allowed "a drug running operation to flourish right under their noses in a supposed drug rehab shelter."  SMOC disputes, however, whether there is any evidence showing that Sage House employees were involved in the distribution of drugs to inmates, as all charges and investigation were dismissed.

        Adams also identifies some of the statements as opinion based on disclosed, non-defamatory facts, or as rhetoric (Statements 6-8, 10-17, 19, 20a-f).  Some of these statements are indeed opinions, and SMOC has not shown them to be false statements.  When Adams stated that "[i]t's far more likely that [SMOC] would just use [61 Clinton St.] for something else, like

-74-

another wet shelter," Adams is clearly stating an opinion about the probabilities of a future event.  SMOC claims that the statement includes a claim that Sage House was a "wet shelter," rather than a dry program, but the word "another" merely indicates that one wet shelter already exists, not that the Sage House is a wet shelter.  Also, when Adams stated facetiously that "STEPPS joins the rest of Framingham in mourning the passing of Jerry Desilets, former Town Moderator and SMOC's director of policy and planning," he was not making a statement of fact, but rather was using rhetoric to communicate a political point.  Adams's Statements 6 and 21 are not actionable.

Esty: Esty claims all three of her statements are true, but the record indicates material factual disputes as to their truth.  For instance, in Statement 1, she refers to SMOC's "underlying plan" for designating Framingham as suitable for "arsonists, sex offenders and criminals."  This could imply that SMOC targeted these categories of individuals for placement in Framingham, and Esty has not pointed to evidence supporting this claim other than the RHP application, which does not refer to Framingham as a target for placement.

Giombetti: Giombetti's statement was that SMOC had been "intimidated by the possibility of a lawsuit," but he claims that he also stated that the timing of the SMOC announcement and Dover Amendment finding was a "coincidence," which is a factual claim

undisputed by SMOC.  Nevertheless, the reference to the lawsuit
was included in the *MetroWest Daily News* quotation, and is a
factual assertion whose truth is disputed by SMOC.  Giombetti has
not established the truth of the entire statement quoted in the
article.

Laurora: Laurora argues that her statement is simply a
response to Orr's post, and expresses an opinion, not a fact.  In
her April 14, 2007 post, Laurora restates what was said by an
earlier posting, and she expresses strong disapproval regarding
the information conveyed.  A jury could find that Laurora, by
republishing allegedly defamatory information conveyed in the
earlier post, can be held separately liable.  *See Jones v.
Taibbi*, 512 N.E.2d 260, 264 (Mass. 1987).

Orr: Orr defends the truth of Statements 1, 2, and 5-14, and
the non-actionable opinion or rhetoric expressed in Statements 1-
4, 6-8, and 10.  All of Orr's statements, with the exception of
Statement 4, however, contain at least one factual assertion that
is capable of being proved false.  In Statement 4, Orr asserted
that SMOC's "attempt to take over 517 Winter . . . will place a
continuing drain on property values . . . [and] would further
drain the resources of our educational system."  This is a
statement about the probabilities of future events, and one that
was not capable of being proved false at the time that Orr made
it.  "The determination whether a statement is a factual

assertion or an opinion is a question of law if the statement unambiguously constitutes either fact or opinion." *Aldoupolis v. Globe Newspaper Co.*, 500 N.E.2d 794, 796 (Mass. 1986). Because Orr's statement is unambiguously an expression of opinion about a future event, he cannot be held liable for defamation as to this statement.

**F. Damages**

The final threshold that remains for SMOC to survive summary judgment on the defamation claim is whether there is a factual dispute as to whether SMOC suffered damages from the alleged defamation. The Plaintiffs must prove that the publication of the defamatory statement was a "material element or substantial cause" of the damages. *Tosti v. Ayik*, 476 N.E.2d 928, 939 (Mass. 1985) (quoting *Lawlor v. Gallagher Presidents' Report, Inc.*, 394 F. Supp. 721, 735 (S.D.N.Y. 1975)). Successful plaintiffs in a defamation suit are entitled to compensatory damages, which for individuals include "mental anguish, embarrassment, and humiliation," but for corporations "signify the more abstract damage to reputation." *Dexter's Hearthside Rest., Inc. v. Whitehall Co.*, 508 N.E.2d 113, 116 (Mass. App. Ct. 1987). SMOC, as a corporate entity, might recover "for damage to its reputation," but cannot recover for mental suffering or "hurt feelings." *Id.*

Adams argues that SMOC cannot show any harm suffered as a

result of the alleged defamatory statements, because SMOC received its requested permit for 517 Winter Street, did not lose its government contracts, and did not lose revenue as a result of the Defendants' comments.  Damages, however, include harm to the plaintiff's reputation, and SMOC has adduced evidence indicating that the events in Framingham affected SMOC's reputation and activities in other towns.  For example, the mayor of Gardner, Massachusetts, told a newspaper that SMOC's "modus operandi appears to be 'shoving projects down the throats of communities,'" and that he did not want to see this happen in Gardner.  Such evidence is sufficient to create disputes of material fact regarding the reputational damage caused to SMOC.

Adams and Orr claim that SMOC's reputation was already suffering at the statewide level and in other cities, and that harm to SMOC's name cannot be causally connected to statements made by the Defendants.  But the content of the statements alleged here is particular to circumstances in Framingham, and a jury could find that the reputational harm suffered by the Defendants is distinct from criticism experienced elsewhere.  In addition, the Defendants do not establish that SMOC's reputation was so reduced outside Framingham that any damages here would be nominal.  This distinguishes the instant case from *Jackson v. Longcope*, 476 N.E.2d 617 (Mass. 1985), where the court was faced with the question of whether "a particular libel plaintiff may

-78-

have such a notorious reputation that he is incapable of recovering damages." *Id.* at 619.  The *Jackson* court noted that this may apply to a "habitual criminal" or a "criminal notorious for one criminal act," but nothing in that case suggests that such persons are comparable to an institution facing criticism in the public arena. *Id.*

Laurora notes that because her comment was a response to a prior post, no harm could be caused by this "subsequent commentary." Because, however, the republication of a defamatory statement can provide a basis for liability, Laurora has not established that as a matter of law her alleged republication caused no reputational damage to SMOC.

## G. *Noerr-Pennington* Immunity

Orr argues that his statements are entitled to protection as petitioning conduct under the *Noerr-Pennington* doctrine.  Orr notes that the *Noerr-Pennington* doctrine, which was developed in the antitrust context, has been extended to apply to defamation law.  None of the cases cited by Orr, however, hold that the *Noerr-Pennington* doctrine is on its own a defense against a defamation claim.  *See Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128 (3d Cir. 1999) (holding that if a case's federal antitrust claims and state law claims involve the same petitioning activity, then the state law claims can be dismissed under the *Noerr-Pennington* doctrine); *Eaton v. Newport Bd. of*

*Educ.*, 975 F.2d 292, 298 (6th Cir. 1992) (finding a defense to a § 1983 claim, involving liability for lobbying for a principal's discharge, to be analogous to the *Noerr-Pennington* doctrine, with no mention of defamation); *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155, 159-60 (3d Cir. 1988) (finding that both the *Noerr-Pennington* doctrine and defamation law under *New York Times v. Sullivan* provide separate protection of free expression on matters of public interest).

Although considerable First Amendment interests are relevant to defamation law, they do not provide immunity for defamatory statements. Rather, those interests have been accommodated in the defamation law framework articulated by the Supreme Court. *See generally New York Times*, 376 U.S. at 280.

## VI.  CONCLUSION

For the reasons discussed more fully above, I DENY the Defendants' Motions for Summary Judgment, with three exceptions: I GRANT Silver's Motion for Summary Judgment (Docket No. 207); I GRANT Adams's Motion for Summary Judgment (Docket No. 205) with respect to Statements 4, 6, and 21 in Count VII; and I GRANT Orr's Motion for Summary Judgment (Docket No. 218) with respect to Statement 4 in Count VII.[7]

---

[7] The statement numbers here are as identified in the Appendix.

## CODA

Evidence presented in this case raises questions about the coarsening of civic discourse and the obstruction of the orderly process of civic governance.  If established, the evidence may ultimately demonstrate that certain defendants, through abusive communications and improper efforts to manipulate the municipal permitting process, unlawfully violated the detailed legal constraints fashioned to assure that prejudice within a community not impede access to housing and related programs for those suffering from recognized disabilities such as alcoholism and addiction.  There is mordant irony in the fact that the plaintiff has turned this litigation into the mirror image of the extended and costly administrative process to which it was subjected.

As this lengthy memorandum and my earlier memorandum in this matter make clear, the facts and the legal principles governing this dispute are complex.  They have taken and will demand substantial resources by the parties to bring the case to formal judgment after trial.  The parties seem bitterly entrenched in their respective positions.  Perhaps at this point, with the potential for increased costs - both economic and personal - looming and the ultimate outcome by no means certain, more measured and sensible voices will come to the fore and less belligerent roles will be assumed in an effort to resolve this matter by some alternative to accumulating additional litigation expenses.  Certainly, such voices and roles are needed to avoid

further debasement of civic discourse and diversion of civic resources from full attention to the orderly process of governance in the Town of Framingham.

The last inscription that a visitor to this courthouse encounters before passing through security on the way to the courtroom provides what appears to be especially pertinent advice.  The inscription quotes former Congresswoman Barbara Jordan, at a gathering of fellow Boston University Law School alumni shortly before her death, urging those involved in narrow legal disputes to remain faithful to their larger community obligations. She said:

> We live in community and each is not an atom of self-interest.  What each one of us does has an impact on the rest of us.  Therefore, the need for thoughtful judgment and wise counsel is always paramount.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

**DEFAMATION (Count VII)**

**DEFENDANTS' STATEMENTS**

**[Statements Found Non-Defamatory As a Matter of Law Shaded]**

| No. | Statement | Defendant's Response | Summary Judgment Ruling |
|---|---|---|---|
| | | ADAMS'S STATEMENTS | |
| 1 | On June 2, 2005, regarding 517 Winter Street: "If it hadn't been for the 'rumor mill' and some sharp neighbors on Ardmore, we would have learned about this when the buses arrived to drop off homeless drug addicts." (Pls.' Statement of Additional Material Facts ("SAMF") ¶ 804) | • True<br>• Opinion, vituperation<br>• Not defamatory | • <u>Truth disputed</u>: Factual dispute as to whether purchase was secret. (SAMF ¶¶ 793-97)<br>• <u>Not opinion</u>: Secrecy of the purchase is capable of being proved false.<br>• <u>Arguably defamatory</u>: Could imply that SMOC sought to keep its plans for Sage House hidden from the public, contrary to legal requirements. |
| 2 | In a June 25, 2005 Frambors post: "SMOC . . . asked the seller of 517 Winter Street to keep their arrangement *secret*!" (SAMF ¶ 804) | • True<br>• Not defamatory | • <u>Truth disputed</u>: Factual dispute as to whether purchase was secret. (SAMF ¶¶ 793-97)<br>• <u>Arguably defamatory</u>: Could imply that SMOC sought to keep from the public its plans for Sage House, contrary to legal requirements. |

| 3 | In a July 24, 2005 Frambors post: "[W]hile such facilities are normally deemed to be more effective that [sic] prison, they suffer from the same problem as methadone clinics: they increase crime in the host community whenever someone is imported from one community to another." (SAMF ¶ 808) | • Not "of and concerning" SMOC<br>• True<br>• Opinion<br>• Not defamatory | • <u>Of and concerning</u>: Readers might understand "such facilities" as signifying SMOC facilities, given focus of the posts and news articles. (Pls.' Resp. Defs.' Statement of Undisputed Facts ("Resp. SUF") ¶ 440)<br>• <u>Truth disputed</u>: Disputes as to crime rate effects of SMOC. (SAMF ¶¶ 761-63, 848)<br>• <u>Not opinion</u>: Comparison to methadone clinics and effect on crime rates are capable of being proved false.<br>• <u>Arguably defamatory</u>: Could be understood as stating implicitly that SMOC residents commit crimes. |
| 4 | In an Aug. 8, 2005 Frambors post: The "abundance of shelters in Framingham" caused "increase[s in] crime and school expenditures" and "weakens the town's ability to deal with those problems." (SAMF ¶ 808) | • Not "of and concerning" SMOC<br>• True<br>• Opinion<br>• Not defamatory | • <u>Not of and concerning</u>: Statement is made about the "abundance of shelters in Framingham," and SMOC points to no specific facts tying this statement to SMOC's shelters.<br>• <u>Truth disputed</u>: Disputes as to the age of children at Sage House and their effect on school expenditures (SAMF 841), and links to crime (SAMF ¶¶ 761-63, 848)<br>• <u>Not opinion</u>: Effect of shelters on school expenditures is capable of being proved false.<br>• <u>Arguably defamatory</u>: States that residents at shelters engage in crime. |

| 5 | In a Sept. 19, 2005 Frambors post: Adams expressed "concern[] that this lovely building is in danger, as SMOC is not known for keeping their properties in good condition. If their plans go ahead, there will be 24-45 children of unknown age housed there, supervised by single parents who are addicts or recovering addicts." (SAMF ¶ 816) | • True<br>• Not defamatory | • <u>Truth disputed</u>: Record indicates that Sage House is for those recovering from substance abuse, not current addicts. (SAMF ¶¶ 817-18)<br>• <u>Arguably defamatory</u>: "[S]ingle parents who are addicts" could suggest that Sage House houses current substance abusers. |
|---|---|---|---|
| 6 | On Sept. 26, 2006: "It is unlikely that SMOC would sell their property at 61 Clinton St. It's far more likely that they would just use it for something else, like another wet shelter." (SAMF ¶ 816) | • Opinion<br>• Not defamatory | • <u>Opinion</u>: This is a statement of opinion about SMOC's probable use of the property, not a statement of fact that could be proved false.<br>• <u>Arguably defamatory</u>: Statement may imply that Sage House is also a wet shelter. |
| 7a | On Jan. 2, 2006, regarding SMOC's contract with the DOC: "Now we have evidence of SMOC actively pursuing criminals as clients." (SAMF ¶ 886) | • True | • <u>Truth disputed</u>: Record indicates that SMOC was aware of residents' criminal backgrounds, but no clear indication that SMOC "actively pursu[ed]" them as residents. (Resp. SUF ¶¶ 422, 424) |
| 7b | Also on Jan. 2, 2006: "I am just done with helping criminals and drug addicts find loopholes in the ADA and other such laws meant to help people with real disabilities." (SAMF ¶ 886.) | • Not of and concerning SMOC<br>• Opinion | • <u>Of and concerning SMOC</u>: Because the statement here was made in conjunction with No. 7a, this could be read as referring to SMOC.<br>• <u>Not opinion</u>: Read with No. 7a, this could be understood as a factual claim about the legal methods used by SMOC and its residents. |

| 8 | On Jan. 2, 2006: SMOC was going to bring "sex offenders and arsonists" into Framingham "for one of [SMOC's] world-famous drug programs." (SAMF ¶¶ 886, 893) | • True<br>• Opinion, rhetoric | • <u>Truth disputed</u>: Disputed facts as to whether SMOC was bringing sex offenders and arsonists into its residency programs. (Resp. SUF ¶ 424)<br>• <u>Not opinion</u>: The "world-famous drug programs" comment is rhetoric, but the first part of the statement is an assertion of fact. |
| --- | --- | --- | --- |
| 9 | On Jan. 23, 2006, regarding 517 Winter Street: "SMOC has drawn up plans to subdivide the lot into five lots, perhaps turning it into a social service 'campus' protected by the overly broad protection of the Dover Amendment." (SAMF ¶ 835) | • True<br>• Opinion, vituperation<br>• Not defamatory | • <u>Truth disputed</u>: SMOC adduces evidence that it never planned to subdivide the lot and expand services. (SAMF ¶¶ 798-800)<br>• <u>Not opinion, vituperation</u>: SMOC's plans for the lot could be proved false.<br>• <u>Arguably defamatory</u>: Could be understood as SMOC expanding its programs beyond what it deserves under the zoning laws. |
| 10 | On May 4, 2006, regarding Sage House: "I say it is not *technically* a wet shelter since the Sage House has a success rate well under 50%, meaning 25-30 residents could relapse there EACH YEAR." (SAMF ¶ 816) | • True<br>• Opinion | • <u>Truth disputed</u>: SMOC disputes characterization of success rate and relapse claims. (Resp. SUF ¶ 459.)<br>• <u>Not opinion</u>: Success rate capable of being proved false. |
| 11 | On Feb. 16, 2007, regarding Framingham social services: SMOC was "[c]learly the worst of the bunch" and was "bringing prostitutes, drug addicts, and other criminals from across the state to live in Framingham." (SAMF ¶ 893) | • True<br>• Opinion, rhetoric | • <u>Truth disputed</u>: Factual disputes over types of persons brought to residences, and whether SMOC brought them "to live in Framingham." (Resp. SUF ¶ 461.)<br>• <u>Not opinion</u>: The "worst of the bunch" comment is opinion, but the "bringing prostitutes" comment is not. |

| 12 | On Apr. 15, 2007: SMOC was a "good ol' boy network with virtually no oversight" and whose "financial mismanagement is also under investigation by the State Auditor. . . . Many, if not most, of their 'recovery specialists' are former drug users themselves. . . . [T]here could be more people inside SMOC actively using drugs, and SMOC doesn't appear to pay much attention." (SAMF ¶ 816.) | • True<br>• Opinion, vituperative<br>• Not defamatory | • <u>Truth disputed</u>: SMOC disputes suggestion of drug use and drug operation in the facility, and disputes Adams's support for truth of claim. (Resp. SUF ¶¶ 464, 465; SAMF ¶ 921.)<br>• <u>Not opinion</u>: The description of a "good ol' boy network with virtually no oversight" is an opinion, but the other statements are capable of being proved false.<br>• <u>Arguably defamatory</u>: The defamatory implication is that SMOC permits unlawful activity and does not manage its business properly. |
| 13 | On June 15, 2007: SMOC "lied about this to the state, by the way. They said that the building was up to code and met all applicable regulations." (SAMF ¶ 827) | • True<br>• Opinion | • <u>Truth disputed</u>: Factual disputes as to SMOC's compliance with regulations. (Resp. SUF ¶ 468)<br>• <u>Not opinion</u>: The claim of SMOC's dishonest statement is capable of being proved false. |
| 14 | On June 16, 2007, regarding a breaking-and-entering incident: "Thank you so much, SMOC, for causing this and so many other incidents in the town of Framingham. No wonder SMOC CEO Jim Cuddy won't live in Framingham. He knows what SMOC is doing here." (Defs.' SUF ¶ 469) | • True<br>• Opinion, rhetoric | • <u>Truth disputed</u>: Factual dispute as to whether SMOC caused either an increase in crimes or this crime in particular. (SAMF ¶¶ 761-63, 848)<br>• <u>Not opinion</u>: The connection between SMOC and the crime could be proved false. |

| 15 | On July 15, 2007 on the Frambors site: SMOC was not "watching over" its employees, and Sage House had had "numerous safety and health violations including spoiled food on the counters and use of prohibited heating equipment. So it's not just heroin addicts we need to worry about, but drug smugglers on staff, rats and fire danger!" (SAMF ¶ 941) | • True<br>• Rhetoric, vituperative | • <u>Truth disputed</u>: Factual disputes as to SMOC's supervision of its employees, and the nature of the violations reported by the DPH. (Resp. SUF ¶ 185)<br>• <u>Not rhetoric</u>: Though the last sentence could be read as rhetoric, the statement includes matter capable of being proved false. |
|---|---|---|---|
| 16 | In a second Frambors post on July 15, 2007: SMOC had allowed a "drug running operation to flourish right under their noses in a supposed drug rehab shelter"; and SMOC had "tried to hide it from the [DPH] . . . . This drug smuggling operation inside SMOC is just as shocking, and just as dangerous, as those horrific lapses by DSS involving the death or abuse of a child in their care." (SAMF ¶ 941) | • True<br>• Opinion, rhetoric | • <u>Truth disputed</u>: Factual disputes over whether SMOC employees were running a "drug running operation" and tried to hide it from DPH. (Resp. SUF ¶ 185)<br>• <u>Not opinion, rhetoric</u>: The existence of a drug operation and attempts to hide it from DPH are capable of being proved false. |
| 17 | In a post on Oct. 4, 2007: SMOC and Jim Cuddy had "succeeded brilliantly in bringing in drunks, drug addicts, panhandlers . . . at least one prostitute (HIV Positive, of course) and one murderer" to Framingham. (SAMF ¶ 893) | • True<br>• Opinion, rhetoric | • <u>Truth disputed</u>: Factual disputes over whether SMOC targeted groups for transport and residency in Framingham. (Resp. SUF ¶¶ 422, 424)<br>• <u>Not opinion, rhetoric</u>: SMOC's activities are capable of being proved false. |
| 18 | On Oct. 10, 2007: SMOC had "let their employees run drugs out of a drug rehab shelter." (SAMF ¶ 941.) | • True | • <u>Truth disputed</u>: Record does not prove that employees were running drugs out of SMOC residences. (Resp. SUF ¶ 185) |

| 19 | On Oct. 12, 2007: "Our town library has already become home to some of the 'fragile people' . . . like sex offenders, who were brought here to be cared for by nonprofits and then dropped on this town's doorstep." (SAMF ¶ 893) | • True<br>• Opinion, rhetoric | • <u>Truth disputed</u>: Factual dispute as to whether SMOC brought sex offenders to the Town, and abandoned services for them. (Resp. SUF ¶¶ 422, 424)<br>• <u>Not opinion</u>: SMOC's targeting of sex offenders can be proven false. |
|---|---|---|---|
| 20a | On the STEPPS site: STEPPS "helped expose SMOC's secret contract with the Department of Corrections to house sex offenders and arsonists." (SAMF ¶¶ 885, 893.) | • True<br>• Opinion<br>• Not defamatory | • <u>Truth disputed</u>: Facts indicate that contract was not "secret."<br>• <u>Not opinion</u>: The secrecy of the contract and groups that would be housed can be proven false.<br>• <u>Arguably defamatory</u>: Describing the contract as "secret" could suggest clandestine, unlawful conduct. |
| 20b | "SMOC has three programs with the Department of Corrections - Fresh Start, Clean Slate, and The Prisoner Rentry [sic] Program - to place people, like arsonists and sex offenders." (SAMF ¶ 893.) | • True<br>• Opinion | • <u>Truth disputed</u>: SMOC disputes that it runs the Clean Slate program, and that it targets arsonists and sex offenders.<br>• <u>Not opinion</u>: The programs and their objectives can be proven false. |
| 20c | The title of the STEPPS web page: "SMOC misleads town in application." (SAMF ¶ 827.) | • True<br>• Opinion | • <u>Truth disputed</u>: SMOC's honesty on the application subject to factual dispute. (Resp. SUF ¶ 488; SAMF ¶¶ 832-33)<br>• <u>Not opinion</u>: Whether the SMOC was misleading with the Town is capable of being proved false. |

| 20d | On the STEPPS site: The cost of educating "just 25 children SMOC will bring to Framingham to live in the Sage House if it is moved to 517 Winter Street" will be "over $6 million over twenty years. How many non-Framingham school children are living in tax-exempt properties being educated at others' expense?" (SAMF ¶ 840) | • Not "of and concerning" SMOC<br>• True<br>• Opinion, rhetoric<br>• Not defamatory | • <u>Of and concerning</u>: SMOC is referred to by name, and the stated costs are based on Sage House.<br>• <u>Truth disputed</u>: Factual dispute as to educational costs created by SMOC institutions. (SAMF ¶¶ 754-59, 842)<br>• <u>Not opinion</u>: Costs can be proven false.<br>• <u>Arguably defamatory</u>: Could be read as accusing SMOC of having negative effects on the Town. |
| --- | --- | --- | --- |
| 20e | On the STEPPS site, under a photograph of the Winter Street property: "Will SMOC turn this lovely historic property on a quiet residential street into a homeless drug rehab shelter?" (SAMF ¶ 816) | • True<br>• Opinion, rhetoric<br>• Not defamatory | • <u>Truth disputed</u>: SMOC disputes whether Sage House is a "drug rehab shelter," rather than a residence for those already in recovery.<br>• <u>Not opinion</u>: The statement implies that SMOC plans to use the property as a "drug rehab center," which is capable of being proved false.<br>• <u>Arguably defamatory</u>: A reasonable reader could understand this as holding SMOC up to contempt for bringing a wet shelter into a residential neighborhood. |
| 20f | On the STEPPS site, under a photograph of the Winter Street property: SMOC "wants to turn this property into a drug rehab shelter and flood our quiet neighborhood of single family homes with transients, many addicted to heroine." (SAMF ¶ 816) | • True<br>• Opinion, rhetoric | • <u>Truth disputed</u>: See Adams's Statement No. 20e *supra*.<br><br>• <u>Not opinion</u>: See Adams's Statement No. 20e *supra*. |

-h-

| 20g | The "proposed drug rehab shelter at 517 Winter Street is the same one that was found to be operating a drug running operation to a state prison." (SAMF ¶ 816) | • True | • <u>Truth disputed</u>: Factual disputes over both the status as a "drug rehab shelter" and the "drug running operation." |
|---|---|---|---|
| 21 | On Aug. 16, 2007, on the STEPPS website: "STEPPS joins the rest of Framingham in mourning the passing of Jerry Desilets, former Town Moderator and SMOC's director of policy and planning." (SAMF ¶ 506) | • Not "of and concerning" SMOC | • <u>Of and concerning</u>: This could be understood as a statement about SMOC.<br><br>• <u>Rhetoric</u>: This is not a statement of truth, as there is no indication that Adams believed Desilets to have died, but rather a rhetorical statement. |

| ESTY'S STATEMENTS | | |
|---|---|---|
| 1 | In a quoted statement from *MetroWest Daily News* article on Dec. 31, 2005, regarding a contract between SMOC and the DOC:  "I think this exposes the fact that there is an underlying plan . . . for designating Framingham as a place that would be suitable for centering a large population of arsonists, sex offenders and criminals." (SAMF ¶¶ 883, 904) | • True | • <u>Truth disputed</u>: See Adams's Statement No. 7a *supra*. |
| 2 | At a May 1, 2007 Town Meeting regarding the lodging house amendment: "I would like to address the question of due diligence in checking out the lodgers. That stems from the fact that it was uncovered that one of the agencies in Town has a contract with the Department of Corrections to house arsonists, sex offenders and criminals . . . . The due diligence concerns the check with CORI, which is a criminal record check on potential lodgers. And one of the reasons why we wanted to make sure that that was mentioned was that in the narrative when this particular non-profit looks for the contract with the Department of Corrections, they spelled out how they would train people to urge landlords to NOT check CORIs . . . well, I know you'd rather we didn't speak about this but it is very real in our community . . . ."  (SAMF ¶ 904) | • True | • <u>Truth disputed</u>: See Adams's Statement No. 7a *supra*. |

| 3 | In a *MetroWest Daily News* article on Sept. 29, 2006, regarding SMOC's decision to close the Common Ground Shelter, Esty is quoted as making several statements: (1) that they did so due to "the threat of legal action," (2) that "[t]hey avoided a test case that would affect siting for similar buildings across the state. They've had pressure before, which they've ignored, so there has to be another reason why they're closing the shelter at this point." (SAMF ¶ 953) | • True<br>• Not defamatory | • <u>Truth disputed</u>: Factual dispute as to the reasons that SMOC decided to close the Common Ground Shelter. (SAMF ¶¶ 669, 692.)<br>• <u>Arguably defamatory</u>: A reasonable reader could understand this to suggest that Common Ground Shelter was operated unlawfully, and that SMOC feared sanction if the shelter remained open. |
| --- | --- | --- | --- |
| | **GIOMBETTI'S STATEMENT** | | |
| 1 | On Oct. 5, 2006, the *MetroWest Daily News* quoted Giombetti as saying that SMOC closed the Common Ground Shelter because it was "intimidated by the possibility of a lawsuit." (SAMF ¶ 954) | • True<br>• Not defamatory | • <u>Truth disputed</u>: See Esty's Statement No. 3 *supra*.<br>• <u>Arguably defamatory</u>: See Esty's Statement No. 3 *supra*. |

| LAURORA'S STATEMENT | | |
|---|---|---|
| 1 | From an Apr. 14, 2007 post on the Frambors website: "It's interesting that Framingham town government at first rejected, then blessed and voted to give SMOC drug dealing employees a larger environment to ply their trade. As Jim Hanrahan, SMOC's lawyer and a SMOC Executive Board of Directors member says, 'There's no gratification other than the fact that the town is finally abiding by the law in granting this permit.' My question to Jim is, 'Are your employees at least paying taxes on drugs they're peddling?'" (SAMF ¶ 950) | • Not "of and concerning" SMOC<br>• Opinion | • <u>Of and concerning</u>: Statements about SMOC's employees could be read as also a statement about SMOC.<br>• <u>Not opinion</u>: Statement was a response to a prior post, not a statement averring the truth of the prior post. But a jury could find that Laurora effectively republished the statement of the alleged fact. |

| ORR'S STATEMENTS | | | |
|---|---|---|---|
| 1 | On May 21, 2005, Orr posted statements emailed to him by an anonymous Town employee, including the following statements: (1) that the Town's education budget increases "with every student enrolled who now list [sic] their home as Framingham"; (2) "SMOC has contributed to the entire downfall of Framingham by bringing other communities['] problem people to our town for the mere sake of assisting SMOC to sustain themselves . . . . We now have sex offenders calling their SMOC residences home where they are unknown to most residents, convicted criminals now in town where they are also unknown"; (3) "We have now had our property taxes increased, our children charged money for simply riding the school bus to school, . . . because of SMOC induced infiltration." (SAMF ¶ 846) | • Not authored by Orr<br>• Not "of and concerning" SMOC<br>• True<br>• Opinion<br>• Not defamatory | • <u>Not authored by Orr</u>: Orr could be liable for a republished defamatory statement that was sent to him and which he republished. *Jones v. Taibbi*, 512 N.E.2d 260, 264 (Mass. 1987).<br>• <u>Of and concerning</u>: SMOC is referred to explicitly.<br>• <u>Truth disputed</u>: SMOC's effects on education expenses and its alleged targeting of sex offenders are both genuine issues of material fact. (SAMF ¶¶ 754-59, 842; Resp. SUF ¶¶ 422, 424)<br>• <u>Not opinion</u>: The statement includes empirical claims that are capable of being proved false.<br>• <u>Arguably defamatory</u>: A reasonable reader could understand the statement as casting shame and contempt on SMOC for targeting sex offenders for residence in the Town. |
| 2 | In a Frambors post on May 15, 2006: SMOC was "troll[ing] the prison system to look for arsonists and sex criminals to bring to Framingham . . . ." (SAMF ¶¶ 889, 899) | • True | • <u>Truth disputed</u>: See Adams's Statement No. 7a *supra*. |

| 3 | In a May 23, 2006 Frambors post, regarding SMOC's contract with the Department of Corrections: Town residents should put up signs saying "Welcome To All Rapists And Arsonists"; and "Framingham is not putting our children in danger. That honorific goes to the Dept of Corrections and possibly/probably to the agencies that elect to engage in this type of business in our neighborhoods." (SAMF ¶¶ 890, 890) | • Not "of and concerning" SMOC <br> • Opinion | • <u>Of and concerning</u>: The full post makes multiple references to SMOC, indicating that "agencies" here signify SMOC. <br> • <u>Not opinion</u>: The statement makes the factual claim that agencies and the DOC brought these groups to the neighborhood, which is capable of being proved false. |
| 4 | On June 6, 2006: SMOC's "attempt to take over 517 Winter . . . will place a continuing drain on property values . . . [and] would further drain the resources of our educational system." (SAMF ¶ 852) | • Opinion | • <u>Opinion</u>: A statement about the probable economic effect of the Sage House relocation is a matter of opinion, which at the time the statement is not capable of being proved true or false. |
| 5 | On July 3, 2006: SMOC made clients call from a payphone when they needed medical assistance to "cut down the already huge number of calls for assistance that were already happening"; and the contract with the DOC "basically called for SMOC to troll the prison system looking for the worst violent offenders who needed help finding housing. Of course, SMOC has an 'in' at finding housing for violent offendors [sic] since it maintains an entire department of people who specialize in maintaining a database of landlords who are known to not conduct CORI checks." (SAMF ¶ 899) | • True | • <u>Truth disputed</u>: No evidence indicates that SMOC staff directed calls to be made in a particular way (Resp. SUF ¶ 522), and SMOC adduces evidence that SMOC does not seek landlords who do not perform CORI checks (SAMF ¶¶ 874-76). |

| 6 | On Feb. 2, 2007: "SMOC has an entire division devoted to housing. This division maintains a database of landlords who are known to not conduct CORI checks." Orr stated that SMOC was probably "unhappy" with negative publicity because it "caused a delay in getting the next substance abuser, sex offendor [sic], arsonist, or other violent offendor [sic] to enter the continuum of destruction." (SAMF ¶ 899) | • True<br>• Opinion | • <u>Truth disputed</u>: Evidence disputes that SMOC had such a database. (SAMF ¶ 875)<br>• <u>Not opinion</u>: The statement about SMOC's probable unhappiness is opinion, but the first part of the statement regarding the landlord database is not. |
|---|---|---|---|
| 7 | On Feb. 15, 2007: "On an almost daily basis, we have crime being handled by our police force, committed by people who have been brought here by the social service agencies." (SAMF ¶ 899) | • Not "of and concerning" SMOC<br>• True<br>• Opinion | • <u>Of and concerning</u>: This could be read as concerning SMOC as the heading was "Another model SMOC client living in Framingham." (Orr Aff. Ex. A at 11-12)<br>• <u>Truth disputed</u>: Factual disputes as to the criminal conduct of SMOC residents.<br>• <u>Not opinion</u>: The statement is an empirical claim, capable of being proved false. |
| 8 | On Feb. 17, 2007: Residents could learn of "all the criminals being injected into our town by the agencies" by "subtract[ing] all of the dislocated elbows" from the SSA Watch report, and that "SMOC (as one example) maintains a database of landlords whom are known to not conduct CORI checks." (SAMF ¶ 899) | • True<br>• Opinion | • <u>Truth disputed</u>: See Orr Statement No. 5 *supra*.<br>• <u>Not opinion</u>: The database comment is an empirical statement, capable of being proved false. |

| 9 | In a Frambors post on Mar. 22, 2007: SMOC "troll[s] the cities, the prisons, everywhere they can to find substance abusers and violent criminal offenders to place them here in Framingham. Once they're here, they get some of the help they need in a 'program' which lasts for some period (maybe 6 weeks, 6 months, whatever) and then they graduate to the next program in their COC. That opens a spot in the previous program, which is then occupied by the next wino . . . ." (SAMF ¶ 899) | • Not "of and concerning" SMOC<br>• True | • <u>Of and concerning</u>: A reasonable reader could have concluded that the statement referred to SMOC, given the content of the statement and its parallels in other statements about SMOC.<br>• <u>Truth disputed</u>: See Adams's Statement Nos. 8, 11 *supra*. |
| 10 | On Apr. 14, 2007: Sage House is a "program for drug addicts from out of town . . . with their children being placed into our . . . school system at $13K per, with a substantial percentage of the employees who are 'former' substance abusers being run by a company that is not willing to do an excellent job of running the operation, in a neighborhood that is terrified of loss of property value, on a lot that could allow more programs to be built, being run partly by former drug addicts who went to far and [sic] to actually deal drugs." (SAMF ¶¶ 854, 947) | • True<br>• Opinion | • <u>Truth disputed</u>: Existence of drug dealing is disputed (SAMF ¶¶ 921, 926-27); effect on education costs is disputed (SAMF ¶¶ 754-59, 842).<br>• <u>Not opinion</u>: The factual assertions in the statement are capable of being proved false. |

| 11 | On a June 17, 2007 Frambors post: "What SMOC is trying to do to the Winter St. neighborhood is to make money off of substance abusers, which is a polite word for heroin, crack, methamphetamines, crank, etc. . . . Things like some of the aforementioned drugs will make you a hopeless addict after at most just a few experiences. . . . What SMOC is looking at acquiring as clientele are the so-called 'recovering substance abusers' who are running at a whopping 66% recidivism rate. These people have histories of violent crime, prostitution, burglary, but no matter how you look at it, unless they have a nice trust fund, the drugs cost money and whatever it takes to get that money is how the drugs get paid for (Hopefully, the staff people of Sage House at 517 Winter won't be involved in actually supplying drugs like the staff at Sage House on Clinton St did to the Shirley Prison.)" (SAMF ¶¶ 857, 947) | • True | • <u>Truth disputed</u>: Drug smuggling allegations are disputed (SAMF ¶¶ 921, 926-27); criminal history and recidivism rate of residents is disputed or not established (SAMF ¶ 858). |
|----|----|----|----|
| 12 | On a Frambors post on June 26, 2007: There is a "long list of violent offenders that SMOC either has as clientele or wishes they had." (SAMF ¶ 899) | • True<br>• Not defamatory | • <u>Truth disputed</u>: SMOC disputes characterization of programs as being for "violent offenders." (Resp. SUF ¶ 545; SAMF ¶¶ 868-69, 896)<br>• <u>Arguably defamatory</u>: A reasonable reader could read statement as expressing contempt for SMOC in wanting to bring violent offenders into the community. |

| 13 | In a June 27, 2007 Frambors post, commenting on recent breaking and entering on Winter Street: tied suspect to SMOC's "Ready Able Willing" and other day labor programs and accused SMOC of allowing program to "run with no discrimination as to who is viable for candidacy in this program"; stated that SMOC runs "multiple programs that bring violent offenders into Framingham as they get released from prisons all over the state." (SAMF ¶ 899) | • True | • <u>Truth disputed</u>: See Orr's Statement No. 12 *supra*. |
| 14 | On July 11, 2007: "SMOCs [sic] CORI responsibilities, as outlined by DPH General Counsel to all vendors, were ignored and 25% of all Sage House employees were in violation of state regulations. SMOC chose not to inform DPH of these violations. SMOC safety violations at the Sage House were strictly against DPH safety rules and regulations. Some Sage House employees were working 15-17 hour shifts that are against recommendations of DPH. . . ."; and "SMOC turned a blind eye to their funding source and even lied to them in their attempts to keep DPH out of the loop on the Sage House drug smuggling." (SAMF ¶ 947) | • True | • <u>Truth disputed</u>: Safety violations and SMOC's obligations to inform DPH are disputed. (Resp. SUF ¶¶ 185, 557-58; SAMF ¶¶ 921, 926-27) |